**CONSOLIDATED CASE NOS. 09-16676, 09-16677, 09-16679, 09-16682, 09-16683, 09-16684, 09-16685, 09-16686, 09-16687, 09-16688, 09-16690, 09-16691, 09-16692, 09-16693, 09-16694, 09-16696, 09-16697, 09-16698, 09-16700, 09-16701, 09-16702, 09-16704, 09-16706, 09-16707, 09-16708, 09-16709, 09-16710, 09-16712, 09-16713, 09-16717, 09-16719, 09-16720, 09-16723**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION**
**MDL NO. 06-1791-VRW**

---

**NO. 09-16676**

**TASH HEPTING, GREGORY HICKS, CAROLYN JEWEL, AND ERIC KNUTZEN,**
**ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,**

**PLAINTIFFS-APPELLANTS,**

**V.**

**AT&T CORPORATION, AT&T, INC.,**

**DEFENDANTS-APPELLEES,**

**AND**

**UNITED STATES OF AMERICA,**

**DEFENDANT-INTERVENOR-APPELLEE.**

---

**AND CONSOLIDATED CASES**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
THE HONORABLE VAUGHN R. WALKER, CHIEF UNITED STATES DISTRICT JUDGE, PRESIDING

---

# JOINT APPELLANTS' OPENING BRIEF OF ALL PLAINTIFFS-APPELLANTS *EXCEPT* NO. 09-16683

**(PRIOR APPEAL: Nos. 06-17132, 06-17137 (Pregerson, Hawkins, McKeown, Js.))**

---

**[*COUNSEL LISTED ON SIGNATURE PAGE*]**

# TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**QUESTIONS PRESENTED** .......... **2**

**STATEMENT OF FACTS** .......... **3**

**JURISDICTIONAL STATEMENT** .......... **6**

**STATEMENT OF THE CASE** .......... **6**

**SUMMARY OF ARGUMENT** .......... **8**

**ARGUMENT** .......... **11**

- **I. Standard Of Review** .......... **11**
- **II. The Structure Of Section 802** .......... **11**
- **III. Section 802 Violates The Lawmaking Procedures Of Article I, Section 7 Of The Constitution Because It Gives The Attorney General Plenary Power To Nullify And Preempt Existing Law** .......... **13**
  - A. Only Congress Can Negate Previously-Enacted Law .......... 13
  - B. Section 802 Violates The Lawmaking Procedures Of Article I, Section 7 .......... 16
  - C. The *Clinton* Court's Analysis Of *Marshall Field & Co. v. Clark* Demonstrates The Unconstitutionality Of Section 802 .......... 22
- **IV. Section 802 Violates The Nondelegation Doctrine Because It Delegates Lawmaking To The Executive Without Any "Intelligible Principle"** .......... **26**
  - A. Section 802 Lacks Any Intelligible Principle To Which The Attorney General Must Conform In Deciding Whether To File A Certification .......... 26
  - B. This Case Is Unlike The Usual Nondelegation Case In Which Congress Has Provided Standards For The Executive In The Statutory Text .......... 29

C. Legislative History Cannot Supply The Intelligible Principle That Section 802 Lacks .................................. 31

**V. Section 802(a) Violates Due Process By Denying Plaintiffs A *De Novo* Decision By An Unbiased Adjudicator ............ 36**

A. Section 802 Deprives Plaintiffs Of Liberty And Property Interests Protected By The Due Process Clause.......................................................................... 36

B. Section 802(a) Denies Plaintiffs A *De Novo* Decision By An Unbiased Adjudicator........................................ 37

1. Attorney General Mukasey Did Not Provide Plaintiffs With Due Process ................................ 39

2. Section 802's Constraints Denied The District Court The Power To Provide Plaintiffs With Due Process ............................................................ 41

**VI. Section 802(c) Violates Due Process By Denying Plaintiffs Meaningful Notice Of The Government's Basis For Seeking Dismissal And A Meaningful Opportunity To Oppose The Government's Arguments And Evidence ...... 46**

**VII. Section 802 Unconstitutionally Interferes With The Judicial Branch's Adjudication Of These Cases................. 53**

**VIII. Section 802 Violates The Separation Of Powers And Due Process Because It Prohibits The Adjudication In Any Federal Or State Forum Of Plaintiffs' Constitutional Claims For Injunctive Relief................................................ 57**

**CONCLUSION ........................................................................... 63**

**STATEMENT OF RELATED CASES ...................................... 73**

**ADDENDUM OF RELEVANT STATUTORY PROVISIONS............ 74**

# TABLE OF AUTHORITIES

**Cases**

*Abrego v. Dow Chemical Co*., 443 F.3d 676 (9th Cir. 2006)................ 31, 34

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) .................................... 60

*Al Haramain Islamic Foundation v. Bush*, 507 F.3d 1190 (9th Cir. 2007).... 6

*Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832 (2d Cir. 1930)............. 59

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ............................................. 21

*Alpha Epsilon Phi Tau v. City of Berkeley*, 114 F.3d 840 (9th Cir. 1997)... 40

*American Federation of Government Employees Local 1 v. Stone*, 502 F.3d 1027 (9th Cir. 2007) ......................................................................... 60

*American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir. 1995)........................................................................................... 50, 51

*Bane v. Spencer*, 393 F.2d 108 (1st Cir. 1968)........................................... 50

*Bartlett v. Bowen*, 816 F.2d 695 (D.C. Cir. 1987)....................................... 62

*Bell v. Hood*, 327 U.S. 678, 684 (1946) ...................................................... 60

*Berger v. New York*, 388 U.S. 41 (1967)...................................................... 52

*Boumediene v. Bush*, 533 U.S. ___, 128 S.Ct. 2229 (2008)............ 15, 44, 45

*Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986).. 61

*Brock v. Roadway Express, Inc*., 481 U.S. 252 (1987) ............................... 47

*Caperton v. A. T. Massey Coal Co.*, __ U.S. __, 129 S.Ct. 2252 (2009) ..... 40

*Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) ............................................................................................................ 32

*City of New York v. Beretta*, 524 F.3d 384 (2d Cir. 2008) .......................... 17

*Clements v. Airport Authority of Washoe County*, 69 F.3d 321 (9th Cir. 1995) ........ 39

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) ........ 47

*Clinton v. City of New York*, 524 U.S. 417 (1998) ........ passim

*Concrete Pipe & Products v. Construction Laborers Pension Trust*, 508 U.S. 602 (1993) ........ passim

*Connecticut National Bank v. Germain*, 503 U.S. 249 (1992) ........ 32

*Cooper v. United States Postal Service*, 577 F.3d 479 (2d Cir. 2009) ........ 60

*Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ........ 60

*Crim v. Handley*, 94 U.S. 652, 657 (1876) ........ 56

*Duncan v. Louisiana*, 391 U.S. 145 (1968) ........ 36

*Edison Co. v. Labor Board*, 305 U.S. 197 (1938) ........ 57

*Exxon Mobil Corp. v. Allapattah Services*, 545 U.S. 546 (2005) ........ 35

*Fields v. Legacy Health System*, 413 F.3d 943 (9th Cir. 2005) ........ 37

*Flores-Miramontes v. I.N.S.*, 212 F.3d 1133 (9th Cir. 2000) ........ 61

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ........ 39, 47, 50, 53

*Goss v. Lopez*, 419 U.S. 565 (1975) ........ 49

*Grace v. Collector of Customs*, 79 F. 315 (9th Cir. 1897) ........ 35

*Greenya v. George Washington University*, 512 F.2d 556 (D.C. Cir. 1975) 60

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ........ 38, 43, 44, 47

*Hepting v. AT&T Corp.*, 439 F.Supp.2d 974 (N.D. Cal. 2006) ........ 4

*Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) ........ 51

*Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964) ........ 50

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) .................................................. 14, 15

*Ileto v. Glock*, 565 F.3d 1126 (9th Cir. 2009) ................................ 17, 25, 46

*In re Murchison*, 349 U.S. 133 (1955)........................................................ 39

*J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928).............. 23

*Katz v. United States*, 389 U.S. 347 (1967)................................................ 52

*Kenneally v. Lungren*, 967 F.2d 329 (9th Cir. 1992) .................................. 41

*Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y. 1975) ......................................... 51

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ................................ 35

*Leisek v. Brightwood Corp*., 278 F.3d 895 (9th Cir. 2002)......................... 11

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)................................ 37

*Loving v. United States*, 517 U.S. 748 (1996) ............................................ 27

*Lynn v. Regents of University of California*, 656 F.2d 1337 (9th Cir. 1981) ........................................................................................ 48, 49

*Marbury v. Madison*, 5 U.S. 137 (1803)................................................ 58, 61

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892)............................ 22, 23

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) .......................................... 42

*Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252 (1991) ........................................................ 25

*Mistretta v. United States*, 488 U.S. 361 (1989)............................ 27, 29, 31

*Morgan v. United States*, 304 U.S. 1 (1938) .............................................. 48

*Northwest Environmental Defense Center v. Bonneville Power Administration*, 477 F.3d 668 (9th Cir. 2007).................................... 34, 35

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)................................... 29

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) .......................... 55, 57

*Printz v. United States*, 521 U.S. 898 (1997) ............................................. 21

*Robertson v. Seattle Audubon Society*, 503 U.S. 429 (1992) .......... 17, 18, 25

*Rodriguez v. United States*, 480 U.S. 522 (1987)........................................ 36

*Ryan v. Commissioner of Social Security*, 528 F.3d 1194 (9th Cir. 2008)... 43

*Shannon v. United States*, 512 U.S. 573 (1994) .......................................... 34

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) ............ 60

*Stivers v. Pierce,* 71 F.3d 732 (9th Cir. 1995) ............................................ 40

*Touby v. United States*, 500 U.S. 160 (1991) ............................ 26, 27, 30, 31

*Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478 (1988) 37

*United States v. Lujan*, 504 F.3d 1003 (9th Cir. 2007) ................................ 11

*United States v. United States District Court (Keith)*, 407 U.S. 297 (1972) 52

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951)......................... 43

*Webster v. Doe*, 486 U.S. 592 (1988)........................................................... 61

*West Ohio Gas Co. v. Public Utilities Commission (No. 1),* 294 U.S. 63 (1935) ........................................................................................... 48

*West Virginia University Hospitals v. Casey*, 499 U.S. 83 (1991)............... 32

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001).... 26, 27, 29, 30

*Wyeth v. Levine*, ___ U.S. ___, 129 S.Ct. 1187 (2009)................................ 21

*Yakus v. United States*, 321 U.S. 414 (1944)........................................ 27, 28

**Federal Constitutional Provisions**

U.S. Constitution, art. I, § 1 ........................................................................ 14

U.S. Constitution, art. I, § 7 ................................................................ passim

U.S. Constitution, art. VI, cl. 2 .................................................................... 21

**Federal Statutes**

15 U.S.C. § 7902 .......... 17

18 U.S.C. § 2511 .......... 7

18 U.S.C. § 2520 .......... 7, 19, 20, 24

18 U.S.C. § 2702 .......... 7

18 U.S.C. § 2707 .......... 7, 19, 20, 24

18 U.S.C. App. (Classified Information Procedures Act) .......... 52

21 U.S.C. § 811 .......... 30

21 U.S.C. § 811 .......... 30

21 U.S.C. § 812 .......... 31

28 U.S.C. § 1291 .......... 6

28 U.S.C. § 1331 .......... 6, 19

28 U.S.C. § 1332 .......... 6

28 U.S.C. § 1367 .......... 6

28 U.S.C. § 1441 .......... 6

42 U.S.C § 7408 .......... 30

47 U.S.C. § 605 .......... 7, 19, 20, 24

50 U.S.C. § 1806(f) .......... 52

50 U.S.C. § 1809 .......... 7

50 U.S.C. § 1810 .......... 7, 19, 20, 24

50 U.S.C. § 1885a(f) .......... 6

50 U.S.C. § 1885a, section 802 of the Foreign Intelligence Surveillance Act ("FISA") .......... passim

**Federal Rules**

Fed. R. App. Pro. 3(a)(1)(B) ........ 6

Fed. R. Civ. Pro. 12(d) ........ 8

**State Constitutional And Statutory Provisions**

California Constitution, art. I, §1 ........ 7

California Public Utilities Code § 2891 ........ 7

**Legislative Reports**

S. Rep. No. 110-209 (2007) ........ 31, 32, 33

Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities and the Rights of Americans, S. Rep. No. 94-755, Book II (1976) ........ 59

**Other Authorities**

*The Federalist* No. 78 (Alexander Hamilton) ........ 54

## INTRODUCTION

Every day, hundreds of millions of Americans entrust their most private and sensitive communications to our nation's telecommunications carriers. The carriers are the guardians of their customers' privacy. Not only are they paid to protect the privacy of their customers' communications, but also federal and state law prohibit the carriers from disclosing the contents and records of their customers' communications except as authorized by law.

The telecommunications carriers that are defendants in these lawsuits betrayed that trust. Eight years ago, the Executive branch and the telecommunications carrier defendants defied the law and began a vast, secret dragnet surveillance program in which the carriers turned over to the Executive the domestic communications and communications records of millions of innocent Americans.

Plaintiffs, customers of the telecommunications carrier defendants, brought federal constitutional and statutory causes of action and state constitutional, statutory, and common-law causes of action against the carriers challenging their participation in the unlawful dragnet surveillance. This is an appeal from the dismissal of plaintiffs' lawsuits.

The district court dismissed these actions pursuant to a statute unprecedented in the history of our Republic, section 802 of the Foreign Intelligence Surveillance Act. In section 802, Congress did not unconditionally abolish liability in a defined class of cases, as it has done in

numerous statutes. Instead, Congress gave the Attorney General the unreviewable discretion to nullify existing law and compel dismissal of any lawsuit falling within the scope of section 802 by filing a secret certification with the district court. By choosing to file a certification here, Attorney General Mukasey nullified existing federal and state law imposing liability for unlawful surveillance so that it no longer applied to these lawsuits. If Attorney General Mukasey had chosen not to file a certification, these lawsuits would have continued to be governed by existing law, section 802 would not apply to the lawsuits, and no dismissal under section 802 would have been possible.

In section 802, Congress ceded to the Executive unconstrained power to nullify existing law, to intrude into the proper spheres of both Congress and the Judiciary, and to ignore basic notions of due process. It is not surprising that a law this radical and unprecedented violates a number of fundamental constitutional principles.

## QUESTIONS PRESENTED

1. Does section 802 violate the lawmaking procedures of Article I, section 7 of the Constitution by empowering the Attorney General to nullify existing federal law and preempt existing state law governing these actions?

2. Does section 802 violate the nondelegation doctrine by failing to provide the Attorney General with any standard or intelligible principle for deciding whether or not to file a certification in actions that meet the statutory prerequisites?

3. Does section 802 deny plaintiffs procedural due process by depriving them of their liberty and property interests without a hearing conducted by an unbiased adjudicator empowered to decide *de novo* whether they should be deprived of their interests?

4. Does section 802 deny plaintiffs procedural due process by depriving them of their liberty and property interests without an adequate opportunity to know and challenge the evidence and arguments presented against them?

5. Does section 802 violate the separation of powers by limiting judicial review to deferential, "substantial evidence" review of the Attorney General's certification while denying to the Judiciary the power to independently review the fairness and procedural regularity of the Attorney General's decisionmaking process?

6. Is section 802 unconstitutional as applied to plaintiffs' federal constitutional claims seeking injunctive relief against the telecommunications carrier defendants because it denies plaintiffs any federal or state judicial forum for those claims?

Pertinent statutory provisions are set forth in an addendum to this brief.

## STATEMENT OF FACTS

Plaintiffs' claims center on two categories of ongoing unlawful activities by the telecommunications carrier defendants: the dragnet surveillance in which the carriers acquire and turn over to the government

the domestic communications of millions of Americans, and the carriers' mass disclosure to the government of the communications records of millions of Americans.

The telecommunications dragnet involves the mass, indiscriminate diversion to the government by the telecommunications carrier defendants of the communications transiting their domestic telecommunications facilities. ER 483-84; *Hepting v. AT&T Corp.*, 439 F.Supp.2d 974, 986-90 (N.D. Cal. 2006). In San Francisco, for example, AT&T has installed special fiber-optic "splitters" in its Folsom Street facility. ER 323-26, 358-64, 369-72, 469-71, 491-96. The Folsom Street facility handles telecommunications traffic from both AT&T's Internet network and from the "peer" networks of other telecommunications carriers with which AT&T has "peering links." *Id*. These networks use fiber-optic cables and laser light to carry the e-mail, VOIP voice communications, and other Internet communications of AT&T's customers, customers of "peer" networks, and other Internet users (communications on the Internet typically traverse many different networks in addition to the user's home network). *Id*. AT&T's splitters divide the light signal carrying telecommunications between AT&T and its peer networks, making two exact copies of every communication. *Id*. One copy travels on to its destination. *Id*. AT&T transmits the other copy to a room in its Folsom Street facility controlled by the National Security Agency that contains powerful special-purpose computers. *Id*.; ER 365-68. AT&T has similar installations in its facilities around the country. ER 326, 374-77.

The telecommunications carrier defendants have also indiscriminately disclosed to the government the communications records of millions of Americans. ER 484-91. AT&T, for example, has provided the government with its telephone communications record database called "Hawkeye" and its Internet communications record database called "Aurora." *Id.*; ER 56-58.

The unlawful surveillance program was first publicly disclosed in December 2005. Since then, additional details have continued to emerge. As part of the section 802 proceedings below, plaintiffs filed eight volumes of evidence (Dkt. 486 to 495), a separate summary of this evidence (ER 456), and supplemental declarations of additional disclosures as they occurred (ER 522, 529). The evidence includes the declarations of former AT&T employee Mark Klein and expert J. Scott Marcus, former Senior Advisor for Internet Technology to the Federal Communications Commission. ER 320, 345.

The most recent disclosures came in a July 2009 report by the Inspectors General of the Justice Department, Defense Department, Central Intelligence Agency, National Security Agency, and Office of the Director of National Intelligence ("IG Report").[1] The IG Report refers to the surveillance program as the "President's Surveillance Program." As the IG Report confirms, the "President's Surveillance Program" is far broader than the so-called "Terrorist Surveillance Program" this Court addressed in

---

[1] Available at <www.dni.gov/reports/report_071309.pdf>.

*Al Haramain Islamic Foundation v. Bush*, 507 F.3d 1190, 1192-93, 1198-1201 (9th Cir. 2007). *See* IG Report at 1-2, 5-6, 36-37; ER 508-11.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over these actions under 28 U.S.C. §§ 1331, 1332, 1367, and 1441. Two independent grounds of appellate jurisdiction exist. The district court's order of June 3, 2009 dismissing these actions is an appealable order under 50 U.S.C. § 1885a(f). The final judgments entered on July 21 and 22, 2009 are separately appealable under 28 U.S.C. § 1291. Plaintiffs' July 31, 2009 notice of appeal is timely with respect to both the order and the judgments. Fed. R. App. Pro. 3(a)(1)(B).

## STATEMENT OF THE CASE

These 33 actions were filed in 2006. The first-filed action, Hepting v. AT&T Corp. (No. 09-16676), was filed in the Northern District of California.[2] Twenty-eight of these actions were filed elsewhere; they were transferred to the Northern District and consolidated for pretrial proceedings with the Hepting action by the Judicial Panel on Multidistrict Litigation. ER 309-19. Four additional actions pending in the Northern District (two of which were removed from California state court) were consolidated with the

---

[2] Hepting v. AT&T Corp. was the subject of a prior interlocutory appeal. The Hepting panel (Pregerson, Hawkins & McKeown, Js.) retained jurisdiction over any subsequent appeals. 8/21/08 Order in Nos. 06-17132, 06-17137.

MDL proceeding by the district court. Nos. 09-16684, 09-16685, 09-16710, 09-16712.

Plaintiffs' complaints state claims against the telecommunications carrier defendants arising under federal constitutional and statutory law and state constitutional, statutory, and common law. For example, many of the complaints allege causes of action under the First and Fourth Amendments, the Foreign Intelligence Surveillance Act ("FISA") (50 U.S.C. §§ 1809, 1810), the Wiretap Act (18 U.S.C. §§ 2511, 2520), the Stored Communications Act provisions of the Electronic Communications Privacy Act (18 U.S.C. §§ 2702, 2707), and the Communications Act of 1934 (47 U.S.C. § 605). *See*, *e.g.*, ER 63-72, 112-14, 136-47, 184-93, 222-31, 265-75. Many of the complaints also allege causes of action under state law, presenting claims, for example, under the privacy guarantee of Article I, section 1 of the California Constitution, under section 2891 of the California Public Utilities Code, and under California common law for breach of contract. ER 87-90, 101-03, 148-50, 193-200, 232-43, 275-306. For purposes of the MDL proceedings, plaintiffs filed master consolidated complaints against the Sprint, MCI/Verizon, BellSouth, and Cingular groups of defendants. ER 117, 153, 203, 245. The claims against the AT&T group of defendants are found in the complaints in each action against those defendants. *See*, *e.g.*, ER 47, 78, 106.

After the enactment of section 802 of FISA, Attorney General Mukasey filed a section 802 certification in the district court (filing both a

public version and a secret, *ex parte* version which plaintiffs have never seen) asserting that plaintiffs' actions "fall within at least one provision contained in Section 802(a)(1)-(5)," and the government moved to dismiss these actions, or in the alternative for summary judgment, pursuant to section 802(a).[3] ER 431. Plaintiffs opposed the government's motion; the telecommunications carrier defendants submitted briefing in support of the government's motion. The district court requested supplemental briefing on the issue of whether section 802 violates the nondelegation doctrine. Dkt. 559. The district court granted the government's motion and entered judgment against plaintiffs. ER 1, 535-67. Although the district court described its order as a grant of the government's motion to dismiss, because the court relied upon disputed evidence outside the complaints, its order was a grant of summary judgment. Fed. R. Civ. Pro. 12(d).

## SUMMARY OF ARGUMENT

1. Section 802 is unconstitutional because it gives the Executive the power to negate the legal force and effect of the existing law governing plaintiffs' lawsuits. Article I, section 7 of the Constitution requires that any nullification of existing law must be decided by Congress and enacted using the process of bicameral passage and presentment. Section 802 transgresses that constitutional limitation by giving the Attorney General the

---

[3] Section 802 of FISA (herein "section 802" or "§ 802") was enacted as part of section 201 of the FISA Amendments Act of 2008, Public Law 110-261, 122 Statutes at Large 2436, and is codified at 50 U.S.C. § 1885a.

unconstrained power to decide whether to nullify existing federal and state law governing these actions. By filing his certification, Attorney General Mukasey negated the legal effect of existing federal and state law creating liability for unlawful surveillance. Section 802 is unlike other statutes in which Congress itself has unconditionally abolished liability in a designated class of cases. If Congress wants to change the legal force and effect of existing federal statutes and preempt state law so that plaintiffs no longer have any causes of action, it must do so itself.

2. Section 802 violates the nondelegation doctrine. Neither the text of section 802 nor its legislative history supply any standard or intelligible principle to guide the Attorney General's discretion in whether to file a certification in a lawsuit falling within the scope of section 802.

3. Section 802 violates due process because plaintiffs never received an adjudication by an unbiased adjudicator empowered to decide *de novo* whether they should be deprived of their liberty and property interests. Attorney General Mukasey was a biased decisionmaker; his decision that plaintiffs' lawsuits fell within the scope of section 802 and his separate decision to file a certification causing their dismissal were not adjudications because plaintiffs had no opportunity to participate in them. The district court, in turn, was forbidden by section 802 from adjudicating *de novo* whether plaintiffs should be deprived of their liberty and property interests. The district court could review Attorney General Mukasey's certification that plaintiffs' lawsuits fell within the scope of section 802 only under the

deferential "substantial evidence" standard of review and could not review at all his decision whether to file a certification.

4. Section 802 further violates due process because it required the district court to decide the government's motion on the basis of secret evidence and arguments that plaintiffs could not see and to which they could not meaningfully respond. Due process requires meaningful notice of the evidence and arguments of the opposing party and a meaningful opportunity to respond; plaintiffs received neither.

5. Section 802 violates the separation of powers because it provides the Attorney General's decision with the imprimatur of judicial review while denying the Judiciary the power to conduct any review of the process by which the Attorney General reached his decision. Highly deferential, "substantial evidence" review of the outcome of a decision, like that imposed by section 802, must be accompanied by independent review of the fairness and procedural regularity of the decisionmaking process. Deferential review alone is inconsistent with the integrity of the Judiciary as a co-equal branch of government.

6. Section 802 is unconstitutional because it denies plaintiffs any judicial forum for their First and Fourth Amendment claims for injunctive relief against the telecommunications carrier defendants. It is beyond the power of Congress and the Executive to deny any federal or state forum for a valid constitutional claim seeking injunctive relief against a party actively participating in unconstitutional conduct.

## ARGUMENT

### I. Standard Of Review

This Court reviews *de novo* both the constitutionality of a statute and a grant of summary judgment. *United States v. Lujan*, 504 F.3d 1003, 1005 (9th Cir. 2007) (constitutionality of a statute); *Leisek v. Brightwood Corp*., 278 F.3d 895, 898 (9th Cir. 2002) (summary judgment).

### II. The Structure Of Section 802

As the district court found, section 802 is *sui generis*. ER 10. It has no parallel in any other statute ever enacted by Congress because it gives the Attorney General power that Congress has never before in our history given to the Executive: the discretionary power to terminate litigation between private parties by nullifying the existing federal and state law giving rise to the causes of action.

Subsections (a)(1) through (a)(5) of section 802 define five categories of civil actions against electronic communications service providers for providing assistance to the intelligence community.[4] Subsection (a) of section 802 gives the Attorney General unlimited discretion to cause, or not to cause, the dismissal of any action falling within one of these five statutory categories. It provides that "a civil action may not lie or be maintained in a Federal or State court against any person for providing assistance to an element of the intelligence community, and shall be promptly dismissed, if

[4] The text of section 802 is set forth in the addendum.

the Attorney General certifies to the district court" that one of the five categories set forth in (a)(1) through (a)(5) is satisfied. § 802(a).

If the Attorney General chooses not to file a certification in an action falling within one of the five statutory categories, existing federal and state law creating liability for unlawful surveillance continues to govern the plaintiff's causes of action. If the Attorney General chooses to file a certification, he negates the legal force and effect of existing law so that it no longer applies to the plaintiff's causes of action. The plaintiff's causes of action no longer "lie or [may] be maintained" under existing law. § 802(a).

It is entirely up to the Attorney General's discretion whether or not to undertake a determination of whether a civil action falls within one of the five categories set forth in section 802. If the Attorney General does make a determination that the action falls within one of the five statutory categories, it is also entirely up to his discretion whether or not to file a certification in the district court and thereby negate the legal force and effect of the existing federal and state law governing the action. In the words of the district court, "section 802 contains no charge or directive, timetable and/or criteria for the Attorney General's exercise of discretion." ER 24.

If the Attorney General does choose to file a certification, his determination that a lawsuit falls within one of the five categories of subsections (a)(1) through (a)(5) of section 802 is reviewable by the district court under the deferential "substantial evidence" standard of review. § 802(b) ("A certification under subsection (a) shall be given effect unless

the court finds that such certification is not supported by substantial evidence . . . ."). However, the Attorney General's separate decision to exercise, or not to exercise, his power to file a certification in any particular lawsuit falling within one of the five statutory categories is completely unreviewable.

Section 802 is not limited to lawsuits challenging surveillance authorized by the President between 2001 and 2007 as described in subsection (a)(4), but may also be used in the future by the Attorney General, at his discretion, to dismiss other lawsuits challenging future unlawful surveillance. The Attorney General may do so by certifying that the surveillance was conducted pursuant to a court order, statutory certification, or statutory directive specified in subsections (a)(1) through (a)(3), regardless of whether the order, certification, or directive was valid and lawful under statutory and constitutional law.

## III. Section 802 Violates The Lawmaking Procedures Of Article I, Section 7 Of The Constitution Because It Gives The Attorney General Plenary Power To Nullify And Preempt Existing Law

### A. Only Congress Can Negate Previously-Enacted Law

Section 802 is unconstitutional because it authorizes the Executive to choose whether or not to negate previously-enacted federal law and to preempt state law. Congress's power to alter existing law is exclusive and cannot be shared with the Executive. The Constitution requires that any

change to the legal force and effect of previously-enacted law must be made by Congress in accordance with Article I, section 7's mandatory procedures for the enactment, amendment, and repeal of statutes, which include bicameral passage and presentment. *Clinton v. City of New York*, 524 U.S. 417, 437-41, 444-45 (1998). "Amendment and repeal of statutes, no less than enactment, must conform with Art. I." *I.N.S. v. Chadha*, 462 U.S. 919, 954 (1983).

Congress may not give to the Executive its exclusive power to change or negate the legal effect of statutes it has previously enacted because "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438. Instead, Congress must itself make the decision whether to change the legal effect of existing law, and must do so by enacting the change. *Clinton*, 524 U.S. at 438-41; *Chadha*, 462 U.S. at 954-55.

To permit the Executive rather than Congress to change or negate the effect of existing law would impermissibly transfer legislative power to the Executive in contravention of Article I, section 7. "These provisions of Art. I are integral parts of the constitutional design for the separation of powers." *Chadha*, 462 U.S. at 946. "[T]he Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions. . . . [T]he prescription for legislative action in Art. I, §§ 1, 7, represents the Framers' decision that the legislative power of the

Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *Id*. at 951.

The Constitution's separation of legislative from executive power "serves not only to make Government accountable but also to secure individual liberty." *Boumediene v. Bush*, 533 U.S. ___, 128 S.Ct. 2229, 2246 (2008). By requiring that any change to the legal effect of previously-enacted statutes must be made by Congress, Article I, section 7 forces Congress to take responsibility for those changes. It prohibits Congress from empowering the Executive to nullify, without the protections and accountability of the legislative process, the legislative choices previously made by Congress.

The Supreme Court applied the constitutional limitations imposed by Article I, section 7 in *Clinton*. At issue in *Clinton* was the Line Item Veto Act. That law gave the President unlimited discretion to "cancel" any individual appropriation in an appropriations statute, thereby depriving the portion of the statute containing the canceled appropriation of any " 'legal force or effect,' " although the rest of the statute remained effective. *Clinton*, 524 U.S. at 437-38. The Executive's action thus partially negated the legal effect that the appropriations statute would otherwise have. The Court held that "cancellations [of appropriations] pursuant to the Line Item Veto Act are the functional equivalent of partial repeals of Acts of Congress that fail to satisfy Article I, §7." *Id*. at 444.

Nor did it matter that Congress had intended to cede to the Executive its power to partially negate previously-enacted law: "The Line Item Veto Act authorizes the President himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7. The fact that Congress intended such a result is of no moment." *Clinton*, 524 U.S. at 445.

### B. Section 802 Violates The Lawmaking Procedures Of Article I, Section 7

Attorney General Mukasey's decision to change the legal force and effect of the existing law governing plaintiffs' lawsuits by filing a section 802 certification violates the lawmaking procedures of Article I, section 7.[5] Just as in *Clinton*, under section 802 it is the Executive, not Congress, that decides in its sole discretion whether to negate the existing federal and state law governing these actions. Just as in *Clinton*, where the President could partially repeal an appropriations bill on an appropriation-by-appropriation basis, under section 802 the Attorney General may partially repeal or preempt the substantive federal and state law governing electronic surveillance on a lawsuit-by-lawsuit basis.

Instead of giving over to the Attorney General its power to change the legal effect of existing law, Congress could have enacted a statute

[5] The district court never addressed plaintiffs' contention that section 802 violates Article I, section 7's requirements of bicameral passage and presentment.

unconditionally changing existing law and abolishing plaintiffs' causes of action. That is what Congress did, for example, in the statute giving gun manufacturers immunity from certain lawsuits. That statute provides:

> (a) In general. A qualified civil liability action may not be brought in any Federal or State court.
>
> (b) Dismissal of pending actions. A qualified civil liability action that is pending on the date of enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending.

15 U.S.C. § 7902. Unlike section 802's abdication of unlimited and standardless discretion to the Executive, the gun manufacturers' immunity statute does not grant any discretion to the Executive to decide whether to apply the statute in a particular lawsuit to nullify the governing law. Instead, Congress "set[] forth a new legal standard . . . to be applied to *all* cases." *Ileto v. Glock*, 565 F.3d 1126, 1139 (9th Cir. 2009) (emphasis added); *accord, City of New York v. Beretta*, 524 F.3d 384, 395 (2d Cir. 2008) (gun manufacturers' immunity statute "sets forth a new legal standard to be applied to all actions")). Because Congress left no discretion in the statute's application but instead mandated that the gun manufacturers' immunity statute "appl[y] generally to all cases, both pending and future," the statute does not violate the separation of powers. *Ileto*, 565 F.3d at 1139.

Congress similarly changed the legal effect of existing law in the statute at issue in *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 438-41 (1992). In that case, Congress itself made the decision that timber

sales in certain national forests, which were being challenged in pending lawsuits, should be subject to a different legal standard from the standard that federal environmental laws otherwise imposed, and it enacted a statute that unconditionally said so. *Id.* (noting "the imperative tone of the provision, by which Congress 'determined and directed' that compliance with two new provisions would constitute compliance with five old ones"). It was Congress, and not the Executive, that made the decision to "amend applicable law" to change the legal standards governing the pending lawsuits. *Id*. at 441. The Executive had no power to choose whether the lawsuits would be governed by prior law or the new law.

Here, by contrast, Congress avoided the ultimate decision of whether to nullify existing law governing these actions, instead unconstitutionally depositing its legislative powers into the hands of the Attorney General unconstrained by any limiting principle. The enactment of section 802 did not change the legal force or effect of a single word of the law establishing the causes of action that plaintiffs have sued upon. The day after the President signed the FISA Amendments Act of 2008 ("FISAAA"), the legal force and effect of the law governing those causes of action remained the same and continued to apply to these actions in exactly the same manner as it had applied the day before the President signed FISAAA. In the words of the government and the telecommunications carrier defendants: "Nothing in the Act requires the Attorney General to exercise his discretion to make the authorized certifications, and until he actually decides to invoke the

procedures authorized by Congress, the Act would have no impact on this litigation." Dkt. No. 466 at 22 n.16. Thus, *Congress* did not nullify the law governing plaintiffs' causes of action.

Instead, it is Attorney General Mukasey who has nullified the law. We first address plaintiffs' federal-law causes of action. By the act of filing certifications in the district court, the Attorney General has functionally repealed, in part, the federal statutes governing plaintiffs' lawsuits long after Congress enacted FISAAA and the President signed it. The legal force and effect of the statutes governing plaintiffs' federal causes of action is different today than it was the day before Attorney General Mukasey filed his certification. Plaintiffs' lawsuits no longer "lie or [may] be maintained" under those statutes. § 802(a). For these lawsuits only, the Attorney General has functionally repealed the statutory causes of action set forth in 18 U.S.C. §§ 2520, 2707, 47 U.S.C. § 605, and 50 U.S.C. § 1810 by negating the application of those statutes to plaintiffs' lawsuits. Those statutes now exclude plaintiffs' lawsuits from their scope and no longer create any cause of action or impose any liability on the telecommunications carrier defendants. For plaintiffs' claims arising under the Constitution, the Attorney General has functionally repealed 28 U.S.C. § 1331, which would otherwise give the district court the power to hear plaintiffs' constitutional claims. The Attorney General has also eliminated state-court jurisdiction over plaintiffs' federal constitutional claims.

Section 802 violates Article I, section 7's procedures for nullifying existing federal statutes because it is the Executive, and not Congress, that decided to change the legal effect of those statutes in these actions. Like the President's cancellation of enacted appropriations in *Clinton*, it is the Attorney General's certification, not Congress' enactment of section 802, that deprives the federal statutes under which plaintiffs sued of any " 'legal force or effect' " (*Clinton*, 524 U.S. at 438) in these lawsuits. The certification is thereby "the functional equivalent of partial repeals of Acts of Congress." *Id.* at 444.

Section 802 thus impermissibly authorizes the Attorney General "himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7." *Clinton*, 524 U.S. at 445. Whether "Congress intended such a result is of no moment." *Id.* Section 802 would be valid under Article I, section 7 only if "Congress itself made the decision to suspend or repeal the particular provisions at issue" in plaintiffs' lawsuits. *Id.* Because Congress made no such decision, section 802 is unconstitutional.

This is not a case in which Congress has given the Executive discretion to act on a matter on which Congress has not spoken. Instead, as in *Clinton*, Congress has already spoken on the subject of electronic surveillance, and has made the telecommunication carriers liable for unlawful surveillance. *See* 18 U.S.C. §§ 2520, 2707; 47 U.S.C. § 605; 50 U.S.C. § 1810. On matters on which Congress has spoken, it cannot

delegate the power to amend or repeal its enactments to the Executive, as *Clinton* holds. In particular, the inescapable corollary of the rule that any "private rights of action to enforce federal law must be created by Congress" (*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)) is that only Congress may extinguish a cause of action it has created.

Turning to plaintiffs' state-law causes of action, Attorney General Mukasey's preemption by fiat of plaintiffs' state constitutional, statutory, and common-law causes of action is unconstitutional because it, too, occurs without bicameral passage and presentment. The Supremacy Clause provides that state law is preempted only by "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof." U.S. Const., art. VI, cl. 2; *Printz v. United States*, 521 U.S. 898, 924 (1997) ("The Supremacy Clause, however, makes 'Law of the Land' only 'Laws of the United States which shall be made in Pursuance [of the Constitution]' " (alterations original)). "Laws of the United States" are only "made in Pursuance" of the Constitution if they are made in conformance with Article I, section 7. Thus, state law is preempted only if the decision to preempt is enacted by a majority vote of each house of Congress in accordance with Article I, section 7. *Wyeth v. Levine*, ___ U.S. ___, 129 S.Ct. 1187, 1207 (2009) (Thomas, J., concurring; "The Supremacy Clause thus requires that pre-emptive effect be given only those to federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment

procedures."). Because it is the Attorney General, and not Congress, who decided that state law should be preempted in plaintiffs' lawsuits, there has been no compliance with Article I, section 7 and no valid preemption.

### C. The *Clinton* Court's Analysis Of *Marshall Field & Co. v. Clark* Demonstrates The Unconstitutionality Of Section 802

The unconstitutionality of section 802 is also demonstrated by applying to it the *Clinton* Court's analysis contrasting the unconstitutional line-item veto statute with the tariff statute found constitutional in *Marshall Field & Co. v. Clark* , 143 U.S. 649 (1892). In the tariff statute, Congress compelled the President to suspend certain tariffs upon the occurrence of certain triggering facts specified by Congress. Section 802 lacks the crucial limits Congress imposed on the Executive in the tariff statute at issue in *Field*, just as the unconstitutional line-item veto statute in *Clinton* lacked those same limits. By imposing these limits in *Field*, Congress ensured that it, and not the Executive, was the true lawmaker determining whether the legal force and effect of previously-enacted law should change.

The *Clinton* Court identified three such limits. First, in *Field*, "the exercise of the [tariff] suspension power was contingent upon a condition that did not exist when the Tariff Act was passed." *Clinton*, 524 U.S. at 443. Here, the five circumstances listed in section 802(a) are all ones that existed at the time section 802 was enacted if they existed at all in these actions, and thus were ones that Congress could have acted upon in FISAAA itself by

directly changing the law governing these actions. *See Clinton*, 524 U.S. at 443 (President's exercise of power under unconstitutional line-item veto statute "necessarily was based on the same conditions that Congress evaluated when it passed those statutes"). Like the unconstitutional line-item veto statute in *Clinton*, the Attorney General's section 802 dismissal power does not require that a future contingency come into existence before it is triggered.

"Second, under the Tariff Act, when the President determined that the contingency had arisen, he had a duty to suspend . . . ." *Clinton*, 524 U.S. at 443; *accord*, *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 411 (1928) (describing the President's role under the statute at issue in *Field*: "He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect."). "[W]hen enacting the statutes discussed in *Field*, Congress itself made the decision to suspend or repeal the particular provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only the determination of whether such events occurred up to the President." *Clinton*, 524 U.S. at 445.

Here, in contrast, the Attorney General has no duty to file a certification even if he determines that one of the five circumstances set forth in section 802(a) exists. The unconstitutional line-item veto statute in *Clinton* likewise required the President to make three determinations before canceling an appropriation, but those determinations did not limit his

discretion to negate existing law: "[W]hile it is true that the President was required by the Act to make three determinations before he canceled a provision, . . . those determinations did not qualify his discretion to cancel or not to cancel." *Clinton*, 524 U.S. at 443-44.

"Finally, whenever the President suspended an exemption under the Tariff Act, he was executing the policy that Congress had embodied in the statute." *Clinton*, 524 U.S. at 444. In *Clinton* and in section 802, by contrast, Congress enacted one policy but then gave the Executive the power to negate it. In *Clinton*, Congress forgave a debt New York owed the United States and gave a beneficial tax treatment to agricultural cooperatives but gave the President the power to cancel these provisions if he so chose. Here, Congress enacted causes of action for unlawful surveillance in 18 U.S.C. §§ 2520, 2707, 47 U.S.C. § 605, and 50 U.S.C. § 1810 but then gave the Attorney General the power to nullify them if he chose. In deciding to file his certification, Attorney General Mukasey was not executing a policy decision made by Congress that the existing law governing these actions should be nullified. Instead, as did the President in *Clinton*, Attorney General Mukasey made a decision that Congress refused to make: whether to negate the effect of the law governing these actions and to force the dismissal of these actions. In choosing to nullify existing law, the Attorney General exercised core legislative power and rejected the policy judgments that Congress made in enacting statutes creating liability for unlawful surveillance. And section 802 goes further than the line-item veto statute by

giving the Executive the power to preempt state law as well as to negate federal law. The Founders placed the preemption of state law firmly—and exclusively—in the hands of Congress.

Ultimately, in enacting FISAAA Congress ducked the fundamental legislative choice of whether or not to nullify the federal statutes and preempt the state laws creating plaintiffs' claims, a choice that under the Constitution it alone is empowered to make. Instead, it sought to shift that decision to the Executive, surrendering without limitation its exclusive legislative powers to negate the effect of previously-enacted statutes and to preempt existing state law governing these actions between private parties.

" 'Rather than turning the task over to its agent, if the Legislative Branch decides to act with conclusive effect, it must do so . . . through enactment by both Houses and presentment to the President.' " *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 274 n.19 (1991). "[W]hen Congress '[takes] action that has the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch,' it must take that action by the procedures authorized in the Constitution." *Id*. at 276. The constitutional procedure by which Congress may nullify existing law to terminate legal liability, either in specific lawsuits (*Robertson*) or in an entire class of lawsuits (*Ileto*), is well established. Because Congress failed to nullify the law creating plaintiffs' federal and state-law causes of action

through the constitutionally-mandated procedure of bicameral passage and presentment, section 802 is unconstitutional.

## IV. Section 802 Violates The Nondelegation Doctrine Because It Delegates Lawmaking To The Executive Without Any "Intelligible Principle"

### A. Section 802 Lacks Any Intelligible Principle To Which The Attorney General Must Conform In Deciding Whether To File A Certification

Even where Congress gives the Executive some authority other than the prohibited power to negate the legal force and effect of previously-enacted law, the grant of authority may run afoul of "the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165 (1991); *see also Clinton*, 524 U.S. at 447-48 (distinguishing between Article I, section 7 violations and nondelegation doctrine violations)

For Congress validly to confer decisionmaking authority upon the Executive, it must retain control of the delegated authority by imposing an "intelligible principle" to which the Executive's decisions must conform: "[W]hen Congress confers decisionmaking authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (emphasis original, internal quotation marks and brackets omitted). Congress fails to provide an

intelligible principle if "there is an absence of standards for the guidance of the [Executive's] action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944).

" 'The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government.' " *Touby*, 500 U.S. at 165. "It is difficult to imagine a principle more essential to democratic government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature." *Mistretta v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting); *accord*, *Loving v. United States*, 517 U.S. 748, 758 (1996) ("[T]he delegation doctrine[] has developed to prevent Congress from forsaking its duties.").

Section 802 violates the nondelegation doctrine because Congress has not imposed any standard or intelligible principle governing how the Attorney General should decide whether or not to exercise his discretionary power to file a certification in lawsuits falling within the five statutory categories of section 802. "[T]he first step in assessing whether a statute delegates legislative power is to determine what authority the statute confers . . . ." *Whitman*, 531 U.S. at 465. There is no ambiguity to section 802's grant of plenary power and unfettered discretion to the Attorney General to file, or to withhold, a certification. Nor is there any ambiguity to the

absence of any standard or intelligible principle guiding or limiting the Attorney General's exercise of that power.

The statute says nothing more than that "*if* the Attorney General certifies," then the "civil action may not lie or be maintained . . . and shall be promptly dismissed." § 802(a) (emphasis added). Nothing in the statute qualifies that "if" and provides any standard or intelligible principle. Section 802 does not require the Attorney General to do anything. He is not required to examine any "civil action . . . against any person for providing assistance to an element of the intelligence community" (§ 802(a)) to determine whether it falls within one of the five statutory categories in which certification is permitted. Even if the Attorney General does decide to examine a lawsuit and determines that certification is permitted, he is not required to take any further action. He is not required to consider any factors, apply any criteria, undertake any investigation, or engage in any analysis. He can exercise, or refuse to exercise, his discretion to file a certification for any reason or for no reason at all.

The "absence of standards" governing the Attorney General's discretion to file or not to file a certification makes it "impossible . . . to ascertain whether the will of Congress has been obeyed." *Yakus*, 321 U.S. at 426. Congress never enacted its will by agreeing upon a standard for the Attorney General to apply in deciding whether these actions should continue or be dismissed. Instead, Attorney General Mukasey exercised *his* will by

deciding for reasons of his own to file a certification and cause the dismissal of these actions.

Because section 802 is nothing more than a naked delegation of legislative power lacking any intelligible principle, it is unconstitutional. Congress "failed to articulate any policy or standard that would serve to confine the discretion of the authorities to whom Congress had delegated power." *Mistretta*, 488 U.S. at 374 n.7. Section 802 "provide[s] literally no guidance for the exercise of discretion" by the Attorney General. *Whitman*, 531 U.S. at 474. Instead, "Congress left the matter to the [Attorney General] without standard or rule, to be dealt with as he pleased." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418 (1935).

### B. This Case Is Unlike The Usual Nondelegation Case In Which Congress Has Provided Standards For The Executive In The Statutory Text

This case is unlike the usual nondelegation case, in which Congress has stated a principle in the statutory text and the question is whether the principle is sufficiently clear and definite to be an intelligible guide for the Executive's actions. In section 802, by contrast, Congress stated no principle at all, much less an intelligible one.

In *Whitman*, for example, Congress stated intelligible principles in instructing the Environmental Protection Agency to set air pollution standards that: are "requisite to protect the public health;" are "based on" scientific air quality "criteria" developed by the EPA; and "allow[] an

adequate margin of safety." *Whitman*, 531 U.S. at 465, 472 (statutory citations and internal quotation marks omitted). In turn, the criteria must "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities." 42 U.S.C § 7408(a)(2).

In *Touby*, Congress also gave detailed instructions on how the Attorney General was to exercise the authority Congress granted. *Touby*, 500 U.S. at 163. The statute permitted the Attorney General temporarily to add a drug to the schedule of controlled substances only if he "finds that the scheduling of a substance in schedule I on a temporary basis is necessary to avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h)(1). In deciding whether there is an "imminent hazard to the public safety" justifying adding a drug to the schedule, "the Attorney General shall be required to consider" the factors of: the drug's "history and current pattern of abuse;" "[t]he scope, duration, and significance of abuse;" "[w]hat, if any, risk there is to the public health;" and "actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution." 21 U.S.C. § 811(h)(3) (incorporating by reference factors (4), (5), and (6) of 21 U.S.C. § 811(c)); *Touby*, 500 U.S. at 166. In addition, to temporarily schedule a drug Congress required the Attorney General to decide whether the drug "has a high potential for abuse," whether it "has no currently accepted medical use in treatment in the United States," and

whether "there is a lack of accepted safety for use of the drug . . . under medical supervision." 21 U.S.C. § 812(b)(1); *Touby*, 500 U.S. at 166-67; *see also Mistretta*, 488 U.S. at 374-79 (Supreme Court upheld delegation of the task of developing sentencing guidelines to the United States Sentencing Commission because Congress provided the Commission with highly specific and detailed guidance).

Section 802, by contrast, contains no standards at all.

### C. Legislative History Cannot Supply The Intelligible Principle That Section 802 Lacks

The district court correctly determined that the text of section 802 contains no language that can be construed as a standard or intelligible principle. ER 20-21, 24, 27, 29-32. It nevertheless held that there was no unconstitutional delegation because in its view "The [Senate Select Committee on Intelligence] report makes clear that Congress wanted to immunize telecommunications companies in these actions." ER 33. The committee report states: "[C]ivil immunity should be afforded to companies that may have participated in the President's program." ER 385 (S. Rep. No. 110-209 at 3 (2007)), *quoted in* Order at ER 8. The district court's resort to legislative history was mistaken on three independent grounds.

First, legislative history has no role to play in statutory construction where the statutory terms are unambiguous. "Ambiguity . . . is . . . a necessary condition" for invoking legislative history. *Abrego v. Dow Chemical Co.*, 443 F.3d 676, 683 (9th Cir. 2006). "When the words of a

statute are unambiguous . . . 'judicial inquiry is complete.' " *Connecticut National Bank v. Germain*, 503 U.S. 249, 254 (1992); *accord, Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 878 (9th Cir. 2001) (en banc) (absent ambiguity, " 'the sole function of the courts is to enforce [the statute] according to its terms' "). The meaning of an unambiguous statutory phrase cannot "be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process." *West Virginia University Hospitals v. Casey*, 499 U.S. 83, 98-99 (1991).

Here, no ambiguity lurks in the phrase "a civil action may not lie or be maintained . . . and shall be promptly dismissed, if the Attorney General certifies to the district court." § 802(a). The power granted to the Attorney General is plenary, unlimited by any principle or standard. "If" the Attorney General files a certification, the action is dismissed, but nothing compels the Attorney General to file a certification or provides him with any standard for deciding whether to file a certification. Given the unambiguous character of section 802's grant of unlimited discretion to the Attorney General to decide whether or not to file a certification, there is no occasion to resort to legislative history.

Second, even if the statutory text were ambiguous, nothing in the legislative history supplies any intelligible principle or standard that the Attorney General must apply in choosing whether or not to file a certification in a case falling within subdivisions (a)(1) through (a)(5) of section 802. *See* ER 390-93, 404-05 (S. Rep. No. 110-209 at 8-11, 22-23).

Nothing in the legislative history suggests that any legislator intended to circumscribe the unlimited discretion the text of section 802 gives to the Attorney General or suggests that any legislator believed that there was any principle or standard that the Attorney General must apply. Indeed, the committee report's section-by-section analysis of the bill acknowledges that dismissal occurs only "*if* the Attorney General makes a certification" and does not suggest any standard or principle limiting the Attorney General's discretion whether or not to file a certification. ER 404-05 (S. Rep. No. 110-209 at 22-23) (emphasis added).

To say, as the district court did, that 13 of the senators on the Senate Intelligence Committee expected the Attorney General would exercise his standardless discretion by filing a section 802 certification in these lawsuits is not to say that they intended for the statute to impose any limits on the Attorney General's discretion. Nor does that inchoate expectation by individual legislators of a particular *outcome* supply any standard or intelligible principle by which the *process* of exercising discretion can be measured by a reviewing court. The motive of legislators for enacting a statute is a different question from the meaning they intended to give to the words of the statute.

Moreover, section 802 applies not only to this action but also to lawsuits against persons who assist the intelligence community in the future. Nothing at all in the legislative history supplies any intelligible principle for deciding whether to file a certification in those actions.

Third, the committee report cannot be used to supply the intelligible principle missing from section 802 because there is no link between the generalized expectation of immunity the district court found in the committee report and any of the words Congress used in section 802. " '[C]ourts have no authority to enforce [a] principle gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States*, 512 U.S. 573, 584 (1994) (*id*. at 583: "We are not aware of any case . . . in which we have given authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute."); *accord, Northwest Environmental Defense Center v. Bonneville Power Administration*, 477 F.3d 668, 683 & n.11 (9th Cir. 2007); *Abrego*, 443 F.3d at 685-86. "The case law of the Supreme Court and our court establishes that legislative history, untethered to text in an enacted statute, has no compulsive legal effect." *Northwest Environmental*, 477 F.3d at 682. This is because the purpose for resorting to legislative history is to illuminate the meaning of the statutory text, not to discover expectations of individual legislators that are divorced from their understanding of what the statutory text requires.

Here, nothing in the legislative history has any statutory reference point in section 802(a) or purports to explain any of the words set forth in section 802(a). "To give effect to this snippet of legislative history, we would have to abandon altogether the text of the statute as a guide in the interpretative process." *Shannon*, 512 U.S. at 583.

The requirement that Congress express its will in statutory language is not a meaningless formality. "[T]he will of the majority does not become law unless it follows the path charted in Article I, § 7, cl. 2, of the Constitution." *Landgraf v. USI Film Products*, 511 U.S. 244, 263 (1994); *accord*, *Grace v. Collector of Customs*, 79 F. 315, 320 (9th Cir. 1897). "[L]egislative reports are not acts of law satisfying the precise requirements of Article I, which were devised by the Framers to ensure separation of powers and a careful legislative process." *Northwest Environmental*, 477 F.3d at 684. "Members of Congress cannot use committee report language to make an end run around the requirements of Article I. If Congress wishes to alter the legal duties of persons outside the legislative branch, including administrative agencies, it must use the process outlined in Article I." *Id.* Otherwise, "legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Exxon Mobil Corp. v. Allapattah Services*, 545 U.S. 546, 568 (2005).

These considerations are especially weighty here, where Congress did absolutely nothing to limit the Attorney General's discretion. The nondelegation doctrine's essential purposes of ensuring legislative responsibility for the government's basic policy choices and preserving a

carefully-designed constitutional process for enacting legislation are not served when a court reads an "intelligible principle" into the text of a statute where Congress has provided none. Doing so usurps the role of Congress and creates a statute that was never enacted. As the Supreme Court has observed, "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (emphasis original). Accordingly, this Court cannot disregard Congress' intention to grant the Attorney General unlimited discretion ungoverned by any intelligible principle, and may not rewrite section 802 to supply an intelligible principle never voted upon by Congress.

For all of these reasons, resort to legislative history cannot cure section 802's lack of any standard or intelligible principle that would limit the Attorney General's discretion.

## V. Section 802(a) Violates Due Process By Denying Plaintiffs A *De Novo* Decision By An Unbiased Adjudicator

### A. Section 802 Deprives Plaintiffs Of Liberty And Property Interests Protected By The Due Process Clause

Plaintiffs have *liberty* interests in their constitutional right to be free from unreasonable searches and seizures and their constitutional right to free speech. *Duncan v. Louisiana*, 391 U.S. 145, 148 (1968) (due process protects First and Fourth Amendment liberty interests). Plaintiffs cannot be deprived of their liberty interests without due process.

Plaintiffs have a *property* interest in their federal and state causes of action against the telecommunications carriers. Even before it is reduced to a final judgment, "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *accord*, *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 485 (1988) (same); *Fields v. Legacy Health System*, 413 F.3d 943, 956 (9th Cir. 2005) (same).

Because causes of action are property, "the 'property' component of the Fifth Amendment's Due Process Clause . . . impose[s] 'constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.' " *Logan v. Zimmerman Brush*, 455 U.S. at 429.

Plaintiffs can be deprived of their liberty interest in their constitutional rights and their property interests in their federal and state claims only if the procedure by which they are deprived satisfies due process. The procedure of section 802 does not.

### B. Section 802(a) Denies Plaintiffs A *De Novo* Decision By An Unbiased Adjudicator

Attorney General Mukasey took away plaintiffs' liberty and property interests by filing his certification. This deprivation violates due process because plaintiffs never received a *de novo* hearing before a neutral, unbiased adjudicator at which they could challenge the deprivation.

Attorney General Mukasey did not provide plaintiffs with due process. He gave no notice, conducted no hearing, and was a biased, *ex parte* decisionmaker. The district court could not provide due process because section 802 denied the court the ability to adjudicate the issues *de novo*. Instead, it forced the district court to defer, under a "substantial evidence" standard of appellate review, to the biased determinations of Attorney General Mukasey.

Due process requires that the government must provide an adjudicative hearing if it wants to deprive a person of a protected liberty or property interest. "For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. These essential constitutional promises may not be eroded." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion; internal quotation marks and citations omitted).

Due process also requires that the adjudication be conducted by a neutral and unbiased adjudicator. "[D]ue process requires a 'neutral and detached judge' . . . ." *Concrete Pipe & Products v. Construction Laborers Pension Trust*, 508 U.S. 602, 617 (1993). "A biased proceeding is not a procedurally adequate one. At a minimum, Due Process requires a hearing before an impartial tribunal." *Clements v. Airport Authority of Washoe*

*County*, 69 F.3d 321, 333 (9th Cir. 1995); *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."); *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("[O]f course, an impartial decision maker is essential."). "This impartial tribunal requirement applies in both civil and criminal cases" as well as in "administrative adjudications, in order to protect the 'independent constitutional interest in fair adjudicative procedure.' " *Clements*, 69 F.3d at 333.

Thus, due process requires that plaintiffs receive a hearing before an impartial adjudicator empowered to receive evidence and argument and to decide whether plaintiffs should be deprived of their liberty and property interests. Under section 802, that never occurs.

### 1. Attorney General Mukasey Did Not Provide Plaintiffs With Due Process

Attorney General Mukasey's decisionmaking failed to provide plaintiffs with due process for two reasons. First, in deciding whether plaintiffs' actions fell within the five statutory categories and in deciding whether to file a certification to cause the dismissal of plaintiffs' actions, Attorney General Mukasey did not act as an adjudicator and did not conduct an adjudication. He did not provide notice, conduct a hearing, receive evidence and argument from opposing parties, determine facts, render a decision on the basis of the evidence and argument so received, or perform

any other "judicial or quasi-judicial functions." *Concrete Pipe*, 508 U.S. at 619.

Second, in addition to failing to conduct an adjudication, Attorney General Mukasey was presumptively and actually biased. Attorney General Mukasey's office and duties created a structural, institutional bias because he was a member of the Bush Administration and was counsel to the United States, a defendant in these lawsuits. *See* ER 516-17; *Concrete Pipe*, 508 U.S. at 618 (bias presumed from decisionmaker's "statutory role and fiduciary obligation"). Both his policymaking duties and his ethical duties to his client gave Attorney General Mukasey a very strong motive to rule in a way that would aid the Bush Administration's policies. "[E]ven if the decisionmaker does not stand to gain personally, due process may also be offended where the decisionmaker, because of his institutional responsibilities, would have 'so strong a motive' to rule in a way that would aid the institution." *Alpha Epsilon Phi Tau v. City of Berkeley*, 114 F.3d 840, 844 (9th Cir. 1997); *see also Caperton v. A. T. Massey Coal Co.*, __ U.S. __, 129 S.Ct. 2252, 2262 (2009) (presuming bias where circumstances demonstrated "an unconstitutional 'potential for bias' "); *Stivers v. Pierce,* 71 F.3d 732, 741 (9th Cir. 1995) (presuming bias from decisionmaker's circumstances and interests).

Attorney General Mukasey also had an actual bias in this matter and had prejudged it before making his decision to file a certification. ER 517-19. Even before section 802 was enacted, he made no secret of his

intent to cause the dismissal of plaintiffs' lawsuits by whatever means necessary, telling Congress that granting "liability protection" was "simply the right thing to do" and was "the fair and just result." ER 454, 518-19. Attorney General Mukasey's statements show that he " 'prejudged, or reasonably appears to have prejudged, an issue.' " *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992).

### 2. Section 802's Constraints Denied The District Court The Power To Provide Plaintiffs With Due Process

Where the decision to deprive someone of a protected interest is initially made by a biased decisionmaker who does not conduct an adjudication, "due process may be satisfied by providing for a neutral adjudicator to 'conduct a *de novo* review of all factual and legal issues.' " *Concrete Pipe*, 508 U.S. at 618. A proceeding does not satisfy due process if, as is true under section 802, it is structured so that a biased decisionmaker makes an initial decision that a later, unbiased adjudicator is forbidden from reviewing *de novo* but instead must accept under a deferential standard of review. *See Concrete Pipe*, 508 U.S. at 619-20, 626, 629-30.

In *Concrete Pipe*, as here, the initial decision was made by a biased decisionmaker, the trustee of an ERISA plan. The trustee, like the Attorney General here, was "not required to hold a hearing, to examine witnesses, or to adjudicate the disputes of contending parties on matters of fact or law." *Id*. at 619. Only because there was a subsequent hearing *de novo* before an

arbitrator who was not bound in any way by the trustee's decision and who was empowered to receive evidence and make factual and legal determinations *de novo* did the scheme satisfy due process. *Id.* at 619-20, 626, 629-30.

So, too, in *Marshall v. Jerrico, Inc.*, the Supreme Court held that the bias of an administrative decisionmaker was not a due process deprivation only because there was a subsequent *de novo* hearing before an administrative law judge who was not bound by the administrator's decision. 446 U.S. 238, 247-48 & n.9 (1980). Absent a trial *de novo*, however, using the decision of a biased decisionmaker who conducted no adjudication as the basis for depriving a person of a property or liberty interest means that the person is "deprived thereby of the impartial adjudication in the first instance to which [he or she] is entitled under the Due Process Clause." *Concrete Pipe*, 508 U.S. at 626.

Because Attorney General Mukasey did not provide plaintiffs with the process due them, due process could be satisfied here only if section 802 provided for a *de novo* adjudication by the district court of whether plaintiffs should be deprived of their liberty and property interests. Section 802, however, prohibits a *de novo* adjudication by the district court and so violates due process.

Unlike the proceedings in *Concrete Pipe* and *Marshall v. Jerrico*, under section 802 there is never an adjudication before an unbiased adjudicator who has the power to determine facts and law *de novo*. Instead,

section 802(b)(1) compels the district court to give effect to the Attorney General's certification unless the "certification is not supported by substantial evidence." § 802(b)(1). As the district court correctly held, this is a deferential appellate standard of review, not a standard of proof for a trial *de novo*. ER 6-7; *see Concrete Pipe*, 508 U.S. at 622-23 (contrasting standards of review with standards of proof). " 'Substantial evidence is more than a mere scintilla but less than a preponderance.' " *Ryan v. Commissioner of Social Security*, 528 F.3d 1194, 1198 (9th Cir. 2008). Section 802 requires the district court to uphold the Attorney General's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).

Perhaps more importantly, section 802 limits the district court's review to only the question whether the certification is supported by substantial evidence. The district court does not get to review at all, under any standard, the Attorney General's discretionary decision whether to file the certification. As to that decision, plaintiffs have no recourse whatsoever.

Section 802 thus denies plaintiffs due process because it denies them a hearing before a neutral and disinterested adjudicator who has the power to decide *de novo* whether plaintiffs should be deprived of their liberty and property interests. *Hamdi* involved a similarly unconstitutional attempt to limit due process by imposing on the district court an appellate "some evidence" standard of review for reviewing decisions by the Executive to

detain citizens as enemy combatants. 542 U.S. at 527-28 (plurality opinion). The plurality noted that because the "some evidence" standard is "a standard of review, not . . . a standard of proof. . . . [I]t primarily has been employed by courts in examining an administrative record developed after an adversarial proceeding." *Id.* at 537 (plurality opinion). "This standard therefore is ill suited to the situation in which a habeas petitioner has received no prior proceedings before any tribunal and had no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker." *Id.* Instead, the Court held that the petitioner had a right to notice of the facts the government claimed supported its position and a fair opportunity to rebut those facts in a *de novo* hearing before a neutral decisionmaker. *Id.* at 535-538 (plurality opinion), 553 (Souter and Ginsburg, JJ., concurring in the judgment; petitioner "entitled at a minimum to notice of the Government's claimed factual basis for holding him, and to a fair chance to rebut it before a neutral decisionmaker"); *see also id*. at 573 (Scalia, J., dissenting; due process entitled petitioner to full criminal trial). Like section 802, the government's scheme in *Hamdi* failed to provide due process because it combined an initial decision by a biased decisionmaker who held no hearing with subsequent court review of the decision under a deferential standard of appellate review rather than a trial *de novo*.[6]

[6] The analysis of the dissenting justices in *Boumediene* is also instructive. The Detainee Treatment Act provided for the Executive to determine the legality of a Guantanamo detainee's detention, followed by judicial review

*(footnote continued on following page)*

The district court took the position that Congress, not the Attorney General, had decided to negate the application of existing law to plaintiffs' lawsuits and that Congress, not the Attorney General, had therefore deprived plaintiffs of their liberty and property interests. From this, it concluded that the process of legislative enactment was all the process to which plaintiffs were due in connection with the deprivation of their protected interests. ER 35.

The district court erred in its analysis because Congress did *not* mandate in section 802 that existing law should no longer apply to these lawsuits and that these plaintiffs should be deprived of their causes of action. As explained above, Congress gave the power to make that decision to the Attorney General. It was Attorney General Mukasey in the exercise of his unlimited discretion, and not Congress, who decided that these actions should no longer be governed by existing federal and state law and instead should be dismissed under section 802. Had he chosen not to file a

---

*(footnote continued from preceding page)*
of the Executive's determination. The dissenting justices concluded that the DTA provided due process to Guantanamo detainees only because in the judicial review proceedings the detainee had the opportunity for a *de novo* determination of all questions of fact and law by an Article III court, the detainee personally received a summary of the classified evidence against him, and his counsel had full access to the classified evidence. 128 S.Ct. at 2284-85, 2287-89, 2293 (dissenting opinion of Roberts, C.J., joined by Scalia, Thomas, and Alito, JJ.). All of these basic procedural rights granted to alien detainees suspected of being enemy combatants, however, are denied to plaintiffs here.

certification, these lawsuits would be going forward today under federal and state law as it existed at the time the complaints were filed.

The district court's analysis also ignores that even if Congress, and not the Attorney General, had negated existing law for cases falling within the scope of section 802, plaintiffs would still be entitled to notice and a hearing *de novo* at which they could contest whether the circumstances set forth in subsections (a)(1) through (a)(5) exist. Even when a deprivation occurs under a statute that unconditionally abolishes liability for a class of cases, the plaintiff is still entitled to contest whether her lawsuit falls within the designated class of cases at a *de novo* hearing before a neutral and unbiased adjudicator. *Ileto*, 565 F.3d at 1142.

## VI. Section 802(c) Violates Due Process By Denying Plaintiffs Meaningful Notice Of The Government's Basis For Seeking Dismissal And A Meaningful Opportunity To Oppose The Government's Arguments And Evidence

Section 802(c) provides that if the Attorney General files a declaration stating that "disclosure of a certification made pursuant to subsection (a) or the supplemental materials provided pursuant to subsection (b) or (d) would harm the national security of the United States," the district court is required to review the certification and supplemental materials *in camera* and *ex parte*, and is not allowed to state the basis for its decision in its public order. § 802(c). The Attorney General invoked the secrecy provisions of section 802(c) here, and as result the district court kept secret from plaintiffs the supporting factual basis and legal grounds for the certifications. ER 436-37.

The district court also kept secret the basis for its conclusion that Attorney General Mukasey's certification was supported by substantial evidence. ER 44. These secrecy provisions violate due process.

Due process requires that before plaintiffs are deprived of their protected interests they must receive adequate and meaningful notice of the factual and legal basis on which the government seeks dismissal. "[T]he right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Hamdi*, 542 U.S. at 533 (plurality opinion) (internal quotation marks omitted). Meaningful notice requires both "notice of the . . . allegations" and "notice of the substance of the relevant supporting evidence." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 264 (1987); *accord*, *Hamdi*, 542 U.S. at 533 (plurality opinion; due process requires "notice of the factual basis" supporting the government's position); *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985) (due process requires "notice of the charges" and "an explanation of the . . . evidence"). This is the constitutional minimum.

The due process guarantee of an opportunity to be heard likewise is not meaningful where arguments and evidence presented against a party are kept secret. The reason that due process requires that "the evidence used to prove the Government's case must be disclosed to the individual [is] so that he has an opportunity to show that it is untrue." *Goldberg v. Kelly*, 397 U.S. at 270. "The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the

opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one." *Morgan v. United States*, 304 U.S. 1, 18 (1938); *see also West Ohio Gas Co. v. Public Utilities Commission (No. 1),* 294 U.S. 63, 69 (1935) ("A hearing is not judicial, at least in any adequate sense, unless the evidence can be known."); *Lynn v. Regents of University of California*, 656 F.2d 1337, 1346 (9th Cir. 1981) (A decision based on *ex parte* evidence offends "principles of due process upon which our judicial system depends to resolve disputes fairly and accurately.").

The Attorney General's invocation of section 802(c) violated due process because it denied plaintiffs any *meaningful* notice of the factual and legal grounds on which the government sought dismissal or of the government's supporting evidence, and thereby deprived plaintiffs of a *meaningful* opportunity to be heard in opposition to the government's motion. With the exception of the Attorney General's artful and illusory denial under section 802(a)(5) of a communications content dragnet,[7] the government refused to inform plaintiffs of the specific subsections of section

[7] The Attorney General's denial of a content dragnet is illusory because it mischaracterizes plaintiffs' allegations as limited to alleging only a content dragnet "for *the purpose of* analyzing those communications through *key word searches*" and denies only a content dragnet conducted for that purpose. ER 434:6-8 (emphasis added), 435:13-19. Plaintiffs' allegations encompass dragnet surveillance regardless of the purpose for which it is conducted. *See* ER 55-56, 131-32, 176-77, 217-18, 259-60; *see also generally* ER 479-99.

802(a) under which it sought dismissal. The government entirely refused to inform plaintiffs of the factual grounds supporting dismissal or the evidence submitted in support of dismissal (or even whether any supporting evidence had been submitted to the district court). Forcing plaintiffs to guess at which subsections of section 802(a) the government had put in issue and to speculate about what evidence the government may have submitted made the opportunity to be heard in the district court meaningless.

Due process requires more than the chance to shadow-box with the government. Our adversarial system is based upon "vigorous and informed argument," which is impossible "without disclosure to the parties of the evidence submitted to the court." *Lynn*, 656 F.2d at 1346. "Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Goss v. Lopez*, 419 U.S. 565, 580 (1975) (ellipsis, brackets, and internal quotation marks omitted). Even the most "rudimentary" conception of due process requires that the party facing a deprivation receive an "explanation of the evidence the authorities have." *Id*. at 581. This requirement applies whether the deprivation is a few days' suspension from high school, as in *Goss*, or, as here, the deprivation of the constitutional liberties of millions of Americans by a sweeping domestic communications dragnet and the loss of their causes

of action against the telecommunications carriers who are conducting the dragnet.

In addition, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. at 269; *accord*, *Hornsby v. Allen*, 326 F.2d 605, 608 (5th Cir. 1964) ("[I]t is not proper to admit *ex parte* evidence, given by witnesses not under oath and not subject to cross-examination by the opposing party.").

These principles apply equally in cases like this one where the government seeks to use classified or secret information to its litigation advantage to obtain a decision in its favor. In *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1070 (9th Cir. 1995), this Court held that use of undisclosed classified information in alien legalization proceedings violates due process. The Court concluded that the "use of undisclosed information in adjudications should be presumptively unconstitutional" "[b]ecause of the danger of injustice when decisions lack the procedural safeguards that form the core of constitutional due process." *Id*. The Court distinguished the state secrets privilege, noting that in such cases "the information is simply unavailable and may not be used by either side." *Id*. By contrast, in the case before it, as here, "the Government does not seek to shield state information from disclosure . . . ; instead, it seeks to use secret information as a sword against the" opposing party. *Id.*; *accord, Bane v. Spencer*, 393 F.2d 108, 109 (1st Cir. 1968) ("defendant should not

be able to use the [*ex parte* evidence] as a sword to seek summary judgment and at the same time blind plaintiff so that he cannot counter"); *Kinoy v. Mitchell*, 67 F.R.D. 1, 15 (S.D.N.Y. 1975) (denying government's summary judgment motion supported by *in camera* exhibits of allegedly secret information; "Our system of justice does not encompass *ex parte* determinations on the merits of cases in civil litigation."). So, too, here, due process prohibits any procedure by which plaintiffs' claims are dismissed without adequate notice of government's legal arguments and supporting evidence and without a meaningful opportunity to be heard in opposition and to cross-examine the government's witnesses.

The district court did not disagree that the government's invocation of the secrecy provisions of section 802(c) denied plaintiffs notice and an opportunity to be heard regarding the secret evidence and arguments presented by the government. It nonetheless held there was no due process violation by relying on a line of decisions approving the use of *ex parte*, *in camera* secret evidence in proceedings challenging the Executive's designation of a foreign terrorist organization. ER 36-37; *see*, *e.g.*, *Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003).

The district court's reasoning ignores this Court's contrary holding in *American-Arab Anti-Discrimination Committee*, discussed above. The district court's reasoning also ignores that the purpose of foreign-terrorist-designation proceedings is to deny assets and material support to foreign

terrorist organizations, a much different purpose from extinguishing the legal claims of millions of innocent American citizens arising out of surveillance within the United States of their domestic telecommunications. The Executive's power over foreign relations and national defense that lies at the heart of its justification for using secret evidence in foreign-terrorist-designation proceedings does not extend to conducting an unconstitutional warrantless domestic dragnet acquiring the telecommunications of innocent American citizens within the United States who are not agents of foreign powers. *See United States v. United States District Court (Keith)*, 407 U.S. 297, 312-13 ("the Fourth Amendment . . . shields private speech from unreasonable surveillance"), 321-22 (1972); *Katz v. United States*, 389 U.S. 347, 352 (1967); *Berger v. New York*, 388 U.S. 41, 55 (1967). Thus, whatever the balance of interests that may justify using secret evidence to adjudicate whether a foreign organization is a terrorist organization, it does not exist here.

Nor is it the case that the courts cannot protect secrets and provide justice simultaneously. As Congress has recognized in other statutes, including FISA itself, litigation procedures can be crafted that protect secrets and preserve the due process rights of litigants. *See* 18 U.S.C. App. (Classified Information Procedures Act); 50 U.S.C. § 1806(f). By means of such procedures, a court can safeguard legitimate national security interests while ensuring that its decisions are fair and based on an accurate understanding of the facts—the interests that due process protects. The

secret, *ex parte* process section 802(c) imposes on the district court unnecessarily sacrifices due process on the altar of national security.

Finally, the Attorney General's use of section 802(c) to censor the contents of the order the district court issued deciding the government's section 802 motion also violates due process. The district court's decision on the motion "must rest solely on the legal rules and evidence adduced at the hearing. To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on . . . ." *Goldberg v. Kelly*, 397 U.S. at 271 (internal citations omitted). The restrictions on disclosure of the reasoning and evidence on which the district court's decision rests violate due process by preventing plaintiffs from effectively challenging on appeal the merits of the decision, including the district court's determination that the certification was supported by substantial evidence.

## VII. Section 802 Unconstitutionally Interferes With The Judicial Branch's Adjudication Of These Cases

The foregoing analysis demonstrates that section 802 violates the due process rights of plaintiffs by depriving them of a *de novo* adjudication before an unbiased adjudicator. Section 802's limitation on judicial review also violates the separation of powers because it is a legislative incursion upon the proper functioning of the judicial branch. Congress cannot simultaneously invoke the integrity associated with judicial review while at

the same time undermining the scope of that review to the point of rendering it meaningless.

In section 802, Congress not only granted to Attorney General Mukasey the unbridled discretion to nullify the law governing these actions, but also provided that his certification will receive the imprimatur of judicial review as long as the certification can be said to be supported by "substantial evidence." "Substantial evidence" is, at best, a truncated and incomplete standard for judicial review. Judicial review traditionally encompasses both a deferential standard of "substantial evidence" to the factual findings of a lower court and independent oversight over the fairness and procedural regularity of the adjudication below. Because section 802 fails to impose any procedures on the Attorney General—much less those of an adjudication—a court of review is left with nothing but the deferential "substantial evidence" standard to apply. Without any procedural oversight, Attorney General Mukasey was free to limit the evidence in the certification so as to leave the district court without any real choice but to rule in the government's favor. As a consequence, there was no judicial review that was worthy of the name, and no basis for binding the integrity of the Judiciary to the certification.

Maintaining the constitutional integrity of the judicial branch is a fundamental obligation of the Judiciary, and Congress may not enact a statute that compels the Judiciary to act in a manner that is inconsistent with inherent judicial functions. *See The Federalist* No. 78 (Alexander Hamilton)

("from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its coordinate branches"). Thus, in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995), the Supreme Court held that a statute that reopened final judgments had overstepped the bounds that separated legislative from judicial power.

In *Plaut*, Congress had enacted in December 1991 an amendment to the Securities Exchange Act, whereby the limitations period for federal securities fraud would be the same limitations period applicable in a given jurisdiction. The amendment was expressly made retroactive to all cases that had been time-barred after June 19, 1991, including those cases in which a court had entered a final judgment. In holding that reopening final judgments overstepped constitutional limits, the *Plaut* Court relied on "the text, structure, and traditions of Article III." *Plaut*, 514 U.S. at 218.

The traditions of Article III confirm that certain features of the Judiciary are inherent to that branch: "The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy . . . ." *Plaut*, 514 U.S. at 218-19 (emphasis in original). The Court then reviewed the history of legislative interference into judicial acts that predated Article III and described how Article III had established the separation between the legislative power to make general law and the judicial power to apply that law in particular cases.

The tradition of deference to factual findings at common law predated the ratification of the Constitution. That deference is distinct from a reviewing court's ability to satisfy itself of the fairness and legality of the process that lead to those factual findings. The two—deference to factual findings and review of the fairness and legality of the proceedings—are always together: "[The seventh] amendment to the Constitution provides that no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law. Two modes only were known to the common law for the examination of facts once tried by a jury; to wit, the granting of a new trial by the court where the issue was tried or to which the record was returnable, or by the award of a *venire facias de novo* from the appellate court for some error of law in the proceedings." *Crim v. Handley*, 94 U.S. 652, 657 (1877).

Section 802 provides a form of judicial review that is deferential to the point of meaninglessness. Before making his certification, Attorney General Mukasey sought out information from only a single source: other government officials. Attorney General Mukasey met with officials of the NSA, and he reviewed the classified declarations of the Director of National Intelligence and the Director of the NSA. ER 433. He did not seek out information from plaintiffs; he merely surveyed the allegations set forth in the pending complaints, allegations that he fundamentally mischaracterized. *See* note 7, above. He did not seek any information from the telecommunications carrier defendants.

As the district court acknowledged, "substantial evidence" means "more than a mere scintilla," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ER 7, citing *Edison Co. v. Labor Board*, 305 U.S. 197, 229 (1938). By presenting the government's evidence and the government's evidence alone, Attorney General Mukasey could be certain that a "reasonable mind" would be forced to accept that evidence as adequate for lack of any contrary evidence. Section 802 thus put in place a structure in which the Judiciary must give its imprimatur to an Executive decision resulting from a procedure whose fairness the Judiciary cannot test.

If the integrity of the Judiciary as contemplated in Article III is to remain intact, then the traditional functions of a court sitting as a court of review must be preserved. Because section 802 undermines the concept of judicial review by imposing a partial and meaningless standard, section 802 should be struck down as inconsistent with "the text, structure, and traditions of Article III." *See Plaut*, 514 U.S. at 218.

## VIII. Section 802 Violates The Separation Of Powers And Due Process Because It Prohibits The Adjudication In Any Federal Or State Forum Of Plaintiffs' Constitutional Claims For Injunctive Relief

Finally, section 802 violates both the separation of powers and due process by purporting to eliminate plaintiffs' federal constitutional claims seeking injunctive relief against the telecommunications carriers for violations of their First and Fourth Amendment rights. Congress lacks the

power to prohibit entirely, as section 802 purports to do, any adjudication in either federal or state court of plaintiffs' federal constitutional claims seeking injunctive relief against the carriers.

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Yet section 802, when invoked by the Attorney General, purports to deny plaintiffs precisely that right: it denies plaintiffs any judicial remedy whatsoever, federal or state, for their federal constitutional claims against the telecommunications carrier defendants.

The district court erroneously held that the possibility that plaintiffs might be able to bring a separate action against the government and government officials justified denying plaintiffs any judicial forum to remedy the constitutional violations committed by the telecommunications carrier defendants. ER 12. This ruling misconceives plaintiffs' causes of action, which seek to hold the telecommunications carriers directly liable for their own conduct, not to hold them vicariously liable for the government's conduct.

The telecommunications carriers are highly regulated, have many incentives to comply with government requests, and have a history of complying with such requests. From the 1930's until the 1970's, various telecommunications companies provided United States intelligence agencies with access to their customers' communications on a massive scale, without

warrants and in violation of the Fourth Amendment. *See* Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities and the Rights of Americans, S. Rep. No. 94-755, Book II at 2, 12-14, 139 (1976).[8] FISA, the Wiretap Act, and the Stored Communications Act were intended to end that conduct and strengthen Fourth Amendment protections by requiring the carriers, on pain of criminal and civil liability, to resist government requests for unlawful access to records and communications. Notwithstanding those statutory prohibitions, which have been in place for decades, the telecommunications carriers complied with the government's unlawful requests here.

Lawsuits against the telecommunications carriers adjudicating their wrongdoing and awarding injunctive relief against them directly would prevent and deter such abuses in the future. An action against only the government or government officials would not adjudicate whether the telecommunications carriers have violated plaintiffs' constitutional rights and thus would create no precedent guiding the carriers' future conduct. Nor could an action against the government or government officials award any injunctive relief against the carriers. *Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930) (per L. Hand, J.; "no court can make a decree which will bind any one but a party").

---

[8] Available at <http://www.aarclibrary.org/publib/contents/church/contents_church_reports_book2.htm>.

The Constitution mandates that injunctive relief be available against the telecommunications carriers for their unconstitutional conduct. " 'The power of the federal courts to grant equitable relief for constitutional violations has long been established.' " *American Federation of Government Employees Local 1 v. Stone*, 502 F.3d 1027, 1038 (9th Cir. 2007). "[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) ("it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"); *Greenya v. George Washington University*, 512 F.2d 556, 562 n.13 (D.C. Cir. 1975) ("If the Constitution creates a right, privilege, or immunity, it of necessity gives the proper party a claim for equitable relief if he can prevail on the merits.").

All those who participate in a constitutional violation, whether they are government actors or private parties, are subject to injunctive relief. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614-16 (1989) (private party liable for unconstitutional conduct if it is agent of or in joint participation with government or if government encourages, endorses, or participates in the private party's conduct); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Cooper v. United States Postal Service*, 577 F.3d 479, 491-92, 496 (2d Cir. 2009).

The Supreme Court has held that a " 'serious constitutional question' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988); *accord*, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681 n.12 (1986) (noting with approval the view that " '[All] agree that Congress cannot bar all remedies for enforcing federal constitutional rights' "); *Flores-Miramontes v. I.N.S.*, 212 F.3d 1133, 1136, 1138 (9th Cir. 2000) (at 1136: "If he cannot raise [his constitutional claims] in any other federal court, then we must address them here in order to preserve a forum for them."). For this reason, when faced with a statute that appears to foreclose relief, courts strive to find a saving construction permitting constitutional claims to survive. *See*, *e.g.*, *Webster*, 486 U.S. at 603-04.

No saving construction is possible, however, for section 802. This Court is squarely presented with the question whether Congress can give the Executive the power to deny plaintiffs any judicial forum for their constitutional claims against the telecommunications carriers for injunctive relief. The answer must be "no."

To permit Congress to do so would allow Congress and the Executive, and not the courts, to be the ultimate arbiter of the content of constitutional rights. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. at 177. If Congress or the Executive is permitted to abolish every avenue of judicial relief against the telecommunications carrier defendants for their violations of plaintiffs'

constitutional rights, the Judiciary cannot perform this essential function. *Bartlett v. Bowen*, 816 F.2d 695, 703 (D.C. Cir. 1987) (finding that "a statutory provision precluding *all* judicial review of constitutional issues removes from the courts an essential judicial function under our implied constitutional mandate of separation of powers, and deprives an individual of an independent forum for the adjudication of a claim of constitutional right" (emphasis original)).

In addition to threatening the court's role as the final arbiter of the Constitution, section 802's limit on judicial review of constitutional claims also deprives plaintiffs of due process. *Bartlett*, 816 F.2d at 704 ("The question we ask is whether *due process* places any limits on Congress' power, and we conclude, narrowly and rather uncontroversially, that it does and that these limits are broached when Congress denies *any* forum-federal, state or agency-for the resolution of a federal constitutional claim." (emphasis original)). Accordingly, section 802 is unconstitutional as applied to plaintiffs' federal constitutional claims.

## CONCLUSION

The district court's order granting the government's motion to dismiss and for summary judgment, and the district court's judgments of dismissal, should be reversed and the actions remanded for further proceedings.

Dated: December 8, 2009 Respectfully submitted,

s/ *Richard R. Wiebe*
RICHARD R. WIEBE
LAW OFFICE OF RICHARD R. WIEBE
425 California Street
Suite 2025
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

s/ *Cindy A. Cohn*
CINDY A. COHN
LEE TIEN
KURT OPSAHL
KEVIN S. BANKSTON
CORYNNE MCSHERRY
JAMES S. TYRE
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

s/ *Thomas E. Moore III*
THOMAS E. MOORE III
THE MOORE LAW GROUP
228 Hamilton Ave., 3d Fl.
Palo Alto, CA 94301
Telephone: (650) 798-5352
Facsimile: (650) 798-5001

s/ *Aram Antaramian*
ARAM ANTARAMIAN
LAW OFFICE OF ARAM ANTARAMIAN
1714 Blake Street
Berkeley, CA 94703
Telephone: (510) 841-2369
COUNSEL FOR PLAINTIFFS IN
No. 09-16676, *HEPTING, ET AL. v. AT&T CORP., ET AL.*

s/ *Harvey Grossman*
HARVEY GROSSMAN
ADAM SCHWARTZ
KAREN SHELEY
ROGER BALDWIN FOUNDATION OF ACLU
180 North Michigan Avenue
Suite 2300
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 201-9760
COUNSEL FOR PLAINTIFFS IN
No. 09-16713, *TERKEL, ET AL. v. AT&T INC, AT&T CORP, AND ILLINOIS BELL TELEPHONE CO.*

s/ *Peter J. Eliasberg*
PETER J. ELIASBERG
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth St.
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

s/ *Julia Harumi Mass*
JULIA HARUMI MASS
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

DAVID BLAIR-LOY
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF
SAN DIEGO/IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138
Telephone: (619) 232-2121
Facsimile: (619) 232-0036
COUNSEL FOR PLAINTIFFS IN
No. 09-16684, *CAMPBELL v. AT&T* AND
No. 09-16685, *RIORDAN v. VERIZON*
*COMMUNICATIONS INC.*

s/ *Nicholas A. Migliaccio*
MASON LLP
GARY E. MASON
NICHOLAS A. MIGLIACCIO
1625 Massachusetts Ave, NW
Suite 605
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
COUNSEL FOR PLAINTIFFS IN
No. 09-16677, *BASINSKI v. VERIZON*
*COMMUNICATIONS, INC.* AND
No. 09-16679, *SUCHANEK v. SPRINT NEXTEL*
*CORP.*

s/ *Michael A. St. Pierre*
REVENS REVENS & ST. PIERRE
MICHAEL A. ST. PIERRE
946 Centerville Road
Warwick, RI 02886
Telephone: (401) 822-2900
Facsimile: (401) 826-3246
COUNSEL FOR PLAINTIFFS IN
No. 09-16682, *BISSITT v. VERIZON COMMUNICATIONS, INC.*

s/ *Vincent I. Parrett*
MOTLEY RICE LLC
JODI WESTBROOK FLOWERS
VINCENT I. PARRETT
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
COUNSEL FOR PLAINTIFFS IN
No. 09-16686, *CHULSKY v. CELLCO PARTNERSHIP*;
No. 09-16687, *CROCKETT v. HAWAIIAN TELCOM*;
No. 09-16688, *CROSS v. AT&T COMMUNICATIONS*;
No. 09-16690, *DUBOIS v. AT&T CORP*.; AND
No. 09-16691, *CROSS v. AT&T COMMUNICATIONS OF CALIFORNIA*

s/ *Roger L. Mandel*
STANLEY, MANDEL & IOLA
ROGER L. MANDEL
3100 Monticello Ave.
Suite 750

Dallas, TX 75205
Telephone: (214) 443-4300
COUNSEL FOR PLAINTIFFS IN
No. 09-16692, *PAT MAHONEY v. VERIZON*;
No. 09-16693, *PAM MAHONEY v. AT&T*;
No. 09-16694, *SOLOMON v. VERIZON*;
No. 09-16696, *FULLER v. VERIZON*;
No. 09-16697, *SOUDER v. AT&T*;
No. 09-16698, *DOLBERG V. AT&T CORP*

s/ *Michael D. Donovan*
MICHAEL D. DONOVAN
DONOVAN SEARLES, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: 215-732-6067
Facsimile: 215-732-8060
COUNSEL FOR PLAINTIFFS IN
No. 09-16694, *SOLOMON v. VERIZON*

s/ *M. Stephen Turner*
BROAD & CASSEL
M. STEPHEN TURNER
215 South Monroe Street
Suite 400
P.O. Box 11300
Tallahassee, FL 32302
Telephone: (850) 681-6810
Facsimile: (850) 681-9792
COUNSEL FOR PLAINTIFFS IN
No. 09-16700, *FORTNASH V. AT&T CORP.*

s/ *Gerald E. Meunier*
GERALD E. MEUNIER
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Telephone: (504) 522-2304
Facsimile: (504) 528-9973
COUNSEL FOR PLAINTIFFS IN
No. 09-16701, *HARDY v. AT&T CORP.*

s/ *R. James George*
GEORGE & BROTHERS, LLP
R. JAMES GEORGE
D. DOUGLAS BROTHERS
1100 Norwood Tower
114 West 7th Street
Austin, TX 78701
Telephone: (512) 495-1400
Facsimile (512) 499-0094
COUNSEL FOR PLAINTIFFS IN
No. 09-16702, *HARRINGTON, ET AL. V. AT&T INC., ET AL.*

s/ *Val Patrick Exnicios*
LISKA, EXNICIOS & NUNGESSER
ATTORNEYS-AT-LAW
VAL PATRICK EXNICIOS
One Canal Place, Suite 2290
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 410-9611
Facsimile: (504) 410-9937
COUNSEL FOR PLAINTIFFS IN
No. 09-16704, *HERRON v. VERIZON GLOBAL NETWORKS, INC.*

s/ *Christopher A. Slater*
SLATER ROSS
CHRISTOPHER A. SLATER
MICHAEL J. ROSS
1850 Benjamin Franklin Plaza

1 S.W. Columbia Street
Portland, OR 97258
Telephone: (503) 227-2024
Facsimile: (503) 224-7299
COUNSEL FOR PLAINTIFFS IN
No. 09-16706, *HINES V. VERIZON COMMUNICATIONS, INC.*

s/ *Brian H. Adler*
BADER STILLMAN & ADLER PL
BRIAN H. ADLER
6100 West Atlantic Blvd.
Margate, FL 33063
Telephone: (954) 971-3399
Facsimile: (954) 979-3101
COUNSEL FOR PLAINTIFFS IN
No. 09-16707, *JACOBS v. AT&T CORP.*

s/ *Sam J. Alton*
STONE, LEYTON & GERSHMAN, P.C.
JOSEPH R. DULLE
SAM J. ALTON
7733 Forsyth Blvd., Suite 500
St. Louis, MO 63105-1817
Telephone: (314) 721-7011
Facsimile: (314) 721-8660
COUNSEL FOR PLAINTIFFS IN
No. 09-16708, *MINK v. AT&T COMMUNICATIONS OF THE SOUTHWEST, INC.*

s/ *Richard P. Roche*
RICHARD P. ROCHE
4130 Zenith Avenue S.
Minneapolis, MN 55410
Telephone: (612) 929-6866
PRO SE
No. 09-16709, *ROCHE, ET AL. v. AT&T*

s/ *Barry R. Himmelstein*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
BARRY R. HIMMELSTEIN
ELIZABETH J. CABRASER
ERIC B. FASTIFF
ALLISON S. ELGART
275 Battery Street
29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
COUNSEL FOR PLAINTIFFS IN
No. 09-16710, *ROE, ET AL. v. AT&T CORP., AT&T INC., SBC LONG DISTANCE, LLC, PAC BELL TELEPHONE CO., AT&T COMMUNICATIONS OF CALIFORNIA* AND
No. 09-16712, *SPIELFOGEL-LANDIS, ET AL. v. MCI, LLC*

s/ *Clinton A. Krislov*
KRISLOV & ASSOCIATES, LTD.
CLINTON A. KRISLOV
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
Telephone: (312) 606-0500
Facsimile: (312) 606-0207
COUNSEL FOR PLAINTIFFS IN
No. 09-16717, *WAXMAN v. AT&T CORP.*

s/ *James M. Evangelista*
PAGE PERRY LLC
JAMES M. EVANGELISTA
1040 Crown Pointe Parkway
Suite 1050
Atlanta, GA 30338

Telephone: (770) 673-0047
Facsimile: (770) 673-0120
COUNSEL FOR PLAINTIFFS IN
No. 09-16719, *LEBOW v. BELLSOUTH*

s/ *Carl J. Mayer*
MAYER LAW GROUP LLC
CARL J. MAYER
66 Witherspoon Street, Suite 414
Princeton, New Jersey 08542
Telephone: (609) 921-8025
Facsimile: (609) 921-6964

BRUCE I. AFRAN, ESQ.
10 Braeburn Drive
Princeton, NJ 08540
Telephone: (609) 924-2075
Facsimile: (609) 924-1045
COUNSEL FOR PLAINTIFFS IN
No. 09-16720, *ANDERSON v. VERIZON COMMUNICATIONS, INC.*

s/ *Steven E. Schwarz*
THE LAW OFFICES OF STEVEN E. SCHWARZ, ESQ.
STEVEN E. SCHWARZ
2461 W. Foster Ave., #1W
Chicago, IL 60625
Telephone: (773) 837-6134
Facsimile: (773) 275-0202
COUNSEL FOR PLAINTIFFS IN
No. 09-16723, *JOLL V. AT&T CORP.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This joint brief complies with the type-volume limitation of Fed. R. App. Pro. 32(a)(7)(B) and Ninth Circuit Rule 32-1, as augmented by the extension of 1,400 words authorized by the Court on November 19, 2009, because it contains 15,206 words, excluding the parts of the brief exempted by Fed. R. App. Pro. 32(a)(7)(B)(iii).

This joint brief complies with the typeface requirements of Fed. R. App. Pro. 32(a)(5) and the type style requirements of Fed. R. App. Pro. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

s/ *Richard R. Wiebe*

Richard R. Wiebe
Counsel for Plaintiffs-Appellants
Tash Hepting, et al. in
No. 09-16676, *HEPTING, ET AL. v. AT&T CORP., ET AL.*

## STATEMENT OF RELATED CASES

Appellants are aware of no other cases in this Court that are related within the meaning of Ninth Circuit Rule 28-2.6.

## ADDENDUM OF RELEVANT STATUTORY PROVISIONS

**50 U.S.C. § 1885a (section 802 of FISA) . . . . . . . . . . . . . . . . . . . . . . . . 75**

**18 U.S.C. §§ 2511, 2520 (part of the Wiretap Act) . .. . . . . . . . . . . . . . 77**

**18 U.S.C. §§ 2702, 2707 (part of the Stored Communications Act provisions of the Electronic Communications Privacy Act) . . . . . . . 79**

**47 U.S.C. § 605 (part of the Communications Act of 1934) . . . . . . . . 80**

**50 U.S.C. §§ 1809, 1810 (part of FISA) . . . . . . . . . . . . . . . . . . . . . . . . 81**

**50 U.S.C. § 1885a (section 802 of FISA):**

**§1885a. Procedures for implementing statutory defenses.**

**(a) Requirement for certification.** Notwithstanding any other provision of law, a civil action may not lie or be maintained in a Federal or State court against any person for providing assistance to an element of the intelligence community, and shall be promptly dismissed, if the Attorney General certifies to the district court of the United States in which such action is pending that—

(1) any assistance by that person was provided pursuant to an order of the court established under section 103(a) [50 U.S.C. § 1803(a)] directing such assistance;

(2) any assistance by that person was provided pursuant to a certification in writing under section 2511(2)(a)(ii)(B) or 2709(b) of title 18, United States Code;

(3) any assistance by that person was provided pursuant to a directive under section 102(a)(4) [50 U.S.C. § 1802(a)(4)], 105B(e) [50 U.S.C. § 1805b(e)], as added by section 2 of the Protect America Act of 2007 (Public Law 110-55), or 702(h) [50 U.S.C. § 1881a(h)] directing such assistance;

(4) in the case of a covered civil action, the assistance alleged to have been provided by the electronic communication service provider was—

(A) in connection with an intelligence activity involving communications that was—

(i) authorized by the President during the period beginning on September 11, 2001, and ending on January 17, 2007; and

(ii) designed to detect or prevent a terrorist attack, or activities in preparation for a terrorist attack, against the United States; and

(B) the subject of a written request or directive, or a series of written requests or directives, from the Attorney General or the head of an element of the intelligence community (or the deputy of such person) to the

electronic communication service provider indicating that the activity was—

(i) authorized by the President; and

(ii) determined to be lawful; or

(5) the person did not provide the alleged assistance.

**(b) Judicial review.**

(1) Review of certifications. A certification under subsection (a) shall be given effect unless the court finds that such certification is not supported by substantial evidence provided to the court pursuant to this section.

(2) Supplemental materials. In its review of a certification under subsection (a), the court may examine the court order, certification, written request, or directive described in subsection (a) and any relevant court order, certification, written request, or directive submitted pursuant to subsection (d).

**(c) Limitations on disclosure.** If the Attorney General files a declaration under section 1746 of title 28, United States Code, that disclosure of a certification made pursuant to subsection (a) or the supplemental materials provided pursuant to subsection (b) or (d) would harm the national security of the United States, the court shall—

(1) review such certification and the supplemental materials in camera and ex parte; and

(2) limit any public disclosure concerning such certification and the supplemental materials, including any public order following such in camera and ex parte review, to a statement as to whether the case is dismissed and a description of the legal standards that govern the order, without disclosing the paragraph of subsection (a) that is the basis for the certification.

**(d) Role of the parties.** Any plaintiff or defendant in a civil action may submit any relevant court order, certification, written request, or directive to the district court referred to in subsection (a) for review and shall be permitted to participate in the briefing or argument of any legal issue in a judicial proceeding conducted pursuant to this section, but only to the extent that such participation does not require the

disclosure of classified information to such party. To the extent that classified information is relevant to the proceeding or would be revealed in the determination of an issue, the court shall review such information in camera and ex parte, and shall issue any part of the court's written order that would reveal classified information in camera and ex parte and maintain such part under seal.

**(e) Nondelegation.** The authority and duties of the Attorney General under this section shall be performed by the Attorney General (or Acting Attorney General) or the Deputy Attorney General.

**(f) Appeal.** The courts of appeals shall have jurisdiction of appeals from interlocutory orders of the district courts of the United States granting or denying a motion to dismiss or for summary judgment under this section.

**(g) Removal.** A civil action against a person for providing assistance to an element of the intelligence community that is brought in a State court shall be deemed to arise under the Constitution and laws of the United States and shall be removable under section 1441 of title 28, United States Code.

**(h) Relationship to other laws.** Nothing in this section shall be construed to limit any otherwise available immunity, privilege, or defense under any other provision of law.

**(i) Applicability.** This section shall apply to a civil action pending on or filed after the date of the enactment of the FISA Amendments Act of 2008 [enacted July 10, 2008].

**18 U.S.C. §§ 2511, 2520 (part of the Wiretap Act):**

**§ 2511. Interception and disclosure of wire, oral, or electronic communications prohibited**

(1) Except as otherwise specifically provided in this chapter any person who—

> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

. . .

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

. . .

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

. . .

(3)

(a) Except as provided in paragraph (b) of this subsection, a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

. . .

**§ 2520. Recovery of civil damages authorized**

**(a) In general.** Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

. . .

**18 U.S.C. §§ 2702, 2707 (part of the Stored Communications Act provisions of the Electronic Communications Privacy Act):**

**§ 2702. Voluntary disclosure of customer communications or records**

**(a) Prohibitions.** Except as provided in subsection (b) or (c)—

(1) a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service; and

(2) a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service—

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service;

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing; and

(3) a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by paragraph (1) or (2)) to any governmental entity.

. . .

**§ 2707. Civil action**

**(a) Cause of action.** Except as provided in section 2703(e) [18 U.S.C. § 2703(e)], any provider of electronic communication

service, subscriber, or other person aggrieved by any violation of this chapter [18 U.S.C. §§ 2701 et seq.] in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

. . .

**47 U.S.C. § 605 (part of the Communications Act of 1934):**

**§ 605. Unauthorized publication or use of communications**

**(a) Practices prohibited.** Except as authorized by chapter 119, title 18, United States Code [18 U.S.C. §§ 2510 et seq.], no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. . . .

. . .

**(e) Penalties; civil actions; remedies; attorney's fees and costs; computation of damages; regulation by State and local authorities.**

. . .

(3)

(A) Any person aggrieved by any violation of subsection (a) or paragraph (4) of this subsection may bring a civil action in a United States district court or in any other court of competent jurisdiction.

**50 U.S.C. §§ 1809, 1810 (part of FISA):**

**§ 1809 Criminal sanctions**
**(a) Prohibited activities.** A person is guilty of an offense if he intentionally—

(1) engages in electronic surveillance under color of law except as authorized by this Act, chapter 119, 121, or 206 of title 18, United States Code [18 U.S.C. §§ 2510 et seq., 2701 et seq., or 3121 et seq.], or any express statutory authorization that is an additional exclusive means for conducting electronic surveillance under section 112 [50 U.S.C. § 1812][.]; or

(2) discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by this Act, chapter 119, 121, or 206 of title 18, United States Code [18 U.S.C. §§ 2510 et seq., 2701 et seq., or 3121 et seq.], or any express statutory authorization that is an additional exclusive means for conducting electronic surveillance under section 112 [50 U.S.C. § 1812][.].

. . .

**§ 1810 Civil liability**
An aggrieved person . . . who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 109 [50 U.S.C. § 1809] shall have a cause of action against any person who committed such violation . . . .