**CONSOLIDATED CASE NOS. 09-16676, 09-16677, 09-16679, 09-16682, 09-16683, 09-16684, 09-16685, 09-16686, 09-16687, 09-16688, 09-16690, 09-16691, 09-16692, 09-16693, 09-16694, 09-16696, 09-16697, 09-16698, 09-16700, 09-16701, 09-16702, 09-16704, 09-16706, 09-16707, 09-16708, 09-16709, 09-16710, 09-16712, 09-16713, 09-16717, 09-16719, 09-16720, 09-16723**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION**
**MDL NO. 06-1791-VRW**

---

**NO. 09-16676**

**TASH HEPTING, GREGORY HICKS, CAROLYN JEWEL, AND ERIC KNUTZEN,**
**ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,**

**PLAINTIFFS-APPELLANTS,**

**V.**

**AT&T CORPORATION, AT&T, INC.,**

**DEFENDANTS-APPELLEES,**

**AND**

**UNITED STATES OF AMERICA,**

**DEFENDANT-INTERVENOR-APPELLEE.**

---

**AND CONSOLIDATED CASES**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
THE HONORABLE VAUGHN R. WALKER, CHIEF UNITED STATES DISTRICT JUDGE, PRESIDING

---

# JOINT APPELLANTS' REPLY BRIEF OF ALL PLAINTIFFS-APPELLANTS *EXCEPT* NO. 09-16683

**(PRIOR APPEAL: Nos. 06-17132, 06-17137 (Pregerson, Hawkins, McKeown, Js.))**

---

**[*COUNSEL LISTED ON SIGNATURE PAGE*]**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................ 4

I. Section 802 Violates Article I, Section 7 Because It Gives The Attorney General Plenary Power To Nullify And Preempt Existing Law ........................................ 4

A. Like The Cancellations Struck Down In *Clinton*, A Section 802 Certification Is A Unilateral Post-Enactment Action That Nullifies The Legal Force And Effect Of Existing Law .................................. 4

B. Section 802 Is Not A Statute Like The One In *Robertson* Where Congress Itself Unconditionally Changes The Legal Standards Governing A Cause Of Action ...................................... 10

1. The Government's *Robertson* Argument Lacks Merit ........................................................ 10

2. The Amici's *Ileto* Argument Lacks Merit ........... 12

C. None Of The Other Statutes On Which The Government, The Carriers, And Their Amici Rely Provides For The Executive To Nullify Accrued Causes Of Action By Negating Existing Federal Law And Preempting State Law ................................................................... 15

1. Section 802 Is Not A Fact-Triggering-A-Mandatory-Consequence Statute Like The One In *Field v. Clark* ........................................... 15

2. Section 802 Is Not A Statute Authorizing The Executive To Act On A Matter On Which Congress Has Not Spoken ........................ 17

3. Section 802 Is Not A Foreign Affairs Or Military Command Statute .................................. 19

4. Section 802 Is Not Analogous To The Government-Employee Immunity

Provisions Of The Westfall Act, Which Are Unconditional And Not Under The Control Of The Executive ....................23

5. Section 802 Is Not A Statute Waiving A Condition On An Executive Activity....................25

II. Section 802 Violates The Nondelegation Doctrine Because It Delegates Authority To The Executive Without Any "Intelligible Principle"....................29

A. Section 802 Is Unconstitutional If It Lacks An Intelligible Principle ....................29

1. The Intelligible-Principle Requirement Applies To Section 802....................29

2. Changing The Law To Preclude Plaintiffs' Claims Is Fundamentally Different From A Decision Whether To Assert Claims Or Defenses Possessed By The United States...........31

B. The Statutory Text Of Section 802 Contains No Intelligible Principle ....................33

C. Legislative History Cannot Supply The Intelligible Principle That Section 802 Lacks ................35

D. Statutory Purpose, Factual Background, And Context Are Only Used To Give Meaning To A Statutory Standard, Not To Substitute For The Absence Of Any Statutory Standard ....................36

E. Section 802 Is Nothing Like The Existing Liability Limitations Of FISA, ECPA, And The Wiretap Act....................39

F. Section 802 Does Not Impose A Mandatory Duty To Certify Upon The Attorney General ................40

III. Section 802 (a) Violates Due Process By Denying Plaintiffs A *De Novo* Decision By An Unbiased Adjudicator....................41

A. Section 802 Deprives Plaintiffs Of Liberty And Property Interests Protected By The Due Process Clause ....................42

B. Section 802 (a) Denies Plaintiffs A *De Novo* Decision By An Unbiased Adjudicator ....................... 44

C. Section 802(c) Violates Due Process By Denying Plaintiffs Meaningful Notice Of The Government's Basis For Seeking Dismissal And A Meaningful Opportunity To Oppose The Government's Arguments And Evidence ....................... 48

D. The Totality Of Section 802's Procedures Aggravates The Denial Of Due Process That Each Works Individually ....................... 53

IV. Section 802 Unconstitutionally Violates the Separation-of-Powers Prerogative of the Judicial Branch to Decide Cases Before It ....................... 54

V. Section 802 Is Unconstitutional Because It Authorizes The Attorney General To Prohibit The Adjudication Of Plaintiffs' Constitutional Claims For Injunctive Relief In Any Federal Or State Forum ....................... 58

A. Section 802 Presents A "Serious Constitutional Question" ....................... 60

B. Plaintiffs' Injunctive Remedies Against The Carriers Cannot Be Eliminated Because Claims Against The Government Remain Available ....................... 62

1. Tax Refund Cases ....................... 63

2. Tax Injunction Act and Anti-Injunction Act Cases ....................... 65

3. Other Alternate Remedial Schemes ....................... 67

4. Immunities To Damages Liability ....................... 68

C. Plaintiffs Seek An Injunction Directly Against The Carriers; A Suit Against The Government Is Not An Adequate Alternative ....................... 71

CONCLUSION ....................... 72

APPENDIX A ....................... 83

# TABLE OF AUTHORITIES

## Cases

*Alexander v. "Americans United" Inc.*, 416 U.S. 752 (1974) .............66, 67

*Al-Haramain Islamic Foundation v. Bush*,
507 F.3d 1190 (9th Cir. 2007) ............................................................52

*American Federation of Government Employees v. Stone*,
502 F.3d 1027 (9th Cir. 2007) ........................................................61, 62

*Anniston Manufacturing. Co. v. Davis*, 301 U.S. 337 (1937).........63, 64, 65

*Bartlett v. Bowen*, 816 F.2d 695 (D.C. Cir. 1987) ....................................60

*Bob Jones University v. Simon*, 416 U.S. 725 (1974) ..........................66, 67

*Bowen v. Michigan Academy of Family Physicians*,
476 U.S. 667 (1986)............................................................59, 60, 61, 70

*Burrill v. Locomobile Co.*, 258 U.S. 34 (1922)..............................63, 64, 65

*Bush v. Lucas*, 462 U.S. 367 (1983).........................................................67

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948).......................................................................20

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 412 (1971).....55

*Clinton v. City of New York*, 524 U.S. 417 (1998)..............................passim

*Concrete Pipe & Products v. Construction Laborers Pension Trust*,
508 U.S. 602 (1993)...................................................................44, 45, 46

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..........................45

*Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001)..........64

*Currin v. Wallace*, 306 U.S. 1 (1939) .......................................................19

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) .......................................23

*Department of the Navy v. Egan*, 484 U.S. 518 (1988).............................52

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975)..........69

*Edison Co. v. Labor Board*, 305 U.S. 197 (1938) ........................................ 56

*Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) ................................................ 14

*Ex parte Young*, 209 U.S. 123 (1908) ........................................................ 70

*Federal Energy Administration v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976)................................................................................ 38

*Fields v. Legacy Health System*, 413 F.3d 943 (9th Cir. 2005) .................. 43

*Franchise Tax Board of California v. Alcan Aluminum Ltd.*,
493 U.S. 331 (1990)........................................................................... 65, 66

*Go-Bart Importing Co. v. United States*, 282 U.S. 344 (1931)................... 51

*Greene v. Lindsey*, 456 U.S. 444 (1982) .................................................... 49

*Grimesy v. Huff*, 876 F.2d 738 (9th Cir. 1989) .......................................... 43

*Halperin v. Kissinger*, 807 F.2d 180 (D.C. Cir. 1986)................................ 21

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)................................................. 22

*Healthcare Employees Union, Local 399 v. NLRB*,
463 F.3d 909 (9th Cir. 2006) ................................................................ 45

*Heckler v. Chaney*, 470 U.S. 821 (1985)..................................................... 32

*Holy Land Foundation for Relief & Development v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003).............................................................. 50

*Hortonville Joint School District No. 1 v. Hortonville Education Ass'n*,
426 U.S. 482 (1976)................................................................................ 48

*Hui v. Castaneda*, ___ U.S. ___, 130 S.Ct. 1845 (2010) ............................ 24

*Ileto v. Glock*, 565 F.3d 1126 (9th Cir. 2009) ....................................... 13, 41

*In re Murchison*, 349 U.S. 133 (1955) ........................................................ 44

*INS v. Chada*, 462 U.S. 919 (1983)............................................................. 32

*Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005) ........ 33

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004)............................................. 50

*Jones v. United States*, 137 U.S. 202 (1890)............................................... 22

*Lichter v. United States*, 334 U.S. 742 (1948) .......................................... 37

*Little v. Barreme*, 6 U.S. 170 (1804) ......................................................... 22

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)............................... 43

*Loving v. United States*, 517 U.S. 748 (1996) .................................... passim

*Lyon v. Agusta S.P.A.*, 252 F.3d 1078 (9th Cir. 2001) ............................... 43

*Marbury v. Madison*, 5 U.S. 137, 163 (1803) ........................................... 60

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) ............... 15, 17, 20, 22

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ......................................... 49, 52

*McCarthy v. Apfel*, 221 F.3d 1119 (9th Cir. 2000) .................................... 45

*Mistretta v. United States*, 488 U.S. 361 (1989) .................................. 37, 38

*Owens v. Republic of the Sudan*,
531 F.3d 884 (D.C. Cir. 2008)............................................. 16, 17, 22, 38

*People's Mojahedin Organization v. Department of State*,
327 F.3d 1238 (D.C. Cir. 2003)........................................................... 50

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)................................ 54

*Pollard v. Geo Group, Inc.*, 2010 WL 2246418 (9th Cir. 2010)................. 64

*Pulliam v. Allen*, 466 U.S. 522 (1984) ............................................... 69, 70

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004)................................ 22

*Republic of Iraq v. Beaty*, __ U.S. __, 129 S.Ct. 2183 (2009) .................... 23

*Richardson v. Perales*, 402 U.S. 389 (1971).............................................. 45

*Robertson v. Seattle Audubon Society*, 503 U.S. 429 (1992) ............... passim

*Samantar v. Yousuf*, 2010 U.S. LEXIS 4378 (June 1, 2010) ...................... 22

*Schowengerdt v. General Dynamics Corp.*,
823 F.2d 1328 (9th Cir. 1987) ............................................................ 65

*Schweiker v. Chilicky*, 487 U.S. 412 (1988).............................................. 67

*South Carolina v. Regan*, 465 U.S. 367 (1984)........................................... 66

*Stanford v. Texas*, 379 U.S. 476 (1965) .......................................................51

*Supreme Court of Virginia v. Consumers Union of the U.S.*,
446 U.S. 719 (1980)...........................................................................69

*Tenney v. Brandhove*, 341 U.S. 367 (1951) ................................................69

*The Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) ...................................................................69

*Touby v. United States*, 500 U.S. 160 (1991) .......................................18, 34

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) ............30

*United States v. Armstrong*, 517 U.S. 456 (1996).......................................32

*United States v. Brandau*, 578 F.3d 1064 (9th Cir. 2009)...........................64

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936)..............................................................18, 19, 20, 22

*United States v. Dalm*, 494 U.S. 596 (1990) ...............................................13

*United States v. Grimaud*, 220 U.S. 506 (1911)...................................18, 19

*United States v. Jensen*, 425 F.3d 698 (9th Cir. 2005)); ............................31

*United States v. Labonte*, 520 U.S. 751 (1997)..........................................32

*United States v. Lefkowitz*, 285 U.S. 452 (1932)........................................51

*United States v. Mazurie*, 419 U.S. 544 (1975)...........................................35

*United States v. Oakland Cannabis Buyers' Cooperative*,
532 U.S. 483 (2001)...........................................................................41

*United States v. United States District Court (Keith)*,
407 U.S. 297 (1972)...........................................................................21

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)............................45

*Webster v. Doe*, 486 U.S. 592 (1988).............................................58, 61, 62

*Wheaton v. Webb-Petett*, 931 F.2d 613 (9th Cir. 1991) ..............................69

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ........29, 34, 35

*Withrow v. Larkin*, 421 U.S. 35 (1975) ......................................................47

*Yakus v. United States*, 321 U.S. 414 (1944) .......................................18, 19

**Statutes**

5 U.S.C. § 553 ....................................................................................56

5 U.S.C. § 556 ....................................................................................56

5 U.S.C. § 556(d)................................................................................56

5 U.S.C. § 557 ....................................................................................56

5 U.S.C. § 706 ....................................................................................55

5 U.S.C. § 706(2)(A) ..........................................................................55

5 U.S.C. § 706(2)(B) ..........................................................................55

5 U.S.C. § 706(2)(C) ..........................................................................55

5 U.S.C. § 706(2)(D) ....................................................................55, 56

5 U.S.C. § 706(2)(E).....................................................................55, 56

5 U.S.C. § 706(2)(F)............................................................................55

15 U.S.C. § 7902 ...........................................................................13, 24

18 U.S.C. § 2511(2)(a)(ii)(B)...............................................................39

18 U.S.C. § 2511(2)(f)...................................................................21, 72

18 U.S.C. § 2520 ....................................................................................7

18 U.S.C. § 2703(e)..............................................................................39

18 U.S.C. § 5032 ..................................................................................31

21 U.S.C. § 811 ....................................................................................18

21 U.S.C. § 811(h)................................................................................34

21 U.S.C. § 812 ....................................................................................18

22 U.S.C. § 2371(a)..............................................................................16

22 U.S.C. § 2656f(a)(1)(B) ..................................................................16

22 U.S.C. § 2656f(a)(2) .......... 16

22 U.S.C. § 2656f(b)(2) .......... 16

22 U.S.C. § 2656f(b)(3) .......... 16

22 U.S.C. § 2656f(d)(5) .......... 16

26 U.S.C. § 7421 .......... 65

28 U.S.C. § 1341 .......... 65

28 U.S.C. § 1346(b)(1) .......... 24

28 U.S.C. former § 1605(a)(7) .......... 16

28 U.S.C. § 2672 .......... 24

28 U.S.C. § 2674 .......... 24

28 U.S.C. § 2679(b)(1) .......... 23

28 U.S.C. § 2679(d)(1) .......... 24

28 U.S.C. § 2679(d)(3) .......... 24

42 U.S.C. § 1983 .......... 70

50 U.S.C. § 1805(h) .......... 39

50 U.S.C. § 1810 .......... 6, 7, 8

50 U.S.C. § 1881a(h)(3) .......... 39

50 U.S.C. § 1885a, section 802 of the Foreign Intelligence Surveillance Act (“FISA”) .......... passim

50 U.S.C. App. § 2405(j)(1)(A) .......... 16

50 U.S.C. App. § 2405(j)(5) .......... 16

Balanced Budget Act of 1997, Pub. L. 105-33, 111 Stat. 251 .......... 5

Taxpayer Relief Act of 1997, Pub. L. 105-34, 111 Stat. 788 .......... 5

**Constitutional Provisions**

U.S. Constitution, article I, section 7 ................................................passim

U.S. Constitution, article II, section 3 .......................................................32

U.S. Constitution, article III .................................................................2, 54

Mass. Constitution, Part the First, article XXX .........................................58

**Executive Materials**

33 Weekly Comp. Pres. Docs. 1221..............................................................5

62 Fed. Reg. 43262..........................................................................................5

62 Fed. Reg. 43265..........................................................................................5

**Other Authorities**

Gunther, *Congressional Power to Curtail Federal Court Jurisdiction: An Opinionated Guide to the Ongoing Debate*, 36 Stan.L.Rev. 895 (1984)........................................................................60

Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362 (1953)..................................................................68

## INTRODUCTION

As plaintiffs' opening brief explains, there has *never* been another statute like section 802 of the Foreign Intelligence Surveillance Act (50 U.S.C. §1885a). Section 802's fundamental constitutional defect is that it authorizes Congress to give away to the Attorney General its exclusive power to negate existing federal and state law and thereby abolish plaintiffs' accrued causes of action. Article I, section 7 of the Constitution prohibits Congress from abdicating this power.

The response of the government and the telecommunications carriers is to ignore the statutory text of section 802 and instead to proffer a welter of other, unrelated statutes. All of these other statutes are irrelevant to this Court's inquiry because none gives the Executive the unlimited power to negate accrued causes of action between private parties by nullifying previously-enacted federal law and preempting state law.

Independently, section 802 is unconstitutional because it lacks any intelligible principle governing the Attorney General's use of this power. Neither section 802 nor its legislative history states any standard limiting the Attorney General's discretion, and in the absence of a standard stated by Congress this Court may not invent one.

Section 802 is also unconstitutional because its procedure violates due process and the separation of powers. Plaintiffs never received an adjudication *de novo* from anyone, only deferential judicial review of a biased, non-adjudicative executive decision, and the hearing they did receive

was meaningless because they received no notice of the secret legal grounds on which the government sought dismissal or the secret evidence on which the government relied. This procedure not only violates due process; it enlists the courts in a sham proceeding that lacks the essential elements of judicial decisionmaking and violates the Judiciary's Article III independence.

Finally, section 802 is unconstitutional to the extent it denies plaintiffs any forum whatsoever for their constitutional claims for equitable relief against the telecommunication carrier defendants.

It has now been almost a decade since the carriers began turning over the communications and communications records of their customers *en masse* to the government in a program of warrantless surveillance.[1] They

---

[1] The government continues its pretense that there once was a program known as the "Terrorist Surveillance Program." Government Br. at 4. As the Inspectors' General "Unclassified Report On The President's Surveillance Program" and many other sources make clear, the term "Terrorist Surveillance Program" was an after-the-fact marketing label concocted by the Executive in December 2005 to conceal from the American people the true scope of the unlawful surveillance activities the Executive was conducting. *See* IG Report at 1-2, 5-6, 36-37, *available at* <www.dni.gov/reports/report_071309.pdf>; ER 508-11. The true scope of that surveillance—what the IG report terms the "President's Surveillance Program"—was much broader and much more invasive. Thus, the government's assertion that the Terrorist Surveillance Program is no longer "operative" (Government Br. at 4) is meaningless misdirection given that there never was any operational program called the Terrorist Surveillance Program or any program narrowly limited to the fictional boundaries of the Terrorist Surveillance Program.

did so in clear violation of their customers' rights under the Constitution, federal statutory law, and state law. Only Congress can nullify the federal statutes and preempt the state law under which plaintiffs' causes of action have accrued. Because Congress itself did not do so, and because the procedures by which it attempted to do so are independently unconstitutional, these actions must go forward.

# ARGUMENT

## I. Section 802 Violates Article I, Section 7 Because It Gives The Attorney General Plenary Power To Nullify And Preempt Existing Law

### A. Like The Cancellations Struck Down In *Clinton*, A Section 802 Certification Is A Unilateral Post-Enactment Action That Nullifies The Legal Force And Effect Of Existing Law

Section 802 has no parallel in any other statute ever enacted by Congress because it gives the Attorney General power that Congress has never before in our history given to the Executive: the discretionary power to negate accrued causes of action between private parties by nullifying the existing federal and state law giving rise to the accrued causes of action. Attorney General Mukasey's certification nullified federal law and preempted state law that would otherwise govern these actions and instead made plaintiffs' actions subject to section 802's dismissal procedure. AOB 13-26. The Constitution, however, requires that any decision to nullify the legal force or effect of previously-enacted federal law, or to preempt state law, must be made by Congress, not the Executive. *Clinton v. City of New York*, 524 U.S. 417, 437-41, 444-45 (1998).

Attempting to distinguish *Clinton*, the telecommunications carrier defendants ("carriers") mistakenly assert that the President's post-enactment cancellation of an appropriation and a tax benefit in *Clinton* altered the literal text of the statutes containing the cancelled items and that therefore Attorney General Mukasey's post-enactment certification is constitutional

because it did not physically change the text of any federal or state statute. Carriers' Br. at 14. This argument misdescribes the operation of the Line Item Veto Act at issue in *Clinton*.

In *Clinton*, the President's cancellation was a unilateral post-enactment action, and so, regardless of its constitutionality, could not and did not alter a single word of the enacted appropriations statutes containing the cancelled provisions.[2] *Clinton*, 524 U.S. at 423-25, 436 ("each of those provisions had been signed into law . . . before it was canceled"), 439 ("the statutory cancellation occurs *after* the bill becomes law" (emphasis original)). Because the statutes were already enacted law, his post-enactment cancellation did not alter the literal text of the statutes in the Statutes at Large, which sets forth the statutes as enacted, including the cancelled provisions. 111 Stat. 251, 515 (§ 4722(c)); 111 Stat. 788, 895-96 (§ 968); *see Clinton*, 524 U.S. at 421. The President's cancellation altered only the legal force and effect of the cancelled provisions; the words of the cancelled provision remained in the statute book. Thus, the suggestion that under the Line Item Veto Act the President altered the text of enrolled bills

---

[2] There were two enrolled appropriations bills at issue in Clinton, the Balanced Budget Act of 1997 and the Taxpayer Relief Act of 1997. These became Public Laws 105-33 and 105-34, respectively, when the President signed them on August 5, 1997. 33 Weekly Comp. Pres. Docs. 1221 (Aug. 8, 1997).

After both bills became laws, the President on August 11, 1997, cancelled two specific provisions in the laws. 62 Fed. Reg. 43262; 62 Fed. Reg. 43265.

*before* signing and enacting them (as many governors may do under state executive line-item-veto powers) is mistaken.

As the Supreme Court taught in *Clinton*, the pertinent question under Article I, section 7 is whether a unilateral post-enactment executive action has nullified in part or in whole the "legal force or effect" of an enacted statute, thereby effecting "the functional equivalent of a partial repeal." *Clinton*, 524 U.S. at 441 (internal quotation marks omitted). This nullification of the legal force and effect of the cancelled provision, and not a literal alteration of the text of an enacted statute in the Statutes at Large, is what the *Clinton* court is referring to when it says that the Line Item Veto Act "gives the President the unilateral power to change the text of duly enacted statutes." *Id*. at 447.

Section 802 is an exact analog of the Line Item Veto Act. In each case, the legal force or effect of enacted statutes is partially negated if the Executive performs a unilateral, discretionary, post-enactment action, even though the text of the negated statute remained unchanged. If the Executive takes no action, the legal force and effect of existing law continues unimpaired.

Section 802 was enacted into law when the President signed FISAAA on July 10, 2008. The enactment of section 802 did not negate the federal law or preempt the state law giving rise to plaintiffs' causes of action, and those causes of action remained viable and unimpaired by the enactment of section 802. For example, 50 U.S.C. § 1810, creating a civil cause of action

for any "aggrieved person" subjected to electronic surveillance in violation of FISA, continued to apply to plaintiffs and their claims against the carriers, as did 18 U.S.C. § 2520, creating a civil cause of action for "any person" whose communications are "intercepted, disclosed, or intentionally used in violation of" chapter 119 of title 18. None of the defendants could have moved for a dismissal of those causes of action on the basis of section 802 on the day it was enacted.

When Attorney General Mukasey filed his certification on September 22, 2008, however, he changed the legal force and effect of the state and federal laws that previously had offered plaintiffs a remedy. As a result of his cancellation, plaintiffs and their injuries are now excluded from the scope of the federal statutes giving rise to their causes of action and the state laws on which plaintiffs relied are now preempted as to them. For example, plaintiffs and their claims are now excluded from the scope of those who are "aggrieved person[s]" under 50 U.S.C. § 1810 and from the scope of those who are "any person[s]" under 18 U.S.C. § 2520. With respect to plaintiffs and their claims, those statutes are now a dead letter because, and only because, of Attorney General Mukasey's certification triggering the dismissal procedures of section 802. This is the "functional equivalent of a partial repeal" (*Clinton*, 524 U.S. at 438) of those statutes as to plaintiffs.

The plain words of 50 U.S.C. § 1810 have not been altered by Attorney General Mukasey's certification and on their face still give to plaintiffs a cause of action, just as the appropriations statute in *Clinton* was

not altered by the President's cancellation and on its face still authorized the cancelled appropriation. And the plain words of section 802 do nothing of their own force to take away plaintiffs' cause of action under 50 U.S.C. § 1810, just as nothing in the Line Item Veto Act of its own force cancelled the appropriation at issue in *Clinton*. Yet 50 U.S.C. § 1810 no longer has any legal force or effect for plaintiffs' claims, and the cause of that change in the statute's legal force and effect is Attorney General Mukasey's certification, not Congress' enactment of section 802.

As did the President's cancellation in *Clinton*, Attorney General Mukasey's certification here has made laws that would otherwise benefit plaintiffs "entirely inoperative as to" them. *Clinton*, 524 U.S. at 441. "In both legal and practical effect," Attorney General Mukasey "has amended . . . Acts of Congress by repealing a portion of" them. *Id*. at 438. Statutes that once afforded plaintiffs a remedy no longer do so because Attorney General Mukasey has unilaterally excluded plaintiffs from their scope and instead has subjected plaintiffs' actions to dismissal under section 802.

Section 802's unconstitutionality is more sweeping than the Line Item Veto Act because it not only nullifies federal law but also preempts state law. Congress cannot empower the Executive to preempt state law at its discretion; if Congress wants to preempt state law it must enact a law in

which it, and not the Executive, makes the determination to preempt state law.[3] AOB at 21-22.

This examination of how Attorney General Mukasey's certification nullifies existing federal law and preempts state law demonstrates why the carriers are incorrect when they assert that it was Congress' enactment of section 802 and not Attorney General Mukasey's certification that "establish[ed] a new defense" in plaintiffs' lawsuits. Carriers' Br. at 15. Leaving aside whether section 802 is properly characterized as a defense (given that a defendant cannot ever invoke it and that it provides no basis for dismissal until the Attorney General files a certification negating existing law), it is not a defense that Congress imposed. When Congress creates an affirmative defense, *it* makes the decision to alter the scope of liability; Congress itself draws the new boundary line. Here, section 802 did not itself alter the scope of the existing liability of these specific defendants to these plaintiffs but instead gave the Attorney General the unilateral power to do so. Had Attorney General Mukasey decided not to file a certification, these lawsuits would have continued unaffected by section 802 and could not have been subject to dismissal under section 802.

---

[3] The carriers address Attorney General Mukasey's preemption of state law only in passing in a one-sentence footnote, in which they erroneously assert that Congress and not the Attorney General decided that the state-law causes of action of these plaintiffs should be preempted. Carriers' Br. at 24 n.13. That single-sentence footnote is more than the government can muster. It never addresses Attorney General Mukasey's preemption of state law.

The carriers similarly err in asserting that "the Attorney General's certification did not deprive the statutes creating Plaintiffs' claims of legal force." Carriers' Br. at 16. If they mean that the certification did not deprive the statutes of *all* legal force that is true but irrelevant: The relevant consideration is that Attorney General Mukasey's certification deprived the statutes of any legal force or effect *as to the plaintiffs and defendants here*, just as in *Clinton* the relevant consideration was that the President's cancellations had rendered the Balanced Budget Act and the Taxpayers Relief Act "entirely inoperative as to [the plaintiffs]," even though those statutes continued to otherwise have some legal force and effect. *Clinton*, 524 U.S. at 441. If the carriers mean that the certification did not deprive the statutes of legal force in any respect whatsoever, the statement is false. The legal force of the federal statutes and state law creating plaintiffs' causes of action that existed the day before Attorney General Mukasey filed his certification was rendered entirely inoperative as to plaintiffs; if it were otherwise, plaintiffs would still have their causes of action. To assert otherwise is legerdemain.

### B. Section 802 Is Not A Statute Like The One In *Robertson* Where Congress Itself Unconditionally Changes The Legal Standards Governing A Cause Of Action

#### 1. The Government's *Robertson* Argument Lacks Merit

The government similarly errs when it argues that Congress did "alter applicable law" and "changed the law" simply by enacting section 802.

Government Br. at 3, 16, 18, 22, 24-25. The relevant question is not whether Congress by enacting section 802 added some new words to the statute book but whether enacting section 802, without more, altered or changed the legal force and effect of the existing laws giving rise to plaintiff's causes of action. The government avoids the fact that by enacting section 802 Congress made no change to the legal force or effect of the laws establishing plaintiffs' federal and state causes of action, and that the change occurred only when the Attorney General filed his certification and made the dismissal provisions of section 802 applicable for the first time to these actions.

*Robertson v. Seattle Audubon Society*, 503 U.S. 429, 438-41 (1992), upon which the government and telecommunications defendants both rely (Government Br. at 24-25; Carriers' Br. at 15), illustrates the difference between Congress nullifying existing law and section 802's unconstitutional scheme authorizing the Attorney General to nullify existing law. In *Robertson*, Congress "*did* amend applicable law" (*id*. at 441, emphasis original) only because it unconditionally "replaced the legal standards" (*id*. at 437) governing pending lawsuits; no action by the Executive was necessary to trigger the change in the governing legal standards, and the Executive had no power to choose whether or not the new legal standards would apply. AOB at 17-18, 25.

By contrast, Congress did not change the legal standards governing plaintiffs' causes of action by its enactment of section 802; only the

Attorney General's filing of his certification did that by making plaintiffs' actions subject to the dismissal procedure of section 802 and negating the federal and state causes of action that would have otherwise governed them. Had the Attorney General not filed his certification, these actions could not have been dismissed under the dismissal procedure of section 802 even if they fell within one of the statutory categories of subsections (a)(1) through (a)(5).

Thus, the government is mistaken when it asserts that "[i]n enacting Section 802, Congress made the overriding policy judgment that, in prescribed circumstances, suits against private parties alleged to have assisted an element of the intelligence community should be dismissed." Government Br. at 30. To the contrary, in section 802, unlike the statute in *Robertson*, Congress refused to decide whether such suits should be subject to dismissal and gave over its power to make that decision to the Attorney General. Congress made no "fundamental policy judgment that . . . [this] litigation should not proceed." Government Br. at 21. That was the Attorney General's doing; had he not decided to file a certification, this litigation would have proceeded forward unaffected by section 802.

### 2. The Amici's *Ileto* Argument Lacks Merit

The amici law professors are similarly mistaken when they assert that section 802 is identical to another statute in which Congress itself unconditionally changed the legal standards governing a designated category of claims: the gun manufacturers' immunity statute at issue in *Ileto v.*

*Glock*, 565 F.3d 1126, 1139 (9th Cir. 2009). Amici Br. at 22-26. Amici erroneously contend that "[s]ection 802 is structurally identical to the PLCAA [i.e., the gun manufacturers' immunity statute]." Amici Br. at 24. It is not. As explained in plaintiffs' opening brief at 16-17, in the gun manufacturers' immunity statute Congress unconditionally abolished all federal and state causes of action falling within the statute's scope by denying all federal and state courts jurisdiction over such actions. 15 U.S.C. § 7902 ("A qualified civil liability action may not be brought in any Federal or State court."). Unlike section 802's grant of unlimited and standardless discretion to the Executive, the gun manufacturers' immunity statute, like the statute in *Robertson*, does not grant any discretion to the Executive to decide whether to apply the statute in a particular lawsuit to nullify the governing law. Instead, as in *Robertson*, Congress "set[] forth a new legal standard . . . to be applied to *all* cases." *Ileto*, 565 F.3d at 1139 (emphasis added).

Amici erroneously argue that the gun manufacturers' immunity statute does not deny federal and state courts jurisdiction over lawsuits within its scope and might not be invoked by a defendant, allowing an action to go forward even though it is precluded. Amici Br. at 26. Not so. Because the gun manufacturers' immunity statute provides that actions within its scope "may not be brought in any Federal or State court," it denies every court of subject matter jurisdiction over those actions. *See, e.g.*, *United States v. Dalm*, 494 U.S. 596, 601 (1990) (statute providing "[n]o suit or proceeding

shall be maintained in any court" for particular claims barred subject matter jurisdiction over those claims). Lack of subject matter jurisdiction cannot be waived, may be raised at any time, and must be raised by any trial or appellate court *sua sponte*.

In any event, asserting that an action against a gun manufacturer might go forward because the manufacturer failed to assert the statute does nothing to change the fact that the statute is one in which Congress changed the governing legal standard, as in *Robertson*, and not one in which Congress gave the Executive the power and the unbounded discretion to negate federal liability that Congress had previously created and to preempt state-law liability, as does section 802.

Amici also argue that the precluded claims against gun manufacturers continue to exist even though no court has jurisdiction to hear those claims. Amici Br. at 25. The notion that legal claims continue to have an immortal existence even after Congress has abolished them has had no basis since at least *Erie R.R. v. Tompkins*, 304 U.S. 64, 79 (1938) (rejecting the notion that there exists " 'a transcendental body of law;' " " 'law in the sense in which courts speak of it today does not exist without some definite authority behind it' ").

### C. None Of The Other Statutes On Which The Government, The Carriers, And Their Amici Rely Provides For The Executive To Nullify Accrued Causes Of Action By Negating Existing Federal Law And Preempting State Law

Between them, the government, the carriers, and amici raise a farrago of different statutes that they claim demonstrate the constitutionality of section 802 under Article I, section 7. None does.

#### 1. Section 802 Is Not A Fact-Triggering-A-Mandatory-Consequence Statute Like The One In *Field v. Clark*

Section 802 is not a statute like the tariff statute in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) , where Congress imposes a mandatory consequence upon the occurrence of certain triggering facts that do not yet exist at the time of enactment. *See* Government Br. at 27-28; Carriers' Br. at 19-23. Such statutes are nothing like the cancellation statute in *Clinton* or section 802 because they leave nothing to the Executive's discretion. *See* AOB at 22-25. "[U]nder the Tariff Act [at issue in *Field*], when the President determined that the contingency had arisen, he had a duty to suspend" the tariff exemption. *Clinton*, 524 U.S. at 443. "Nothing involving the expediency or the just operation of such legislation was left to the determination of the President." *Field*, 143 U.S. at 693. "[T]he suspension was absolutely required when the President ascertained the existence of a particular fact . . . ." *Id*. Congress set the conditions whose occurrence compelled the President to suspend the exemption, and it gave the President no discretion.

Section 802, however, imposes no mandatory consequence upon the existence of its triggering facts. The Attorney General need not investigate whether any civil action falls within one of the five statutory categories of subsections (a)(1) through (a)(5); even if he does investigate and concludes that one or more of the five categories is satisfied, he still has no duty to file a certification. AOB at 11-13.

*Owens v. Republic of the Sudan*, 531 F.3d 884, 890 (D.C. Cir. 2008), also involved a fact-triggering-a-mandatory-consequence statute. Government Br. at 29; Carriers' Br. at 20. Under the statutory scheme in *Owens*, Congress imposed on the Secretary of State a mandatory duty to make an annual factual determination, applying detailed statutory standards, of which countries support terrorist groups or permit their territory to be used by terrorist groups. 22 U.S.C. §§ 2656f(a)(2), 2656f(b)(3) (support); 22 U.S.C. §§ 2656f(a)(1)(B), 2656f(b)(2), 2656f(d)(5) (territorial use). The Secretary has the mandatory duty to curtail exports and restrict foreign aid to countries that she determines have repeatedly provided support for acts of terrorism. 50 U.S.C. App. §§ 2405(j)(1)(A), 2405(j)(5); 22 U.S.C. § 2371(a).

Congress also imposed a further, mandatory collateral consequence arising out of the Secretary's determination that a country was a supporter of terrorism: sovereign immunity was waived for that country for all terrorism-related claims against it. 28 U.S.C. former § 1605(a)(7); *Owens*, 531 F.3d at 888. The statute operated automatically once the Secretary made a

terrorism-support determination; the waiver of sovereign immunity did not depend upon the Secretary's submitting her determination to the court, and the Secretary had no discretion over whether or not the determination should have the collateral jurisdictional consequence of waiving sovereign immunity. *Owens*, 531 F.3d at 888.

As the *Owens* court noted, the statutes at issue there operated like the tariff-exemption suspension statute in *Field*. *Owens*, 531 F.3d at 891-92. Congress decided to waive sovereign immunity upon the occurrence of certain triggering events—a country's repeated support for international terrorism—and "left only the determination of whether such events occurred up to the" Secretary of State. *Clinton*, 524 U.S. at 445 (describing *Field*). The Secretary of State could not pick and choose whether or not to waive sovereign immunity for a country supporting terrorism; Congress had already determined that all such countries lost their immunity. By contrast, Congress did not determine whether section 802 should preclude any of the lawsuits falling within its five statutory categories but left that decision up to the Attorney General.

**2. Section 802 Is Not A Statute Authorizing The Executive To Act On A Matter On Which Congress Has Not Spoken**

The government argues that the power given the Executive in section 802 is no different in kind from that given in the statutes at issue in *Loving v. United States*, 517 U.S. 748 (1996), *Touby v. United States*, 500 U.S. 160

(1991), *Yakus v. United States*, 321 U.S. 414 (1944); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936); and *United States v. Grimaud*, 220 U.S. 506 (1911). Government Br. at 28-30. This contention is erroneous because those statutes gave no authority to the Executive to nullify existing federal law or to preempt state law. Those were nondelegation doctrine decisions, not Article I, section 7 decisions. More fundamentally, they all involved statutes that, unlike section 802, delegated to the Executive the power to act on a matter that Congress had not acted upon, and, thus, the Executive's action did not negate or repeal any contrary statutory provision.

In *Touby* (AOB 30), for example, the Executive was writing on a blank slate, creating legal prohibitions on a subject on which Congress had not spoken; it was not nullifying Congress' earlier handiwork. The statute at issue in *Touby* permitted the Attorney General temporarily to add a drug to the schedule of controlled substances Congress had established; it did not permit the Attorney General to remove from the schedule a drug that Congress had previously put there. 21 U.S.C. §§ 811, 812; *Touby*, 500 U.S. at 166-67. Likewise, in *Loving*, Congress authorized the President to define capital sentencing aggravating factors for military crimes. Congress had not previously enacted its own capital sentencing factors, so nothing the President did nullified any legal standard established by Congress. *Loving*, 517 U.S. at 770-71. So, too, in *Yakus*, Congress authorized the Executive to set maximum prices for various commodities; Congress had not itself set

prices for those commodities, so none of the Executive's prices nullified different prices that Congress had previously set. 321 U.S. at 423-25; *accord*, *Currin v. Wallace*, 306 U.S. 1, 16-17 (1939) (Carriers' Br. at 20 n.10; authorizing tobacco market regulation where Congress had set no contrary standards). In *Grimaud*, 220 U.S. at 517-22, the forest regulations established by the Secretary of Agriculture did not nullify any forest laws that Congress had already established. *Curtiss-Wright* is to the same effect: the President's prohibition of arm sales to Bolivia did not nullify a previous congressional authorization of those sales. By contrast, the Attorney General's section 802 certification operates to nullify statutory causes of action that Congress previously created.

### 3. Section 802 Is Not A Foreign Affairs Or Military Command Statute

Pervading the arguments of the government and the carriers is the assertion that section 802 is a statute falling within the scope of the Executive's inherent constitutional powers over foreign affairs or military command and for that reason Congress may in section 802 confer on the Executive authority that it could not otherwise confer. *See, e.g.*, Carriers' Br. at 22. The assertion is meritless. Section 802 addresses claims of domestic surveillance of American citizens by domestic telecommunications carriers. It is outside the scope of the Executive's foreign affairs or military command powers, and so case law addressing the exercise of those powers is irrelevant.

"The President also possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs." *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948). The Supreme Court has said that in matters of foreign affairs and military command, the Constitution permits Congress to delegate authority more broadly to the Executive than otherwise. *Clinton* distinguished retaliatory-tariff statutes like the one in *Field* because they were foreign-affairs statutes: "The cited statutes all relate to foreign trade, and this Court has recognized that in the foreign affairs arena, the President has 'a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.' " 524 U.S. at 445; *accord*, *Curtiss-Wright*, 299 U.S. at 320 (foreign affairs statutes "must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved"). But this principle extends only to statutes dealing with "the powers of *external* sovereignty." *Curtiss-Wright*, 299 U.S. at 318 (emphasis added).

The military command power is likewise circumscribed. In *Loving*, the Supreme Court approved Congress' delegation to the President of the power to define capital sentencing aggravating factors for military crimes committed by military service members because of the President's Commander-in-Chief powers: "[T]he same limitations on delegation do not apply 'where the entity exercising the delegated authority itself possesses

independent [constitutional] authority over the subject matter.' " *Loving*, 517 U.S. at 772.

The narrow exception for foreign affairs and military command statutes has no application to section 802 because the statute falls outside the Executive's inherent foreign affairs and military command powers. The President and the Attorney General have no independent authority "already assigned . . . by express terms of the Constitution," *Loving*, 517 U.S. at 772, to abolish accrued causes of action between private domestic citizens, to conduct warrantless surveillance outside the bounds of Fourth Amendment and statutory limits, to negate federal law regulating domestic surveillance, or to preempt state law.

In particular, the Executive has no inherent, free-ranging constitutional power to conduct domestic searches and seizures of the communications of United States citizens who are not agents of foreign powers. *United States v. United States District Court (Keith)*, 407 U.S. 297, 320 (1972) ("We recognize, as we have before, the constitutional basis of the President's domestic security role, but we think it must be exercised in a manner compatible with the Fourth Amendment."); *Halperin v. Kissinger*, 807 F.2d 180, 185 (D.C. Cir. 1986) (per Scalia, Circuit Justice; the warrant "requirement attaches to national security wiretaps that are not directed against foreign powers or suspected agents of foreign powers"). It certainly has no such power where Congress has mandated otherwise, as Congress did here in FISA, ECPA, and the Wiretap Act. *See, e.g.*, 18 U.S.C. § 2511(2)(f)

(providing that FISA, ECPA, and the Wiretap Act "shall be the exclusive means by which electronic surveillance . . . and the interception of domestic wire, oral, or electronic communications may be conducted"); *Hamdan v. Rumsfeld*, 548 U.S. 557, 593 n.23 (2006) (President "may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers"); *Little v. Barreme*, 6 U.S. 170, 178-79 (1804) (same).

Thus, the foreign affairs and military command statutes and decisions which the government and the carriers invoke have no application here. These include *Loving*; *Field*; *Owens*, 531 F.3d at 891-93; *Jones v. United States*, 137 U.S. 202 (1890) (Carriers' Br. at 20 n.10) (exercise of foreign affairs power to acquire territory presented nonjusticible political question); and *Curtiss-Wright*, 299 U.S. at 318.

Also within the foreign affairs power, unlike section 802, are questions involving the liability or immunity of foreign states or officials. Carriers' Br. at 16 & nn.4-5, 18, 44 & n.28; Government Br. at 35. Foreign sovereign immunity is a "*sui generis* context." *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004). "Throughout history, courts have resolved questions of foreign sovereign immunity by deferring to the 'decisions of the political branches . . . on whether to take jurisdiction.' " *Id.* The same is true of immunity for foreign heads of state and officials. *Samantar v. Yousuf*, __ U.S. ___, 2010 U.S. LEXIS 4378 at *13 & n.6 (June 1, 2010). Congress' grant to the President of the power to restore sovereign immunity to post-invasion Iraq, addressed in *Republic of Iraq v. Beaty*, __

U.S. __, 129 S.Ct. 2183, 2189 (2009), (Carriers' Br. at 18) is within that *sui generis* tradition: "The granting of Presidential waiver authority [to restore sovereign immunity to Iraq] is particularly apt with respect to congressional elimination of foreign sovereign immunity [for terrorist-supporting states like Iraq], since the granting or denial of that immunity was historically the case-by-case prerogative of the Executive Branch." *Id.* Section 802 is outside the *sui generis* law of foreign sovereign immunity at issue in *Beaty* and *Owens*.[4]

### 4. Section 802 Is Not Analogous To The Government-Employee Immunity Provisions Of The Westfall Act, Which Are Unconditional And Not Under The Control Of The Executive

The carriers also mistakenly rely on the portion of the Federal Tort Claims Act known as the Westfall Act. Carriers' Br. at 16. In the Westfall Act, Congress unconditionally abolished the tort liability of government employees for acts and omissions within the scope of their employment, making the government exclusively liable for the employee's torts. 28 U.S.C. § 2679(b)(1) ("The remedy against the United States . . . is exclusive of any other civil action . . . . Any other civil action . . . against the employee . . . is precluded . . . ."); *see also* 28 U.S.C. §§ 1346(b)(1), 2672,

[4] *Dames & Moore v. Regan*, 453 U.S. 654, 688 (1981), (Carriers' Br. at 16 n.5) is even further afield. The President's action requiring claimants against Iran to arbitrate rather than litigate their claims was not pursuant to any statutory delegation of authority but under his inherent foreign affairs power.

2674. This preclusion is absolute and unconditional, and does not require any executive action to bring it into existence.

The Westfall Act's unconditional preclusion ("Any other civil action . . . against the employee . . . is precluded") is equivalent to the unconditional preclusion of the gun manufacturers' immunity statute discussed above, 15 U.S.C. § 7902 ("A qualified civil liability action may not be brought"). Neither statute empowers the Executive, as section 802 does, to nullify existing federal or state law, either in general or in particular lawsuits. Under the Westfall Act, the Executive has no choice as to whether tort suits should be abolished against government employees. *See Hui v. Castaneda*, ___ U.S. ___, 130 S.Ct. 1845, 1851 (2010) ("The Westfall Act amended the FTCA [Federal Tort Claims Act] to make its remedy against the United States the exclusive remedy for most claims against Government employees arising out of their official conduct."). Congress, instead, has already unconditionally changed the law by abolishing all liability for government employees.

The contention of the carriers that under the Westfall Act, "the government can trigger immunities . . . by certifying that an individual is acting within the scope of federal employment" (Carriers' Br. at 16) is erroneous. The certification they refer to relates to a separate provision of the FTCA allowing for substitution of the government in place of the employee. 28 U.S.C. §§ 2679(d)(1), (d)(3). In the FTCA, substitution is

separate from preclusion, preclusion exists whether or not substitution occurs, and preclusion is unconditional and requires no certification.

#### 5. Section 802 Is Not A Statute That Permits The Executive To Waive A Condition On An Executive Activity

The carriers assert that section 802 is no different from a host of statutes in which Congress imposes a condition on how the Executive conducts a particular activity and then permits the Executive to waive the condition in certain circumstances. Carriers' Br. at 17-18 & nn.7, 8. This assertion lacks merit. The "waivable-condition" statutes permit the Executive to waive a right belonging to Congress—the right to control how the Executive performs a task Congress has assigned it. Section 802, by contrast, permits the Attorney General to take away rights and remedies that belong to plaintiffs. Congress can empower the Executive to waive conditions that limit only the Executive, but it cannot empower the Executive to abolish retrospectively rights possessed by private parties, for then the Executive truly does become the lawmaker.

All of the waivable-condition statutes are instances of the Executive waiving *its own* obligations under law.[5] For example, 14 U.S.C. § 666(a)

[5] The waivable condition statutes permit waiver of the following statutory conditions limiting activities by the Executive: The condition that certain appropriated funds must be used only for specified purposes; the condition that certain reports by the Executive to Congress must address certain subjects; the condition that the Executive must charge fees to foreign government officials who attend government security studies centers; the
*(footnote continued on following page)*

allows the Coast Guard to waive the condition that its contractors must hire locally in high-unemployment states. The waivers in these statutes affect only the rights and obligations of the Executive *vis-à-vis* Congress. Waiver of these conditions does not negate the legal force or effect of any law granting a right or remedy to any private party. None of the conditions these statutes permit to be waived is a provision creating individual substantive

---

*(footnote continued from preceding page)*
condition that commercial activities conducted by the Executive in connection with intelligence activities must comply with other applicable laws and regulations; the condition that the Executive must appoint only citizens as military officers; the condition that the Defense Department must not authorize industrial facilities it has funded to sell articles to persons outside the Department; the condition that the Executive must not contract with certain entities; the condition that Coast Guard contractors must hire locally in high-unemployment states; the condition that the Executive must impose sanctions on foreign narcotics traffickers; the condition that the Executive must withhold certain foreign aid from independent states of the former Soviet Union that provide assistance to Cuba; the condition that the Executive must submit a report to Congress before lending military articles to another country; the condition that the Executive must restrict the travel within the United States of certain foreign nationals; the condition that the Executive must impose sanctions on foreign countries that disclose certain confidential business information; the condition that the Executive must not provide export credits for commercial exports to certain foreign countries; the condition that the Executive must not make cash payments to the Government of Pakistan except to civilian authorities of a civilian government; the condition that the Executive must suspend foreign aid to high-terrorist-threat countries that have insecure airports; the condition that the Federal Bureau of Investigation and other Executive Branch departments and agencies must inform and consult with each other; and the condition that in building a border security fence the Executive must comply with other applicable laws and regulations. *See* Appendix A, attached hereto.

rights or creating a private cause of action, as do the surveillance statutes here.

Section 802 does not use the terms "waive" or "waiver" and for good reason. Section 802 is not a statute authorizing the Executive to waive a condition Congress has imposed on an executive activity, and Attorney General Mukasey's certification did not waive any condition Congress has imposed on the Executive.[6] Instead, section 802 authorizes the Executive to retroactively destroy rights that the Constitution, federal law, and state law have granted to plaintiffs, just as the presidential cancellations in *Clinton* destroyed rights and benefits of the plaintiffs there.

Unlike section 802, none of the waivable-condition statutes authorize the Executive to abolish already-accrued legal liability between private parties arising under federal statutory and constitutional causes of action or to preempt already-accrued state-law causes of action. None nullifies a legal right, benefit, or remedy to which a private party was entitled before the Executive acted. None authorizes the Executive to preempt state law in any fashion. None of these waivable-condition statutes, therefore, provides any argument against the unconstitutionality of section 802.

---

[6] Although Attorney General Mukasey's certification precluded these lawsuits against the carriers for their unlawful surveillance, it did not make that surveillance lawful or waive compliance with any statutory limitation on surveillance. ER 390-91.

Statutes in which Congress permits the Executive to waive a condition Congress has imposed on an executive activity pose no Article I, section 7 problem under *Clinton* because all that the waiver provision means is that Congress has decided not to make the limitation mandatory in all circumstances. The functional reality of such a statute is that Congress itself has chosen to narrow the mandatory scope of the condition it has imposed on a particular Executive activity and has made the condition discretionary under certain defined circumstances. The Executive is not nullifying existing law or repealing anything because Congress has already determined that the condition need not apply to the activity in those defined circumstances. Because Congress is in control, no *Clinton* issue arises.

Indeed, ultimately the carriers' argument proves too much. Under the carriers' argument that a permissible waiver includes not just a waiver of a condition imposed on the Executive but any change in the law by the Executive, the presidential cancellations in *Clinton* would have been constitutional.

Unlike the waivable-condition statutes, section 802 does not waive a condition running against the Executive from Congress. Instead, section 802 allows the Attorney General to abrogate the rights of the American people against the telecommunications carriers. That is not waiving a condition—it is repealing law.

## II. Section 802 Violates The Nondelegation Doctrine Because It Delegates Authority To The Executive Without Any "Intelligible Principle"

### A. Section 802 Is Unconstitutional If It Lacks An Intelligible Principle

#### 1. The Intelligible-Principle Requirement Applies To Section 802

Congress' delegation of authority to the Attorney General under section 802 is unconstitutional under the nondelegation doctrine because it lacks an intelligible principle. AOB 26-29. The government and the carriers seek to short-circuit any inquiry into whether section 802 contains an intelligible principle by attempting to limit the scope of the nondelegation doctrine to delegations of formal rulemaking authority. Government Br. at 33; Carriers' Br. at 25-26.

The nondelegation doctrine and its intelligible principle requirement, however, are not limited to instances in which Congress confers formal rulemaking authority. They apply whenever Congress confers any sort of decisionmaking authority: "[W]hen Congress confers decisionmaking authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (emphasis original, internal quotation marks and brackets omitted).

The question of whether the intelligible principle requirement applies here is simply whether the Executive is acting by virtue of authority granted

by Congress. If so, Congress has conferred decisionmaking authority, and the grant of authority must be accompanied and limited by an intelligible principle.[7] The answer to that question is "yes." Absent section 802, the Attorney General could not have nullified the law establishing plaintiffs' federal claims, preempted the law establishing plaintiffs' state-law claims, and compelled dismissal of plaintiffs' actions under section 802. The authority to do so comes from Congress, for under the Constitution, the power to create, alter, or abolish the law establishing federal causes of action is exclusively a legislative power, as is the power to preempt state-law causes of action. *See* AOB at 21-22. Congress could have abolished plaintiffs' federal statutory and state-law causes of action directly but did not do so. Because it instead gave the power to abolish plaintiffs' claims to the Attorney General, it was required to cabin that power with an intelligible principle limiting its exercise.

---

[7] *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), (Carriers' Br. at 26) has no relevance to whether section 802 confers any of Congress' decisionmaking authority because the "inherent executive power" at issue in that decision was the foreign affairs power to exclude aliens. As explained previously, plaintiffs' lawsuits do not involve the power over admission of aliens or foreign affairs, or any other inherent executive power.

### 2. Changing The Law To Preclude Plaintiffs' Claims Is Fundamentally Different From A Decision Whether To Assert Claims Or Defenses Possessed By The United States

Contrary to the contentions of the carriers, the Attorney General's decision to nullify plaintiffs' federal causes of action and preempt their state-law causes of action is not a run-of-the-mill litigation decision concerning a claim brought by or against the United States like filing a lawsuit, bringing a criminal prosecution, deciding what crimes or enhancements to charge, granting immunity from prosecution, or asserting an affirmative defense. Carriers' Br. at 16, 26-28 (discussing, e.g., *United States v. Jensen*, 425 F.3d 698 (9th Cir. 2005)); *see also* Government Br. at 29 (discussing juvenile-delinquent prosecutions under 18 U.S.C. § 5032). Unlike section 802, none of those litigation decisions alters the legal standards governing the crimes that are charged or the civil causes of action that are litigated. They are all decisions regarding whether to assert criminal counts or civil claims or defenses possessed by the United States, not decisions that preclude a private party from bringing claims.

The legislative power to create, alter, or abolish a federal cause of action, or to preempt state-law causes of action, is substantially different from the executive power to prosecute or defend actions on behalf of the United States under existing legal standards and rules established by Congress. The Executive's power to decide whether to bring a criminal or civil action on behalf of the United States bears no relation to the legislative

power to change the rules under which a private party's action proceeds. There exists no "traditional" (Carriers' Br. at 25) executive power to nullify causes of action brought by one private party against another. Indeed, Congress has never before delegated this power. Absent the unprecedented authority granted by section 802, Attorney General Mukasey could not have taken any action that would have nullified plaintiffs' causes of action and deprived any federal or state court of jurisdiction to hear them. By contrast, prosecutorial decisions, including the decision not to prosecute or to grant immunity from prosecution, are a traditional and well-established feature of the Executive's Article II, section 3 power to "take Care that the Laws be faithfully executed." *United States v. Labonte*, 520 U.S. 751, 762 (1997) ("the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect. . . . is an integral feature of the criminal justice system"); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("The Attorney General and United States Attorneys retain ' "broad discretion" ' to enforce the Nation's criminal laws. . . . as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.' "); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (same).[8]

---

[8] Likewise, the statutorily authorized power of the Attorney General to suspend deportation of a deportable alien at issue in *INS v. Chada*, 462 U.S. 919, 923-25 (1983), was not, as the carriers would have it, "authority to suspend deportation laws" (Carriers' Br. at 18), but an instance of enforcement discretion like those discussed in the text. Moreover, statutes
*(footnote continued on following page)*

The Executive's power to make litigation decisions related to bringing or defending civil or criminal actions on behalf of the United States is not implicated in any way here. In filing his section 802 certification and changing the legal standards applicable to plaintiffs' actions, the Attorney General was neither prosecuting claims brought by the United States nor defending claims brought against the United States.

### B. The Statutory Text Of Section 802 Contains No Intelligible Principle

Section 802 confers two types of standardless discretion on the Attorney General. AOB at 12, 27-28. First, the Attorney General has discretion whether to undertake a determination of whether a civil action falls within one of the five categories set forth in section 802. If the Attorney General does make a determination that the action falls within one of the five statutory categories, it is also entirely up to his discretion whether to file a certification negating the law governing the action.

Congress stated no principle in the statutory text limiting the Attorney General's exercise of either instance of discretion. The government and the carriers contend that the statutory categories in subsections (a)(1) through (a)(5) set forth an intelligible principle, but they do not. *See* Government Br. at 34; Carriers' Br. at 29. It is simply not true that "Congress provided in

---

*(footnote continued from preceding page)*
delegating authority over aliens address the foreign affairs power. *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 348 (2005).

listed circumstances for immunity for persons allegedly assisting the intelligence community." Government Br. at 34. Congress did not require the Attorney General to file a certification in all or any of the lawsuits within the five statutory categories and provided no standard for him to apply in deciding whether or not to do so in any particular case. The statutory categories define the lawsuits in which the Attorney General *may* nullify the plaintiffs' causes of action, but they provide no standard or principle for exercising that power. They set the boundaries of the playing field but provide no rules for the game.

Section 802's text does nothing to constrain the Attorney General's discretion in exercising the power it grants him and does not specify any circumstances or any statutory purposes he must consider in exercising his discretion. It is unlike the statutory text in *Touby* (Carriers' Br. at 30), which conditions the Attorney General's decision to temporarily add new drugs to the schedule of controlled substances not only on his determination that the drug poses an "imminent hazard to public safety," 21 U.S.C. § 811(h), but also on a host of other statutory factors. *See* AOB at 30-31. "Congress has placed multiple specific restrictions on the Attorney General's discretion . . . . These restrictions satisfy the constitutional requirements of the nondelegation doctrine."[9] *Touby*, 500 U.S. at 167.

---

[9] The reliance of government and the carriers on the statement in *Whitman* that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred," 531 U.S. at 475, is
*(footnote continued on following page)*

### C. Legislative History Cannot Supply The Intelligible Principle That Section 802 Lacks

Like the statutory text, the legislative history of section 802 utterly lacks any statement that could serve as an intelligible principle to constrain the Attorney General's unlimited discretion. AOB 31-36. Although they invoke legislative history, the government and the carriers fail to confront the absence from it of any statement of an intelligible principle.

The government and the carriers make no attempt to argue that any statement in the legislative history amounts to a standard that the Attorney General must apply, much less that any such statement is strong enough to overcome the unambiguous meaning of the statutory text. Failing to identify any *standard* in the legislative history, the government and the carriers instead assert only that the *outcome* the 13 senators who signed the Senate Intelligence Committee report wished was preclusion of these lawsuits.

---

*(footnote continued from preceding page)*
misplaced. *See* Government Br. at 34; Carriers' Br. at 28. First, the proposition is not as sweeping as it first appears, for the cases cited by *Whitman* for this proposition are ones in which there was an independent source of constitutional authority in addition to the delegation, unlike here. *Loving*, 517 U.S. at 772 (military command power); *United States v. Mazurie*, 419 U.S. 544, 556-57 (1975) (delegation to Indian tribe with independent sovereign powers over the subject matter). Second, the issues addressed by plaintiffs' lawsuits are not matters of narrow or parochial concern like " 'country [grain] elevators.' " *Whitman*, 531 at 475. The unlawful and unconstitutional surveillance at issue here is nationwide in scope, involves the telecommunications services that are a central and essential feature of modern life, and has intercepted the domestic communications of millions of Americans.

Government Br. at 37; Carriers' Br. at 33-34. But no amount of hand-waving can make up for the fact that Congress did not legislate any limitation on the discretion it granted the Attorney General in section 802.

When Congress in statutory text unambiguously grants unlimited discretion to the Executive, the expression of fond hopes by a handful of senators that the Executive would exercise its discretion in a particular instance to reach a particular outcome is insufficient to bind the Executive. No senator or representative asserted that any provision of section 802 required the Attorney General to file a certification, either in these particular lawsuits or in any other lawsuit in the future. Nor did any senator or representative specify any standards that Congress intended to require the Attorney General to apply in exercising his unlimited discretion under section 802.

### D. Statutory Purpose, Factual Background, And Context Are Only Used To Give Meaning To A Statutory Standard, Not To Substitute For The Absence Of Any Statutory Standard

The government and the carriers misstate the law when they further assert this Court can invent a standard to limit the Attorney General's discretion under section 802 to nullify plaintiffs' causes of action out of what they purport to be section "802's purpose, history, and context." Carriers' Br. at 31; *see also* Government Br. at 36-37. Looking to purpose, factual background, and context is a process for giving meaning to an express standard Congress has stated in the statutory text, not for conjuring

up a standard when the statutory text contains none. In *Lichter v. United States*, 334 U.S. 742, 778 (1948), the issue was "the adequacy of the *statutory term* 'excessive profits' " as an intelligible principle, not the invention of a principle where the statute stated none. (Emphasis added.) The *Lichter* Court said, "*Standards prescribed by Congress* . . . . 'derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear.' " *Id*. at 785 (emphasis added). In section 802, however, Congress prescribed no standard at all.

*Mistretta v. United States*, 488 U.S. 361 (1989), (Government Br. at 36) is another case where context was used only to help give meaning to detailed standards Congress set forth in the text of the statute establishing the Sentencing Commission, not to substitute for Congress' failure to state any standard in the statute: "Congress charged the Commission with three goals: . . . Congress further specified four 'purposes' of sentencing that the Commission must pursue in carrying out its mandate: . . . [¶] In addition, Congress prescribed the specific tool—the guidelines system—for the Commission to use in regulating sentencing. More particularly, Congress directed the Commission to develop a system of 'sentencing ranges' applicable 'for each category of offense involving each category of defendant.' . . . Congress instructed the Commission that these sentencing ranges must be consistent with pertinent provisions of Title 18 of the United States Code and could not include sentences in excess of the statutory

maxima. Congress also required that for sentences of imprisonment, 'the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 percent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment.' Moreover, Congress directed the Commission to use current average sentences 'as a starting point' for its structuring of the sentencing ranges. [¶] To guide the Commission in its formulation of offense categories, Congress directed it to consider seven factors: . . ." 488 U.S. at 374-75 (citations omitted). The Supreme Court used legislative history only to "provide[] additional guidance for the Commission's consideration of the *statutory factors*," not to create standards where Congress had created none.[10] *Id*. at 376 n.10 (emphasis added).

---

[10] Other decisions cited by the government and the carriers also involved statutes with standards for decisionmaking stated in the statutory text; purpose, history, and context were used to give meaning to the statutory standards, not to invent standards for a statute that stated none. In *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976), the statute had express standards that limited executive discretion and provided an intelligible principle because it required "a finding by the Secretary of the Treasury that an 'article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.' . . . The President can act only to the extent 'he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security.' And § 232 (c) . . . articulates a series of specific factors to be considered by the President in exercising his authority under § 232 (b)." In *Owens*, as described above in the text, a number of statutory standards limited the Secretary of State's power to designate countries as terrorism supporters.

The government and the carriers paper over the absence of any standard or principle from the statutory text or the legislative history of section 802. This Court, however, cannot. The Court must judge the constitutionality of the statute that Congress actually passed, not one Congress might have passed.

**E. Section 802 Is Nothing Like The Existing Liability Limitations Of FISA, ECPA, And The Wiretap Act**

The government also invokes the statutory limitations on liability under FISA, ECPA, and the Wiretap Act that Congress created in 18 U.S.C. §§ 2511(2)(a)(ii)(B), 2703(e) and 50 U.S.C. §§ 1805(h), 1881a(h)(3). Government Br. at 38-41. Examining those provisions, however, only throws into sharper relief the fatal defects of section 802. In those provisions, unlike section 802, Congress itself has unconditionally excluded liability for surveillance that it has statutorily authorized to occur pursuant to a court order, warrant, or other statutory process. The liability exclusion of those provisions is unconditional, and in them Congress has delegated nothing to the Executive, which has no role under them and no power to determine whether to apply them to any particular lawsuit.[11]

---

[11] The government is even more off base when it suggests that section 802 is merely "a mechanism for invoking existing provisions" of 18 U.S.C. §§ 2511(2)(a)(ii)(B), 2703(e) and 50 U.S.C. §§ 1805(h), 1881a(h)(3). Government Br. at 40-41. Section 802 does not create a procedure for submitting evidence relevant to those four liability-limiting provisions and leave it to the court to decide whether a defense has been established under one of those provisions. Section 802 is an independent ground of
*(footnote continued on following page)*

### F. Section 802 Does Not Impose A Mandatory Duty To Certify Upon The Attorney General

In the proceedings below, the government and the carriers conceded that "Congress left the issue of whether and when to file a certification to the discretion of the Attorney General." Dkt. No. 466 at 21:3-5. Reversing that position, the carriers alone now argue that section 802 imposes a mandatory duty on the Attorney General to file a certification in every lawsuit satisfying one of the five statutory categories in subsections (a)(1) through (a)(5). Carriers' Br. at 35-37.

The government and the carriers were correct the first time when they stated: "Nothing in the Act requires the Attorney General to exercise his discretion to make the authorized certifications, and until he actually decides to invoke the procedures authorized by Congress, the Act would have no impact on this litigation." Dkt. No. 466 at 22 n.16. Congress never decided that all actions falling within the five statutory categories should be precluded; it put that decision in the Attorney General's hands. Congress knows the words with which to command mandatory executive action—the

---

*(footnote continued from preceding page)*
preclusion, and dismissal occurs pursuant to section 802, not pursuant to those other provisions. In any event, to the extent Attorney General Mukasey invoked subsection (a)(4) as to any of plaintiffs' claims, none of those four liability-limiting provisions applies because the surveillance was not pursuant to court order, warrant, or any other form of statutory authorization but instead was in violation of the statutory limitations Congress imposed on electronic surveillance.

"shalls" and "musts" that are absent from section 802—but it did not use them.

Moreover, if Congress's intention was to mandate that these actions be precluded, there was no reason to act through the agency of the Attorney General at all. Congress could have acted directly on these lawsuits as it has many times in the past, either designating them by name (as it did in *Robertson*) or describing a category of lawsuits it wished to unconditionally proscribe (as it did in *Ileto*).

Nor does the doctrine of constitutional avoidance (Carriers' Br. at 35-37) provide any license to fabricate a mandatory duty out of section 802. "[T]he canon of constitutional avoidance has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 494 (2001). There is no ambiguity in section 802. AOB at 31-32.

## III. Section 802 (a) Violates Due Process By Denying Plaintiffs A *De Novo* Decision By An Unbiased Adjudicator

Plaintiffs' due process argument is straightforward: Attorney General Mukasey's certification nullifying their causes of action deprived plaintiffs of protected liberty and property interests; due process requires that any deprivation of those interests occur only by means of a hearing before an unbiased adjudicator empowered to decide all questions of fact and law *de novo* and at which plaintiffs have meaningful notice and a meaningful opportunity to respond; Attorney General Mukasey was not an adjudicator,

provided no hearing, and was biased; the district court was forbidden to provide a *de novo* adjudication or to provide meaningful notice and a meaningful opportunity to respond to the secret evidence and argument presented against plaintiffs; plaintiffs therefore were deprived of due process.

The government and the carriers agree that the Attorney General was not an adjudicator and provided no adjudication, and that the district court did not decide the issues *de novo*; they do not dispute that plaintiffs lacked meaningful notice and a meaningful opportunity to respond. They contend that none of this matters, taking the unprecedented positions that plaintiffs have no liberty or property interests at stake, that due process does not require a hearing by an adjudicator empowered to decide the case *de novo*, and that due process does not require meaningful notice and a meaningful opportunity to respond. Controlling precedent is to the contrary.

### A. Section 802 Deprives Plaintiffs Of Liberty And Property Interests Protected By The Due Process Clause

The government and the carriers seek to foreclose any due process inquiry whatsoever by contending that plaintiffs have no protectable liberty or property interests at stake here, and thus no right to due process. This assertion is contrary both to law and to common sense.

Plaintiffs possess liberty interests in their right to be free from unlawful surveillance and property interests in their claims against the carriers. AOB 36. The government fails to address plaintiffs' liberty

interests; the carriers assert that plaintiffs have no liberty interest with respect to surveillance that has already occurred. Carriers' Br. at 38. Plaintiffs, however, challenge not only past but ongoing and future unlawful surveillance violating their liberty interests. *See*, *e.g.*, ER 59, 64. Section 802 has precluded them from obtaining equitable relief to prevent unlawful surveillance by the carriers.

As for plaintiffs' property interests, the government argues that plaintiffs have no property interest in their claims against the carriers because those claims have not yet ripened into a judgment. Government Br. at 41. The government is wrong. As explained in plaintiffs' brief at 37, "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). The government relies on *Grimesy v. Huff*, 876 F.2d 738, 743-44 (9th Cir. 1989), but that was a takings case, not a due process case. Whether a cause of action has become a vested final judgment may matter for a takings claim, but does not matter for a due process claim. Nor is section 802 a "statute[] cutting off the right to sue" like the one in *Fields v. Legacy Health System*, 413 F.3d 943, 956 (9th Cir. 2005) in which the legislature has terminated the property interest in a cause of action; instead, section 802 gave the power to cut off the right to sue to the Attorney General. Finally, the portion of *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1085-86 (9th Cir. 2001), quoted by the government at 41-42 was addressing whether a statute of repose was "substantively" unconstitutional; the court

later addressed on the merits the appellants' procedural due process arguments arising out of the deprivation of their property interest in their causes of action.

### B. Section 802 (a) Denies Plaintiffs A *De Novo* Decision By An Unbiased Adjudicator

At the core of due process is the requirement that at some point a person deprived of a protected interest *must* receive a hearing before an unbiased adjudicator empowered to determine the factual and legal issues *de novo*. AOB 37-46. "[D]ue process may be satisfied by providing for a neutral adjudicator to 'conduct a *de novo* review of all factual and legal issues.' " *Concrete Pipe & Products v. Construction Laborers Pension Trust*, 508 U.S. 602, 618 (1993); *accord*, *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). There is no dispute that that never occurs in the section 802 dismissal process.

All parties agree that the Attorney General is not an adjudicator and never provides a hearing or adjudication before he files a certification. *See* Carriers' Br. at 39; Government Br. at 43. Nor is it disputed that the district court is an adjudicator whose hands are tied; it is forbidden by section 802 from holding a *de novo* hearing or finding facts independently, but must defer to the Attorney General's decision under the highly deferential substantial-evidence standard of review. Because plaintiffs never received an adjudication *de novo*, they have been denied due process.

The position of the government and the carriers is that plaintiffs have no right to an adjudication *de novo* by anyone, only to appellate-style review by the district court of Attorney General Mukasey's non-adjudication under the deferential "substantial evidence" standard of review. Government Br. at 43-45; Carriers' Br. at 43. Yet all of the decisions and statutes they cite applying the substantial-evidence standard of review apply it in reviewing a prior adjudication that itself satisfied due process, unlike its application here to a non-adjudication. *See*, *e.g.*, *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 224-29 (1938) (review of NLRB adjudication); *Richardson v. Perales*, 402 U.S. 389, 394-97 (1971) (review of Social Security disability adjudication); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 476-78 (1951) (review of NLRB adjudication); *McCarthy v. Apfel*, 221 F.3d 1119, 1122 (9th Cir. 2000) (review of Social Security benefit overpayment adjudication); *Healthcare Employees Union, Local 399 v. NLRB*, 463 F.3d 909, 917-18 (9th Cir. 2006) (review of NLRB adjudication).[12]

As the Supreme Court explained in *Concrete Pipe*, there is a fundamental difference between an adjudication applying "a standard of proof before a trier of fact" and the review of a prior adjudication under "standards of review." 508 U.S. at 622-23. In the case of a standard of proof applied in an adjudication, "[b]efore any such burden can be satisfied

[12] The FOIA "deference" decisions cited by the carriers at 44 are not due process cases.

in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Id.* at 622. By contrast, a standard of review like substantial evidence is applied to a prior adjudication and addresses "not a degree of certainty that some fact has been proven in the first instance, but a degree of certainty that a factfinder in the first instance made a mistake in concluding that a fact had been proven under the applicable standard of proof." *Id.* at 622-23.

The attempt of the government and the carriers to distinguish *Concrete Pipe* is unavailing. Government Br. at 45; Carriers' Br. at 46-47. In *Concrete Pipe*, the employer plaintiff challenging the ERISA trustee's determinations received an adjudication *de novo* before an arbitrator, and had the burden of proving the challenged determination wrong. *Concrete Pipe*, 508 U.S. at 623-24, 629-30. This procedure was constitutional only because the arbitrator was not just a reviewing body but was "invested with the further powers of a finder of fact" (*id.* at 624) under the preponderance-of-the-evidence standard of proof and thus had the power to adjudicate the case *de novo*: "[T]he statute does not foreclose any factual issue from independent consideration by the arbitrator . . . an employer may avail itself of independent review by the concededly neutral arbitrator." *Id.* at 630. Thus, contrary to the government's assertion, the employer plaintiff did receive "*de novo* review of the trustee's initial determination." Government Br. at 45. Here, by contrast, plaintiffs were deprived of due process because

they received no adjudication *de novo* from anyone, only deferential appellate-style review of Attorney General Mukasey's non-adjudication.

Finally, even though all agree that Attorney General Mukasey did not act as an adjudicator, his bias still remains relevant. In their opening brief, plaintiffs presented compelling evidence of the structural and actual biases of Attorney General Mukasey. AOB at 40-41. The government and the carriers do not dispute this evidence or attempt to rebut it. Instead, they argue that this Court must nonetheless presume as a matter of law that Attorney General Mukasey was unbiased. Government Br. at 42-43; Carriers' Br. at 40-42. No presumption of neutrality should apply here, given that the Executive secretly and deliberately broke laws protecting the privacy of the communications of the American people against presidential abuses of power and then sought the enactment of section 802 to conceal its abuses.[13]

Attorney General Mukasey's actual bias is also clear. The government and the carriers argue that Attorney General Mukasey's

---

[13] Nor does *Withrow v. Larkin*, 421 U.S. 35, 54-55 (1975), support the contention that the Attorney General is not institutionally and structurally biased. The essence of that decision is that an adversary hearing at which the parties are free to present evidence and argument to the decisionmaker will overcome any preconceptions that the decisionmaker has formed by conducting an *ex parte* prehearing investigation. Here, of course, Attorney General Mukasey conducted *ex parte* all of his investigation leading up to his certification decision and plaintiffs never had the opportunity to participate in an adversary adjudication before him.

statements relating to this litigation were merely abstract and general "position[s] . . . on a policy issue related to the dispute," *Hortonville Joint School District No. 1 v. Hortonville Education Ass'n*, 426 U.S. 482, 493 (1976), divorced from the particular circumstances of plaintiffs' lawsuits. Government Br. at 42-43; Carriers' Br. at 42.

Attorney General Mukasey, however, did far more than just opine on a theoretical policy question of liability for unlawful surveillance. He announced his determination to achieve a particular outcome, lobbying Congress for the power to dismiss these very lawsuits and repeatedly asserting that these lawsuits should be terminated. ER 517-19. He also prejudged the facts, asserting that "the companies . . . relied on written assurances that the President himself authorized the activities." ER 454.

Although the parties agree Attorney General Mukasey did not act as an adjudicator, the fact that his biases would have disqualified him as an adjudicator is still relevant: The fact that a biased decisionmaker made the determinations that were binding upon the district court under the substantial-evidence standard of review is an additional reason why the section 802 procedure cannot satisfy due process.

### C. Section 802(c) Violates Due Process By Denying Plaintiffs Meaningful Notice Of The Government's Basis For Seeking Dismissal And A Meaningful Opportunity To Oppose The Government's Arguments And Evidence

Section 802 also violates due process by denying plaintiffs meaningful notice of and a meaningful opportunity to respond to whatever

statutory categories Attorney General Mukasey secretly invoked in his classified certification and the secret legal arguments and supporting evidence he presented. AOB at 46-53. The government and the carriers do not dispute that plaintiffs had no notice or opportunity to respond that was meaningful. Rather, their position is that the *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), balancing test permits Congress to deny plaintiffs any meaningful notice and any meaningful opportunity to respond. Government Br. at 47-50; Carriers' Br. at 49-52. Not so.

First, no balancing of interests can justify eliminating entirely the right to a meaningful hearing as section 802 does, for a meaningful hearing is the irreducible "constitutional minimum." *Greene v. Lindsey*, 456 U.S. 444, 449-50 (1982). Any proceeding in which the party subject to the deprivation lacks notice of the legal grounds on which the deprivation is sought and lacks notice of the factual basis supporting those grounds is not a hearing in any sense that the Due Process Clause recognizes. AOB 46-49. In essence, what the government and the carriers argue for is an exception to the hearing requirement of the Due Process Clause, and no such exception exists.

Even if balancing were appropriate here, the balance weighs in plaintiffs' favor. The government and the carriers rely primarily on foreign-terrorist-designation cases in which the government was seeking to deny assets and material support to foreign terrorists. Government Br. at 47-50; Carriers' Br. at 49. *See Holy Land Foundation for Relief & Development v.*

*Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003); *People's Mojahedin Organization v. Department of State*, 327 F.3d 1238 (D.C. Cir. 2003). Those cases, whether or not rightly decided, do not control here, where the balance of interests is radically different. First, the deprivations in those cases were exercises of the foreign affairs power against foreign terrorist organizations and their agents; the deprivations here are not. Second, the government has a much greater interest in denying assets and material support to foreign terrorists than it does in depriving its citizens of remedies for the unlawful and unconstitutional surveillance of their communications and communications records.

Third, in the foreign-terrorist designation cases the foreign terrorists received much more process than plaintiffs did here. The terrorists were advised of the exact legal grounds on which the government was proceeding and received disclosure of much of the evidence. In *Holy Land Foundation*, the district court upheld the foreign-terrorist designation on the basis of solely the unclassified evidence in the administrative record. *Holy Land Foundation* ,219 F.Supp.2d at 69-75. Likewise, in *People's Mojahedin Organization*, the court upheld the foreign-terrorist designation on the basis of the unclassified record alone.[14] 327 F.3d at 1243-44.

---

[14] *Jifry v. FAA*, 370 F.3d 1174, 1176-77, 1182-83 (D.C. Cir. 2004), involved the revocation of FAA certificates of non-resident alien pilots who flew only between foreign destinations; it was unclear whether as non-resident aliens they possessed any due process rights at all, and in any event their interest as non-resident aliens in possessing FAA certificates was minimal.

Fourth, plaintiffs' interests as citizens in obtaining relief that will punish past unlawful surveillance, prohibit ongoing unlawful surveillance, and deter future unlawful surveillance is of the highest order. Suspicionless "general" searches and seizures conducted by the Executive in violation of legislative and judicial limitations were one of the fundamental causes of the American Revolution. "Since before the creation of our government, such searches have been deemed obnoxious to fundamental principles of liberty." *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931); *see also Stanford v. Texas*, 379 U.S. 476, 481-84 & n.13 (1965) (at 483; "[i]t was in the context of . . . general warrants that the battle for individual liberty and privacy was finally won"). The attempt of the government and the carriers to trivialize plaintiffs' interest dishonors our Nation's history, for that interest is " 'the very essence of constitutional liberty and security.' " *United States v. Lefkowitz*, 285 U.S. 452, 466 (1932). Relief against the carriers is essential: Because electronic surveillance occurs in secret, unbeknownst to those whose communications are intercepted, only the carriers are in a position to resist unlawful surveillance requests in the future.

Fifth, the government and the carriers have failed to show that Congress could not have crafted procedures similar to the Classified Information Procedures Act that would have both protected the government's secrets and provided plaintiffs with meaningful notice and an opportunity to be heard. Such procedures would minimize the burden on the

government of providing additional fairness to the plaintiffs, one of the relevant factors under *Mathews*, 424 U.S. at 335.[15]

Nor does the state secrets privilege justify the procedure of section 802. Evidence protected by the state secrets privilege is excluded entirely from the judicial process and cannot be relied on by either party or the court. *Al-Haramain Islamic Foundation v. Bush*, 507 F.3d 1190, 1204 (9th Cir. 2007). Under section 802, by contrast, secret evidence is the very foundation of the district court's ruling. (In this respect, the carriers err when they assert (Carriers' Br. at 50-51) that Attorney General Mukasey could have asserted the state secrets privilege to both keep his certification secret and affirmatively use it against plaintiffs.)

Finally, the carriers argue that meaningful notice and an opportunity to respond could not have possibly made any difference to the outcome. Carriers' Br. at 45. Not so. For example, certification under section 802(a)(4) requires a showing that the surveillance have been specifically "designed to detect or prevent a terrorist attack." Broad-brush, targetless dragnet surveillance of the sort plaintiffs allege does not meet this focused standard because it is designed to acquire the communications and

[15] *Department of the Navy v. Egan*, 484 U.S. 518 (1988), (Carriers' Br. at 49) has no bearing on the validity of section 802's secrecy provisions. That was not a due process case; it involved the government's right to keep classified information secret from one of its own employees, not the government's ability to use secret information affirmatively and *ex parte* as a sword in litigation.

communications records of millions of Americans, not just likely terrorists or those connected to them. Yet without knowing whether Attorney General Mukasey certified these lawsuits under subsection (a)(4) and without knowing what evidence and legal arguments he presented to support his certification, plaintiffs had no meaningful opportunity to challenge that certification.

### D. The Totality Of Section 802's Procedures Aggravates The Denial Of Due Process That Each Works Individually

Section 802's denial of due process arises not just from its individual defects, but from the manner in which those defects interact to aggravate the unfairness of each. Attorney General Mukasey's bias and the fact that he conducted no adjudication aggravate the unfairness of the substantial-evidence standard of review by producing a biased, non-adjudicative decision for deferential review. The denial of notice and a meaningful opportunity to be heard in opposition to the government's legal arguments and evidence aggravates the unfairness of substantial-evidence review by further tilting the scales in favor of the government. The result was *ex parte* review of a biased non-adjudication under a deferential standard of review, with the plaintiffs excluded from any meaningful participation and denied an adjudication *de novo* by anyone. No case has ever held that such a procedure satisfies due process.

## IV. Section 802 Unconstitutionally Violates the Separation-of-Powers Prerogative of the Judicial Branch to Decide Cases Before It

As the preceding section explains, the failure of section 802 to afford plaintiffs an adjudication violates their right to due process. That failure is also a violation of the separate power to adjudicate cases and controversies that Article III reserves exclusively for the Judiciary. In short, because section 802 allows only a truncated form of appellate review of an executive non-adjudication, there is nothing real for the Judiciary to adjudicate.

The district court's substantial-evidence review of Attorney General Mukasey's certification did not transform the Attorney General's non-adjudication into an adjudication. For the Judiciary to adjudicate within the meaning of Article III, the Judiciary must not merely rule on cases, but "*decide* them conclusively, subject to review only by superior courts in the Article III hierarchy." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (emphasis in original). There is simply no judicial *decision* where, as in section 802, the operative standard of review is "more than a mere scintilla," the Attorney General's underlying decision is not an adjudication, and the Attorney General alone selects the evidence from sources of his own choosing and puts that evidence secretly before the district court, leaving the district court without the record that an adversarial proceeding would provide.

Both the government and the carriers describe section 802's substantial-evidence standard as both familiar and appropriately deferential

to the Attorney General's decisionmaking, given the alleged national security concerns involved. In fact, section 802's substantial-evidence standard is not familiar when it is applied to an underlying, highly-skewed non-adjudication, nor is "deference" an accurate characterization here when the district court lacks any real alternative but to rule in favor of the Attorney General.

The government and the carriers are also incorrect in attempting to analogize to the judicial review of administrative proceedings. Section 706 of the Administrative Procedure Act ("APA," 5 U.S.C. § 706) provides that a reviewing court shall set aside agency findings that do not meet six separate standards: "In all cases, agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 412, 414 (1971) (citing 5 U.S.C. §§ 706(2)(A), (B), (C), (D)). In addition: "In certain narrow, specifically limited situations, the agency action is to be set aside if the action was not supported by 'substantial evidence.' And in other equally narrow circumstances the reviewing court is to engage in a *de novo* review of the action and set it aside if it was 'unwarranted by the facts.' " 401 U.S. at 414 (citing 5 U.S.C. §§706(2)(E), (F)). The narrow circumstances that would authorize a reviewing court to apply the substantial-evidence standard are "when the agency action is based on a public adjudicatory hearing" (*id*), in which event

the procedural rules are set out within the APA at 5 U.S.C. §§ 556 and 557, or when the agency action results from the formal rulemaking provisions of the APA, 5 U.S.C. § 553, which also circumscribes the procedures that an agency is to apply.

In the context of a public adjudicatory hearing, an agency must allow a party "to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct cross-examination as may be required for a full and true disclosure of the facts." 5 U.S.C. § 556(d). In a rulemaking context, an agency must give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." A court can only affirm an administrative adjudication or the result of an agency's rulemaking function *if* the agency observed "procedure required by [the APA]" (5 U.S.C. § 706(2)(D)), *and* the agency's action was supported by substantial evidence (5 U.S.C. § 706(2)(E)).

Procedural requirements that ensure an even-handed presentation and evaluation of evidence are what make the substantial-evidence standard of review non-trivial. Where the substantial-evidence standard requires more than a mere scintilla of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (ER 7, citing *Edison Co. v. Labor Board*, 305 U.S. 197, 229 (1938)) and both sides have had a full and fair opportunity to present relevant evidence, a court sitting in review has a complete record from which to determine what a reasonable mind might accept.

In this case, Attorney General Mukasey: (i) conducted no adjudication, (ii) unilaterally chose to file a certification, (iii) sought out the evidence to support his certification from government intelligence sources alone, (iv) selected the only evidence that the district court was allowed to consider, and (v) submitted that evidence to the district court *in camera* and *ex parte*. His certification shows that he made no effort to seek out evidence that might be inconsistent with his government intelligence sources, did not seek to confirm the veracity of his sources with former government officials or the carriers and avoided those who occupied an adversarial position to his own. The lack of a complete record constrained the district court to find that substantial evidence supported the Attorney General's certification. The district court had no real choice, and the government and carriers do not suggest that any alternate choice was even conceivable.[16]

The lack of any real choice is not judicial deference to the Executive; it is the subjugation of the Judiciary to the decisions of the Attorney General. In the constitution for the Commonwealth of Massachusetts, John Adams succinctly expressed a principle on which the United States Constitution is

[16] The carriers suggested that the plaintiffs had an opportunity to participate in the creation of a record because they submitted evidence to the district court. In truth, the meaning of "substantial evidence" in section 802 was in dispute, and plaintiffs, out of an abundance of caution, submitted evidence to cover the possibility that the district court might adopt a standard stricter than the traditional "more than a mere scintilla." The district court did adopt that traditional meaning, thereby turning plaintiffs' submission of evidence into a nullity.

also based: "In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men." Mass. Constitution, Part the First, Article XXX (1780). By imposing a substantial-evidence standard on the Attorney General's non-adjudicatory certification, section 802 interfered with the proper exercise of the judicial power of a court sitting in review. The result is governance not by law but by the Executive's decree.[17]

## V. Section 802 Is Unconstitutional Because It Authorizes The Attorney General To Prohibit The Adjudication Of Plaintiffs' Constitutional Claims For Injunctive Relief In Any Federal Or State Forum

In allowing the Attorney General to preclude plaintiffs' constitutional claims against the carriers for injunctive relief for violations of the First and Fourth Amendments, section 802 raises a "serious constitutional question" because it denies "any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988); *accord*, *Bowen v. Michigan*

[17] Attacking a straw man, the carriers erroneously assert that "[b]efore the district court, Plaintiffs relied heavily on *United States v. Klein*, 80 U.S. 128 (1872)." Carriers' Br. at 57 n.36. To the contrary, it was the carriers who relied on *Klein* below; plaintiffs expressly disclaimed any reliance on *Klein*. Dkt. No. 524 at 14-15.

*Academy of Family Physicians*, 476 U.S. 667, 681 n.12 (1986). *See* AOB at 57-62 and *infra* part A.

The carriers argue that that Congress may eliminate injunctive relief from constitutional violations if its intent to do so is "clear." Carriers' Br. at 61. To the contrary, this Court has recognized the serious constitutional question that would arise if Congress attempted to do so. *See infra* at part A.

The carriers (at 59-62) and the government (at 53-54) also argue that the "serious constitutional question" is not squarely presented because Congress may eliminate remedies against the carriers as long as claims against the government remain available. However, the carriers' authorities all address the question of suing either government officials or the government itself and do not support Congress' grant of authority to the Attorney General to eliminate all injunctive relief against a private defendant who is violating the Constitution. The tax refund cases are money damages cases that afford identical relief whether the government or its officer is subject to suit, (*infra* part B (1)); the Tax Injunction Act and Anti-Injunction Act cases address when and in what forum a plaintiff may seek relief, but do not limit the available remedies (*infra* part B (2)); and the *Bivens* cases address only damages claims against either the government or its officials, and do not address the injunctive relief sought here, which is required when damages are inadequate (*infra* part B (3)). Likewise, the official immunities relied on by the amici (at 12-14) allow suits for injunctive relief, with the exception of legislative immunity which implicates the separation of powers.

*See infra* part B (4). Unlike section 802, none of the cases on which defendants rely allows for the elimination of all relief for constitutional claims. In any event, a suit against the government, defendants' recommended alternative, would not provide an effective remedy against the carriers. *See infra* part C.

**A. Section 802 Presents A "Serious Constitutional Question"**

Section 802 presents a "serious constitutional question" by allowing the Attorney General to prevent plaintiffs from suing the carriers for constitutional violations in any court. " '[A]ll agree that Congress cannot bar all remedies for enforcing federal constitutional rights.' " *Bowen*, 476 U.S. at 681 n.12 (quoting Gunther, *Congressional Power to Curtail Federal Court Jurisdiction: An Opinionated Guide to the Ongoing Debate*, 36 Stan.L.Rev. 895, 921 n.113 (1984)). Otherwise, the courts would cede their "province and duty . . . to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *accord*, *Bartlett v. Bowen*, 816 F.2d 695, 703 (D.C. Cir. 1987) ("a statutory provision precluding *all* judicial review of constitutional issues removes from the courts an essential judicial function" (emphasis original)). The same is true where Congress purports to give this same power to bar federal constitutional claims to the Executive.

Further, due process requires a judicial forum for review of plaintiffs' constitutional claims. *Bartlett*, 816 F.2d at 704 (due process is violated "when Congress denies *any* forum-federal, state or agency-for the resolution of a federal constitutional claim" (emphasis original)).

In *Webster v. Doe*, 486 U.S. 592, the plaintiff brought a constitutional claim for declaratory and injunctive relief challenging his firing by the CIA because of his sexual orientation. The government argued that the National Security Act precluded any judicial review of the plaintiff's constitutional claim. *Id.* at 597. It asserted that a suit would lead to " 'rummaging around' in the CIA's affairs to the detriment of national security[,]" and that "Congress in the interest of national security may deny the courts the authority to decide the claim and to order respondent's reinstatement." *Id.* at 603-04. The Supreme Court rejected the national security arguments, finding that the district court had sufficient control through discovery and its equitable powers "to balance respondent's need for access to proof which would support a colorable constitutional claim against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission." *Id.* at 604. The Court found that Congress did not intend to deny any judicial forum for the constitutional claim and recognized that, had Congress done so, the statute would raise a "serious constitutional question." *Id.* at 603 (citing *Bowen*, 476 U.S. at 681 n.12).

The carriers claim that *American Federation of Government Employees v. Stone*, 502 F.3d 1027, 1038 (9th Cir. 2007), contradicts this line of cases and that Congress may restrict the availability of injunctive relief for constitutional violations, if its intent is "clear." Carriers' Br. at 61. To the contrary, *Stone* supports plaintiffs' position. In *Stone*, a federal employee sought injunctive relief from a constitutional violation inflicted

during his employment. Although the government initially argued that the plaintiff was limited to a more restrictive administrative process, the government ultimately "concede[d] that total preclusion of [an employee's] equitable constitutional claims could not be sustained." *Stone*, 502 F.3d at 1034. Applying *Webster*, this Court concluded that Congress had not "clearly" attempted to remove jurisdiction over the constitutional claim, but recognized the "serious constitutional question" that a statute that removed jurisdiction over a constitutional claim would raise. *Stone*, 502 F.3d at 1035.

Here, the "serious constitutional question" is presented, because Congress has granted the Attorney General the power, at his discretion, to preclude plaintiffs from bringing constitutional claims against the carriers in any court. And, as in *Webster*, the national security interests purportedly served by section 802 are not sufficient to eliminate plaintiffs' injunctive constitutional claims.

### B. Plaintiffs' Injunctive Remedies Against The Carriers Cannot Be Eliminated Because Claims Against The Government Remain Available

The carriers and the government claim that the Congress may eliminate all remedies against the carriers as long as plaintiffs may sue the government. Carriers' Br. at 58-62; Government Br. at 53-54. The cases they rely on do not support that proposition.

### 1. Tax Refund Cases

The carriers' tax refund cases do not support the proposition that Congress can grant the Attorney General the power to eliminate all injunctive relief against a private defendant who is violating the Constitution. *See* Carriers' Br. at 59 (citing *Anniston Manufacturing. Co. v. Davis*, 301 U.S. 337 (1937); *Burrill v. Locomobile Co.*, 258 U.S. 34 (1922)). The focus of these cases is not Congress' immunization of an entity or person to prevent equitable relief from being imposed to remedy a constitutional violation.

In *Burrill*, the plaintiff sued in federal court, seeking to recover taxes from the state treasurer. *Burrill*, 258 U.S. at 36. State law immunized the state treasurer from suit in state court, but the plaintiff could still bring a refund claim against the state government in state court. *Id.* at 37. The Court found that "the remedy offered is adequate" and the statute did not "impair[] substantive constitutional rights[.]" *Id.* at 38, 39. This self-imposed judicial restraint had nothing do to with congressional power to grant immunity. By suing the state officer in federal court, the plaintiffs were seeking a different forum, not a different form of relief; if they prevailed in either forum, they would receive identical relief—a tax refund—from the same government that employed the immunized official.

In *Anniston*, the plaintiff challenged the constitutionality of a statute imposing a tax. *Anniston*, 301 U.S. at 340. The federal tax collector was immunized, but the plaintiff could seek recovery against the federal

government through an administrative process, with judicial review. *Id*. at 343-45. The court found that "this plan of procedure provides for the judicial determination of every question of law which the claimant is entitled to raise," including "all questions of general and statutory law and all constitutional questions." *Id*. at 345-46.

These cases provide no doctrinal support for section 802, which the district court correctly described as "*sui generis*." ER 10. If the Attorney General files a certification under section 802, plaintiffs lose any federal or state forum for their constitutional injunctive relief claims against the carriers or their officers.[18] Further, these cases address monetary claims, not injunctive ones.[19] *Id.* Moreover, to the extent that the state court in *Burrill*

[18] The government's suggestion that that plaintiffs' claims are moot lacks factual or legal support. *See* Government Br. at 52. As noted above at note 1, there is no Terrorist Surveillance Program and never has been; nor are plaintiffs' claims limited to that fictional program. The government has done nothing to suggest that it has voluntarily ceased the surveillance that plaintiffs allege, nor has it carried its heavy burden to demonstrate that it is absolutely clear that the surveillance plaintiffs allege has no reasonable probability of recurring. *United States v. Brandau,* 578 F.3d 1064, 1068 (9th Cir. 2009).

[19] While plaintiffs did not appeal their constitutional claims for damages, defendants curiously note that *Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001), held that the Constitution does not "confer a right of action for damages against private companies acting under color of federal law." Carriers' Br. at 60 n.38. To whatever extent *Malesko* barred damages against a company performing a governmental function—a role the carriers did not undertake here—it is no barrier to a damages suit against the individual employee defendants of the carriers. *See Pollard v. Geo Group, Inc.*, 2010 WL 2246418, at *4 (9th Cir. 2010); *Schowengerdt v.*
*(footnote continued on following page)*

or the administrative agency in *Anniston* determined the applicable law was unconstitutional, the immunized official would have been bound by the decision. The substitution of a defendant had no impact in the tax refund cases, and thus the Court found the alternate forums in *Burrill* and *Anniston* adequate.

**2. Tax Injunction Act and Anti-Injunction Act Cases**

The carriers next rely on cases under the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, and Anti-Injunction Act, 26 U.S.C. § 7421(a), which address when and where plaintiffs may seek relief, but do not limit the available relief, or eliminate all relief as does a section 802 certification.

The carriers first cite *Franchise Tax Board of California v. Alcan Aluminum Ltd*., 493 U.S. 331, 338 (1990), which addresses the TIA's prohibition on federal injunctions against the assessment, levy, or collection of state taxes "where a plain, speedy and efficient remedy" may be had in state courts. Carriers' Br. at 61; 28 U.S.C. § 1341. But the TIA does not prevent the plaintiff from seeking the same equitable relief on the same federal constitutional claim against the same defendant in state court and rests on considerations of federalism absent here. *Alcan*, 493 U.S. at 339. Indeed, in *Alcan*, if the same federal constitutional claim for declaratory and injunctive relief had not been available in state court, that proceeding "might

---

*(footnote continued from preceding page)*
*General Dynamics Corp.*, 823 F.2d 1328, 1337-38 (9th Cir. 1987). *See also* ER 53 (suing employees as Doe defendants).

well" have been held deficient and the federal court would have entertained the claim. *Id.* at 340-41. In contrast, the Attorney General's certification completely eliminates all claims against the carriers in state or federal courts.

Second, the carriers rely on *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 759 (1974), which addresses the unique concerns of federal tax collection and implicates the federal government's ability to budget, a factor not present here. Carriers' Br. at 61. In *Alexander* and in *Bob Jones University v. Simon*, 416 U.S. 725 (1974), the Supreme Court addressed the tax collection provision of the Anti-Injunction Act, which requires taxpayers in some instances, but not all, to pay taxes and then seek relief, rather than seeking an injunction prior to the collection of a tax. *Alexander*, 416 U.S. at 755; *Bob Jones*, 416 U.S. at 738.

As *Alexander* explains, the statute is no bar to the grant for a pre-enforcement injunction where the government clearly cannot prevail under any circumstances and jurisdiction otherwise exists. *Alexander*, 416 U.S. at 758. Further, the plaintiffs in *Alexander* and *Bob Jones* had a "full opportunity to litigate . . . precisely the same legal issue" against the same defendant in a refund suit and obtain essentially the same relief. *Alexander*, 416, U.S. at 762; *Bob Jones*, 416 U.S. at 746 ("This is not a case in which an aggrieved party has no access at all to judicial review."); *see also South Carolina v. Regan*, 465 U.S. 367, 378 (1984) (finding that the Anti-Injunction Act did not apply where "aggrieved parties [were] not provided

an alternative remedy”). In *Bob Jones*, the Court was explicit that it was not holding that injunctive relief would be limited in a refund suit. *Bob Jones*, 416 U.S. at 748 n.22; *see also Alexander*, 416, U.S. at 762 n.13.

*Alcan* addressed *what forum* and *Alexander* addresses *when* tax payers can seek relief from the government in tax cases, rather than limiting the relief available, or as in the case at hand, denying relief all together.

**3. Other Alternate Remedial Schemes**

Defendants further argue that an alternate remedy, or even a less effective alternate remedy, would satisfy the constitutional concerns and, therefore, any deficiencies in a case against the government, rather than the carriers, are not of constitutional importance. Carriers’ Br. at 62 (citing *Bush v. Lucas*, 462 U.S. 367 (1983); *Schweiker v. Chilicky*, 487 U.S. 412 (1988)). In *Bush*, a federal employee sought damages for a demotion, claiming a violation of the First Amendment. *Bush*, 462 U.S. at 370-72. In *Schweiker*, claimants of social security disability payments sought damages for the termination and later restoration of those benefits. *Schweiker*, 487 U.S. at 416-418. These cases address only damages claims and not claims for injunctive relief. In both cases, there was an administrative remedial scheme, which addressed the plaintiffs’ claims. *Bush*, 462 U.S. at 388-90; *Schweiker*, 487 U.S. at 424-29. Even if Congress could permissibly create an alternate remedial scheme for monetary relief for the constitutional claims in this matter, defendants’ cases do not address any of the concerns that arise from Congress authorizing the Attorney General to eliminate

injunctive remedies against private entities or persons for constitutional violations.

Defendants' reliance on an article by Professor Hart is also unavailing. *See* Carriers' Br. at 62 (citing Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1366 (1953)). Hart argued that "the denial of one remedy while another is left open, or the substitution of one for another" is constitutionally unproblematic. *Id.* His article discussed the substitution of remedies against the government, not private parties. *Id.* at 1366-70. Using tax cases as an example, Hart argued that as long as some remedy was available against the government, the question of whether Congress could deny any remedy was postponed. *Id.* at 1366. Hart believed that a taxpayer had the right to litigate the legality of a tax, but that "[t]he multiplicity of remedies, and the fact that Congress has seldom if ever tried to take them all away, has prevented the issue from ever being squarely presented." A remedy, whether against a government official or the government itself, has the same effect—a restraint on the government's future conduct. Section 802, however, addresses claims against the carriers, their officers, and employees for their own unconstitutional conduct, not claims against the government for its unconstitutional conduct.

**4. Immunities To Damages Liability**

Amici argue that Congress has the power to expand or contract immunities to damages liability under section 1983, and therefore it can

create new immunities to injunctive relief for constitutional claims. Amici Br. at 12-13. This is a non sequitur. The immunities that Congress preserved in section 1983 only limited damages liability remedies and, with the exception of legislative immunity, did not limit the scope of injunctive relief for constitutional torts.[20] *See* Amici Br. at 12.

---

[20] *See Pulliam v. Allen*, 466 U.S. 522 (1984) (finding judges are not immune from injunctive claims); *Supreme Court of Virginia v. Consumers Union of the U.S.*, 446 U.S. 719, 736 (1980) ("Prosecutors . . . are natural targets for § 1983 injunctive suits since they are the state officers who are threatening to enforce and who are enforcing the law."); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) (holding that federal executive officers receive qualified immunity for damages claims and no immunity for injunctive claims); *Wheaton v. Webb-Petett*, 931 F.2d 613, 620 (9th Cir. 1991) (holding that state officers receive qualified immunity for damages claims and no immunity for injunctive claims). Only legislators receive immunity from injunctions. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503 (1975) (Congress); *Consumers Union*, 446 U.S. at 733 (state legislature). This immunity from injunctions is not "sub-constitutional." *Cf.* Amici Br. at 12. Federal legislative immunity has a constitutional basis and has a unique role in ensuring separation of powers, made explicit in the Speech or Debate Clause of the Constitution. *Eastland*, 421 U.S. at 501. Immunity for state legislatures takes its roots from the same common-law history as the federal constitutional immunity. *See Consumers Union*, 446 U.S. at 733 (citing *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951)). In *Tenney*, which assessed whether Congress, in enacting statutes to enforce the Fourteenth Amendment, had abrogated the immunity of state legislators, the Court noted that it would be a "big assumption" to presume that Congress even had that power because the common-law tradition is so strong. *Tenney*, 341 U.S. at 376. This tradition, which isolates the legislature from the scrutiny of other branches of government, has no bearing on the preclusion of constitutional claims against private entities and persons that results from a section 802 certification.

While amici advise (at 13) that these immunities have never been questioned on separation of powers grounds, that is only because Congress has never sought to eliminate injunctive claims against such officials.[21] An injunction serves a completely different function than money damages. By definition, an injunction is required when money damages are inadequate and the plaintiff would suffer irreparable harm. There is no greater a transgression in a government of laws than a continuing violation of the supreme law of the land.

If Congress were to pass a statute immunizing these state actors from injunctive remedies for constitutional violations, in some instances it would present the same serious constitutional question as in *Bowen*, because there would be no forum for a constitutional claim. *Bowen*, 476 U.S. at 681 n.12. For example, federal courts could no longer enjoin the enforcement of unconstitutional state statutes absent suits against state officials. *See Ex parte Young*, 209 U.S. 123, 156, 159 (1908) (allowing suit against a state

[21] Amici argue (at 13-14) that Congress has narrowed immunity from injunctions in the past in its amendments to section 1983 following *Pulliam*. Those amendments require that a federal court may not enjoin a state judge unless "a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983. This statute governs only the timing and not the power of federal courts to enjoin state judges. The full range of the federal courts' injunctive power is left intact; the statute simply instructs federal courts to exercise restraint in its use in the interest of state and federal comity, a practice common in the administration of federal judicial power. In comparison, section 802 flatly prohibits any injunction by state or federal courts in constitutional litigation.

official, where none could be brought against the state because of sovereign immunity). Thus, amici's reliance upon Congress' power to restrict common-law damages immunities in section 1983 for constitutional violations provides no support for the legitimacy of the blanket grant of injunctive immunity they seek to justify here.

### C. Plaintiffs Seek An Injunction Directly Against The Carriers; A Suit Against The Government Is Not An Adequate Alternative

The carriers claim that an injunction against the government would provide an effective remedy against a private telecommunications company. Carriers' Br. at 62.[22] An injunction against the carriers provides qualitatively different relief from a suit against the government. Because of the telecommunications companies' decades-long history of unlawful compliance with the Executive's requests for access to their customers' communications in violation of the Constitution, it is necessary to obtain injunctive relief directly against the carriers. AOB at 58-59.

Telecommunications companies repeatedly have disregarded the Constitution (and the exclusivity provisions of the surveillance statutes, *see*

[22] The carriers challenge the plaintiffs' right to frame their own case—to determine which parties to sue in order to obtain effective relief. Some plaintiffs have brought cases in this multi-district action in which they chose not to sue the government. *See* Complaints in *Bissitt v. Verizon Communications*, No. 09-16682; *Souder v. AT&T*, No. 09-16697; *Terkel v. AT&T*, No. 09-16713; *Waxman v. AT&T*, No. 09-16717; *Campbell v. AT&T*, No. 09-16684; *Riordan v.Verizon*, No. 09-16685 (all alleging constitutional claims against only the carriers and seeking equitable relief).

18 U.S.C. § 2511(2)(f)) designed to protect the communications of their customers from disclosure and instead have succumbed to unlawful executive branch demands. It is critical to the privacy rights of tens of millions of people that the constitutional propriety of the conduct of the carriers be adjudicated and, if unlawful, definitively enjoined. The alternative is to leave to the telecommunications industry alone the resolution of the legitimacy of secret and unspecified assertions of constitutional power made by the Executive. Plaintiffs' only meaningful remedy to stem off these grave threats to their privacy is injunctive relief that run directly against the carriers. Only under such restraint will the carriers be directly prevented from venturing into the uncharted waters of unlawful executive branch entreaties and will the executive branch be forced to obey the law when it seeks the communications of the carriers' customers.

## CONCLUSION

The judgments should be reversed and the actions remanded for further proceedings.

Dated: July 1, 2010 Respectfully submitted,

s/ *Richard R. Wiebe*
RICHARD R. WIEBE
LAW OFFICE OF RICHARD R. WIEBE
One California Street
Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

s/ *Cindy A. Cohn*
CINDY A. COHN
LEE TIEN
KURT OPSAHL
KEVIN S. BANKSTON
CORYNNE MCSHERRY
JAMES S. TYRE
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

s/ *Thomas E. Moore III*
THOMAS E. MOORE III
THE MOORE LAW GROUP
228 Hamilton Ave., 3d Fl.
Palo Alto, CA 94301
Telephone: (650) 798-5352
Facsimile: (650) 798-5001

s/ *Aram Antaramian*
ARAM ANTARAMIAN
LAW OFFICE OF ARAM ANTARAMIAN
1714 Blake Street
Berkeley, CA 94703
Telephone: (510) 841-2369

COUNSEL FOR PLAINTIFFS IN
No. 09-16676, *HEPTING, ET AL. v. AT&T CORP., ET AL.*

s/ *Harvey Grossman*
HARVEY GROSSMAN
ADAM SCHWARTZ
KAREN SHELEY
ROGER BALDWIN FOUNDATION OF ACLU

180 North Michigan Avenue
Suite 2300
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 201-9760

COUNSEL FOR PLAINTIFFS IN No. 09-16713, *TERKEL, ET AL. v. AT&T INC, AT&T CORP, AND ILLINOIS BELL TELEPHONE CO.*

s/ *Peter J. Eliasberg*
PETER J. ELIASBERG
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth St.
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

s/ *Julia Harumi Mass*
JULIA HARUMI MASS
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

DAVID BLAIR-LOY
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF
SAN DIEGO/IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138
Telephone: (619) 232-2121
Facsimile: (619) 232-0036

COUNSEL FOR PLAINTIFFS IN
No. 09-16684, *CAMPBELL v. AT&T* AND
No. 09-16685, *RIORDAN v. VERIZON COMMUNICATIONS INC.*

s/ *Gary E. Mason*
MASON LLP
GARY E. MASON
NICHOLAS A. MIGLIACCIO
1625 Massachusetts Ave, NW
Suite 605
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

COUNSEL FOR PLAINTIFFS IN
No. 09-16677, *BASINSKI v. VERIZON COMMUNICATIONS, INC.* AND
No. 09-16679, *SUCHANEK v. SPRINT NEXTEL CORP.*

s/ *Michael A. St. Pierre*
REVENS REVENS & ST. PIERRE
MICHAEL A. ST. PIERRE
946 Centerville Road
Warwick, RI 02886
Telephone: (401) 822-2900
Facsimile: (401) 826-3246

COUNSEL FOR PLAINTIFFS IN
No. 09-16682, *BISSITT v. VERIZON COMMUNICATIONS, INC.*

s/ *Vincent I. Parrett*
MOTLEY RICE LLC
JODI WESTBROOK FLOWERS
VINCENT I. PARRETT

28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

COUNSEL FOR PLAINTIFFS IN
No. 09-16686, *CHULSKY v. CELLCO PARTNERSHIP*;
No. 09-16687, *CROCKETT v. HAWAIIAN TELCOM*;
No. 09-16688, *CROSS v. AT&T COMMUNICATIONS*;
No. 09-16690, *DUBOIS v. AT&T CORP*.; AND
No. 09-16691, *CROSS v. AT&T COMMUNICATIONS OF CALIFORNIA*

s/ *Marc R. Stanley*

STANLEY IOLA LLP
Marc R. Stanley
3100 Monticello Ave.
Suite 750
Dallas, TX 75205
Telephone: (214) 443-4300

COUNSEL FOR PLAINTIFFS IN
No. 09-16692, *PAT MAHONEY v. VERIZON*;
No. 09-16693, *PAM MAHONEY v. AT&T*;
No. 09-16694, *SOLOMON v. VERIZON*;
No. 09-16696, *FULLER v. VERIZON*;
No. 09-16697, *SOUDER v. AT&T*;
No. 09-16698, *DOLBERG V. AT&T CORP*

s/ *Michael D. Donovan*

MICHAEL D. DONOVAN
DONOVAN SEARLES, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: 215-732-6067

Facsimile: 215-732-8060

COUNSEL FOR PLAINTIFFS IN
No. 09-16694, *SOLOMON v. VERIZON*

BROAD & CASSEL
M. STEPHEN TURNER
215 South Monroe Street
Suite 400
P.O. Box 11300
Tallahassee, FL 32302
Telephone: (850) 681-6810
Facsimile: (850) 681-9792

COUNSEL FOR PLAINTIFFS IN
No. 09-16700, *FORTNASH V. AT&T CORP*.

s/ *Gerald E. Meunier*
GERALD E. MEUNIER
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
Telephone: (504) 522-2304
Facsimile: (504) 528-9973

COUNSEL FOR PLAINTIFFS IN
No. 09-16701, *HARDY v. AT&T CORP*.

s/ *R. James George*
GEORGE & BROTHERS, LLP
R. JAMES GEORGE
D. DOUGLAS BROTHERS
1100 Norwood Tower
114 West 7th Street
Austin, TX 78701
Telephone: (512) 495-1400
Facsimile (512) 499-0094

COUNSEL FOR PLAINTIFFS IN

No. 09-16702, *HARRINGTON*, *ET AL. V. AT&T INC., ET AL.*

s/ *Val Patrick Exnicios*
LISKA, EXNICIOS & NUNGESSER
ATTORNEYS-AT-LAW
VAL PATRICK EXNICIOS
One Canal Place, Suite 2290
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 410-9611
Facsimile: (504) 410-9937

COUNSEL FOR PLAINTIFFS IN No. 09-16704, *HERRON v. VERIZON GLOBAL NETWORKS, INC.*

s/ *Christopher A. Slater*
SLATER ROSS
CHRISTOPHER A. SLATER
MICHAEL J. ROSS
1850 Benjamin Franklin Plaza
1 S.W. Columbia Street
Portland, OR 97258
Telephone: (503) 227-2024
Facsimile: (503) 224-7299

COUNSEL FOR PLAINTIFFS IN No. 09-16706, *HINES V. VERIZON COMMUNICATIONS, INC.*

s/ *Brian H. Adler*
BADER STILLMAN & ADLER PL
BRIAN H. ADLER
6100 West Atlantic Blvd.
Margate, FL 33063
Telephone: (954) 971-3399
Facsimile: (954) 979-3101

COUNSEL FOR PLAINTIFFS IN
No. 09-16707, *JACOBS v. AT&T CORP.*

s/ *Sam J. Alton*
STONE, LEYTON & GERSHMAN, P.C.
JOSEPH R. DULLE
SAM J. ALTON
7733 Forsyth Blvd., Suite 500
St. Louis, MO 63105-1817
Telephone: (314) 721-7011
Facsimile: (314) 721-8660

COUNSEL FOR PLAINTIFFS IN
No. 09-16708, *MINK v. AT&T COMMUNICATIONS OF THE SOUTHWEST, INC.*

s/ *Richard P. Roche*
RICHARD P. ROCHE
4130 Zenith Avenue S.
Minneapolis, MN 55410
Telephone: (612) 929-6866

PRO SE
No. 09-16709, *ROCHE, ET AL. v. AT&T*

s/ *Barry R. Himmelstein*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
BARRY R. HIMMELSTEIN
ELIZABETH J. CABRASER
ERIC B. FASTIFF
ALLISON S. ELGART
275 Battery Street
29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

COUNSEL FOR PLAINTIFFS IN
No. 09-16710, *ROE, ET AL. v. AT&T CORP., AT&T INC., SBC LONG DISTANCE, LLC, PAC BELL TELEPHONE CO., AT&T COMMUNICATIONS OF CALIFORNIA* AND
No. 09-16712, *SPIELFOGEL-LANDIS, ET AL. v. MCI, LLC*

s/ *Clinton A. Krislov*
KRISLOV & ASSOCIATES, LTD.
CLINTON A. KRISLOV
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
Telephone: (312) 606-0500
Facsimile: (312) 606-0207

COUNSEL FOR PLAINTIFFS IN
No. 09-16717, *WAXMAN v. AT&T CORP.*

s/ *James M. Evangelista*
JAMES M. EVANGELISTA
EVANGELISTA & ASSOCIATES, LLC
One Glenlake Parkway, Suite 700
Atlanta, GA 30328
Telephone: (404) 478-7195
Facsimile: (404) 478-7139

COUNSEL FOR PLAINTIFFS IN
No. 09-16719, *LEBOW v. BELLSOUTH*

s/ *Carl J. Mayer*
MAYER LAW GROUP LLC
CARL J. MAYER
66 Witherspoon Street, Suite 414
Princeton, New Jersey 08542
Telephone: (609) 921-8025

Facsimile: (609) 921-6964

BRUCE I. AFRAN, ESQ.
10 Braeburn Drive
Princeton, NJ 08540
Telephone: (609) 924-2075
Facsimile: (609) 924-1045

COUNSEL FOR PLAINTIFFS IN
No. 09-16720, *ANDERSON v. VERIZON COMMUNICATIONS, INC.*

s/ *Steven E. Schwarz*

THE LAW OFFICES OF STEVEN E. SCHWARZ, ESQ.
STEVEN E. SCHWARZ
2461 W. Foster Ave., #1W
Chicago, IL 60625
Telephone: (773) 837-6134
Facsimile: (773) 275-0202

COUNSEL FOR PLAINTIFFS IN
No. 09-16723, *JOLL V. AT&T CORP*.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This joint brief contains 17,893 words, excluding the parts of the brief exempted by Fed. R. App. Pro. 32(a)(7)(B)(iii). Plaintiffs have concurrently filed a motion to exceed the type-volume limitations of Fed. R. App. Pro. 32(a)(7)(B) and Ninth Circuit Rule 32-1.

This joint brief complies with the typeface requirements of Fed. R. App. Pro. 32(a)(5) and the type style requirements of Fed. R. App. Pro. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

s/ *Richard R. Wiebe*

Richard R. Wiebe
Counsel for Plaintiffs-
Appellants Tash Hepting, et al.
in
No. 09-16676, *HEPTING, ET AL. v. AT&T CORP., ET AL.*

# APPENDIX A

Appendix A

Statutes Permitting The Executive To Waive A Condition Imposed By Congress On How The Executive Conducts A Particular Activity

| **Executive Activity** | **Condition Imposed On The Activity That The Executive May Waive** | **Citation** |
|---|---|---|
| Making grants to public transportation agencies. | The condition that certain appropriated funds must be used only for certain categories of grants. | 6 U.S.C. § 1135(m)(3) |
| Preparing reports to Congress on Defense Department special access programs. | The condition that reports by the Executive to Congress on special access programs must address certain subjects. | 10 U.S.C. § 119(e)(1) |
| Operating regional security studies centers. | The condition that the Executive must charge fees to foreign government officials it allows to attend regional security studies centers. | 10 U.S.C. § 184(f)(3) |
| Conducting commercial activities in connection with intelligence activities. | The condition that commercial activities conducted by the Executive in connection with intelligence activities must comply with other applicable laws and regulations. | 10 U.S.C. § 433(b) |
| Appointing military officers. | The condition that the Executive must appoint only citizens as military officers. | 10 U.S.C. § 532(f) |
| Funding defense industrial facilities with working capital. | The condition that the Defense Department must not authorize industrial facilities it has funded with working capital to sell articles to persons outside the Department. | 10 U.S.C. § 2208(j)(2) |
| Defense Department contracting. | The condition that the Executive must not contract with certain foreign entities that boycott Israel. | 10 U.S.C. § 2410i(c) |

| | | |
|---|---|---|
| Hiring contractors. | The condition that Coast Guard contractors must hire locally in high-unemployment states. | 14 U.S.C. § 666(a) |
| Identifying and sanctioning foreign narcotics traffickers. | The condition that the Executive must impose sanctions on those it determines to be foreign narcotics traffickers. | 21 U.S.C. § 1903(g)(1) |
| Providing foreign aid to independent states of the former Soviet Union. | The condition that the Executive must withhold certain foreign aid from independent states of the former Soviet Union if those states provide assistance to intelligence facilities in Cuba. | 22 U.S.C. § 2295a(d)(2)(A) |
| Lending military articles to other countries. | The condition that the Executive must submit a report to Congress before entering into an agreement lending or leasing military articles to another country. | 22 U.S.C. § 2796a(b) |
| Controlling travel of foreign nationals within the United States. | The condition that the Executive must restrict the travel within the United States of certain foreign nationals. | 22 U.S.C. § 4316(c) |
| Protecting confidential business information. | The condition that the Executive must impose certain sanctions on foreign countries assisting in the disclosure of certain confidential business information. | 22 U.S.C. § 6713(e)(5) |
| Promoting exports to foreign countries. | The condition that the Executive must not provide export credits or other assistance to commercial exports to certain foreign countries. | 22 U.S.C. § 7207(a)(3) |
| Providing foreign aid to Pakistan. | The condition that the Executive must make cash payments to the Government of Pakistan only to civilian authorities of a civilian government. | 22 U.S.C. § 8425(b) |

| | | |
|---|---|---|
| Providing foreign aid. | The condition that the Executive must suspend foreign aid to high-terrorist-threat countries that have insecure airports. | 49 U.S.C. § 44908(b) |
| Coordinating counterintelligence efforts among different government agencies. | The condition that the Federal Bureau of Investigation and other executive branch departments and agencies must inform and consult with each other in certain circumstances. | 50 U.S.C. § 402a(e)(5) |
| Building an international border security fence. | The condition that in building an international border security fence the Executive must comply with other applicable laws and regulations. | Section 102 of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 306 |